UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

. . . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,      .  Case No. 1:18-cr-043
                               .
         Plaintiff,            .  *In-Person Status Conference*
                               .
       - v -                   .
                               .  Wednesday, December 19, 2018
YANJUN XU,                     .  12:03 PM
                               .
         Defendant.            .  Cincinnati, Ohio
. . . . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE


For the Plaintiff:      TIMOTHY S. MANGAN, ESQ.
                        EMILY N. GLATFELTER, ESQ.
                        Assistant U.S. Attorneys
                        United States Attorney's Office
                        221 East Fourth Street, Suite 400
                        Cincinnati, Ohio  45202

For the Defendant:

RALPH W. KOHNEN, ESQ.          ROBERT K. McBRIDE, ESQ.
JEANNE M. CORS, ESQ.           Taft, Stettinius & Hollister
Taft Stettinius & Hollister      LLP
  LLP                          1717 Dixie Highway
425 Walnut Street, Suite 1800  Suite 910
Cincinnati, Ohio  45202-3957   Covington, Kentucky  41011

Law Clerk:              Cristina V. Frankian, Esq.

Courtroom Deputy:       Scott M. Lang

Court Reporter:         Luke T. Lavin, RDR, CRR
                        Potter Stewart U.S. Courthouse
                        100 East Fifth Street, Room 103
                        Cincinnati, Ohio  45202
                        Telephone:  (513) 564-7500


*Proceedings recorded by stenotype; transcript*
*prepared by computer-aided transcription.*

1          P R O C E E D I N G S

2      (In open court at 12:03 PM.)

3          THE COURT:  Please be seated.

4      Good afternoon.  We're here in the open courtroom on the

5  record on the criminal docket in the matter of *United States of*

6  *America versus Mr. Xu*.  We are here for a status report.

7      Would the attorneys begin by entering their appearances.

8  Who appear as the attorneys for the United States of America?

9          MR. MANGAN:  Your Honor, Tim Mangan and Emily

10  Glatfelter on behalf of the United States.

11          THE COURT:  Good afternoon to both of you.

12      And on behalf of the defendant?

13          MR. KOHNEN:  Your Honor, good afternoon.  Ralph Kohnen

14  on behalf of Mr. Xu.  My colleagues Jeanne Cors and Bob McBride

15  are with me as well.

16          MR. McBRIDE:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon to the three of you.

18      We have a quorum.  We are here for a status report.  The

19  Court issued the agreed protective order that you all worked

20  out with significant work in mid-November.  The Court really

21  has nothing to report from its perspective and is eager to hear

22  status from each of your perspectives.

23      So on behalf of the government, where are we on status?  Is

24  there anything the Court can assist with at this point?

25          MR. MANGAN:  Sure, Your Honor.  Just as far as an

 1  update, we've given the defense what I'd call our first wave or

 2  first tier of discovery related to the core allegations in the

 3  Indictment.  That's been provided to them.

 4      We are working on sort of a secondary collection that we

 5  hope to have produced and ready to go sometime in January after

 6  we get through the holidays, but we're working on getting that

 7  together.  That includes some forensics that are ongoing and

 8  some translations that are ongoing.  But we do hope to have the

 9  second wave, which we think would be the bulk of everything

10  between these first two waves, and have that completed sometime

11  in January.

12      The other piece of this that's going on simultaneously is

13  us working on preparing a CIPA filing where we would summarize

14  for the Court what there is in terms of classified information

15  and how the government would propose the Court to treat it

16  under the CIPA act.

17      We are still working on that.  That's going to still take a

18  little bit of time.  I think, given -- and part of that is just

19  the complexities in terms of making sure that we have

20  everything and having it summarized accurately and providing it

21  in the right format for the Court.  So we would ask -- or we

22  would expect to be able to file that motion sometime in March,

23  is what we would anticipate if that's agreeable to the Court.

24  I realize, as part of that, the Court assesses the information

25  in light of what is anticipated to be the defense's -- the

1  defendant's defenses, I should say, and so, at least in the

2  normal course, they would *ex parte* submit to the Court what

3  they anticipate their defenses would be so that the Court can

4  evaluate whether or not the information is or is not helpful to

5  the defense.  I don't know when the defense would be ready to

6  present that part to the Court.  But as far as our filing, we

7  would anticipate sometime in March, if that works.

8          THE COURT:  Very well.

9      What's the status from the defendant's perspective?

10         MR. KOHNEN:  Your Honor, with your permission, I may

11 ask Ms. Cors and Mr. McBride to help me here this afternoon,

12 but I'll start.

13     I think the best thing to do is to start with letting the

14 Court know that we're anxiously awaiting the discovery.  We

15 expect that there may be some translation issues, some

16 interpretation issues.  The most prominent one that I think the

17 Court should just be advised of is that it appears the

18 government is going to turn over to us untranslated material,

19 material that they -- from what we know so far, they are going

20 to decide what is Rule 16 material which has to be turned over

21 because it's going to be intended for use at trial, but not

22 translate other material.

23     I expect that we're going to have a little bit of a

24 disagreement that we may have to approach the Court about.  Our

25 concern is that there will be *Brady*, *Jencks* and *Giglio* material

1    amongst the untranslated information.

2        Of course, it's the government's burden to turn over such

3    information that's in their possession.  They obviously will

4    have translated this material to some extent to decide whether

5    it qualifies as Rule 16 discovery, and so we're going to be

6    asking them, and I think probably asking the Court to direct

7    them, to translate everything that they turn over into English.

8        We're also anxiously awaiting discovery, because our client

9    is anxiously awaiting his trial.  We have not done the

10   research, although we are beginning it, to determine whether or

11   not a CIPA case automatically makes one a complicated case or

12   if there are other factors in this case that would create sort

13   of a *de facto* Rule 3161(h) complicated case situation, but --

14   and as I'm sure the Court will understand, our client is

15   interested in getting this under way as quickly as possible.

16       His interest comes in part from the conditions under which

17   he's being held.  He is being held in solitary confinement in a

18   federal correctional institution.  He's in his room 23 hours --

19   I should say his cell -- 23 hours a day.  His attorneys have to

20   travel five hours each way to meet with him.  We're only able

21   to meet with him on certain days of the week, one of which is a

22   Monday, which makes Sunday evening very interesting.  And his

23   communication with his family and the outside world is sparse

24   at best, limited to two 15-minute calls per week when the mood

25   strikes his jailers.

1     That's just a high-level summary of the difficulties he's

2     encountering there, Your Honor.  We understand that, in the

3     first instance at least, it is up to the U.S. Marshals Service,

4     which is part of the Department of Justice, to determine where

5     a prisoner that's been ordered detained is housed.  We don't

6     have any objection with Magistrate Judge Bowman's conclusion

7     about detention, but we have some serious problems with his

8     conditions.

9     So I think the wise way to put it is, we're also giving the

10    Court advance notice that we're likely -- "we," defense

11    counsel -- are likely to start encountering Sixth Amendment

12    problems.  We're already encountering them, but insurmountable

13    Sixth Amendment problems could arise if we don't get,

14    collectively, this situation straightened out.

15    If you'll give me a moment to check with my co-counsel.

16              THE COURT:  Yes.

17              MR. KOHNEN:  Anything else?

18    (Mr. Kohnen, Ms. Cors and Mr. McBride confer privately.)

19              MR. KOHNEN:  We've been working cooperatively with the

20    United States, Your Honor.  They've been hospitable.  We'd like

21    to get the train rolling as quickly as possible to get this

22    case under way.

23              THE COURT:  What's the government make of all that?

24              MR. MANGAN:  If I could kind of break it into two,

25    Your Honor.

1          THE COURT:  Yes.

2          MR. MANGAN:  First, regarding the discovery part and

3    the translation -- and maybe the best way to do is to give you

4    an example.  I think part of what Mr. Kohnen's talking about

5    is, for example, the government gathered a cloud account that

6    the defendant had, and so that's used as like a backup for his

7    various devices.  It would include messages and other data that

8    was stored on this cloud account.

9          It's large.  It's voluminous.  In order for the government

10   to analyze it, the government has not been going through and

11   translating every line.  They've been doing essentially keyword

12   searches for things that, at least in our estimation, we would

13   deem relevant.  And then what the process is, is when they see

14   something that hits, they go through kind of a rough

15   translation to triage it and determine is this, you know, what

16   we were looking for or not?  If something we deem is relevant,

17   then it goes to sort of a final translation process to where

18   there's actually certified translators who sign off on it and

19   say this is a correct translation.

20         In order for us to do that, it would be impractical for us

21   to try to translate the entire cloud account under that final

22   format.  So what we were proposing to do, first of all, was, to

23   satisfy our discovery obligations, was, one, give them an image

24   of the entire account so that they have what we have, which

25   would -- obviously, the original, you know, is not translated.

1    You know, it's in its original format.  We would give them that

2    image so that they have everything and they can analyze it and

3    they can use whatever keyword searches they want to do and

4    they're not beholden to the government's mode of analysis.

5        At the same time what we said is, look, what we plan to

6    use, anything that we find that we plan to use, we will give

7    you translations of, you know, here's what we found, here's

8    what we plan to use.  If we didn't give you a translation, you

9    know, we will say we're not going to use it, so that they at

10   least know the universe with which we plan to use and prosecute

11   our case.

12       So that's what we're doing.  It is sort of on a dual track

13   where we would give them the original, untranslated, of the

14   entire account, and then we were going to give them

15   translations of what the government would intend to use.

16       I understand they may want to analyze it further, and

17   that's certainly their right.  We'd encourage them to do so.

18   But I don't know that it would make sense for either side to

19   try to go through and get a final translation of every single

20   thing that's in there.

21       You know, you're talking about -- you know, you could have

22   spam e-mails, you could have just things that are completely

23   irrelevant to the case.  And so I think when you're dealing

24   with voluminous electronic discovery like this, a keyword

25   approach, limited triage and translation is the best way to go

1    forward, and that's what we're proposing to do, but at the same

2    time give them access to everything that they would need to do

3    a deeper dive if they so choose.

4        With respect to the defendant's --

5            THE COURT:  Can I ask a question about that?

6            MR. MANGAN:  Sure.

7            THE COURT:  And I hear your practicality argument, but

8    how does the government discharge its duty to disclose *Jencks*

9    and *Giglio* and *Brady* stuff if you don't know what is said?

10           MR. MANGAN:  Well, first of all, in terms of our

11   obligation to turn it over, it will have been turned over --

12           THE COURT:  Okay.

13           MR. MANGAN:  -- because the original, the full account

14   is turned over.  It's simply in Chinese as opposed to in

15   English.  So from the standpoint of satisfying that obligation,

16   we believe giving them the full account addresses that.

17       The issue is what is translated so that, you know, each

18   side can make meaningful use of it.  I think whether you're

19   talking about a foreign language issue or even just in cases

20   where you have large reams of, let's say, e-mail, just evidence

21   and you're trying to get through it, I think courts have at

22   times endorsed keyword search approaches, where necessary, to

23   try to find what you think is going to be the most relevant

24   information within, you know, a vast network of electronic

25   information.

1    So that's how we would propose it, Your Honor, is between

2   giving them the full universe of data untranslated, plus giving

3   them what we found, what we have found through a keyword

4   search, would satisfy our obligations.

5        THE COURT:  I thought I would ask the question just to

6   make the point, and I appreciate your answer.

7        MR. MANGAN:  Okay.

8        THE COURT:  And I interrupted you on your next thing.

9        MR. MANGAN:  Sure.

10   Turning to the defendant's confinement right now in

11  Michigan, we understand their concerns.  I think there has been

12  a progression along this line where, as they've had issues,

13  they've tried to raise them with the BOP.  I think a number of

14  these issues are getting better over time in terms of

15  communication and, you know, providing whatever comforts the

16  defendant is trying to get so that he, you know, is able to

17  sort of function properly.

18   He is able to write back and forth to his family and has

19  done so at length.  I know they're working through some visa

20  issues, but his family is entitled, when they come here, to

21  visit him.  I'm not sure of the details of the phone calls, but

22  I know he has been able to call on the phone.

23   With respect to, I guess, the most significant portion of

24  it, which is the ability for defense counsel to work with him,

25  you know, we don't fully control where he is being housed.  For

1    security reasons, they've found what they deemed to be the most

2    appropriate place for him.  It happens to be in Michigan.  The

3    last one we had was in Terre Haute, which isn't much better in

4    terms of the travel time.  I know when they went up there

5    before, they were allowed to visit with him for several hours.

6        My understanding is that they have set aside a couple of

7    days in the week where they would make the defendant available

8    for these types of meetings, and those are days when no other

9    inmate is getting visits.  So let's say all the other inmates

10   are having visits on Thursday and Friday.  They're setting

11   aside other days, I don't know if it's Monday and Tuesday or

12   which days it is --

13            MS. CORS:  Uh-huh.

14            MR. MANGAN:  Is it Monday and Tuesday?

15            MS. CORS:  (Nods head up and down.)

16            MR. MANGAN:  -- so that Mr. Xu can meet with whoever

17   is coming to meet Mr. Xu, which would include defense counsel.

18       I realize that there's travel issues involved, but that

19   seems to be a pretty significant accommodation to enable him to

20   meet with his counsel as needed to go through the discovery.

21   It sounds like they've had at least, you know, multiple visits

22   up there.  I don't know how many.  But, you know, I think

23   that's the best, you know, that can be done.  He does have

24   access to his counsel.  They can write to him; they can visit

25   him.  There's just some coordination that needs to be done.

1  And we're happy to try to help act as a liaison or facilitate

2  it, but I think it's just something that we're all going to

3  have to try to work through issue by issue.

4  THE COURT:  And who's in charge of his security

5  conditions and responsible for that?  Clearly, the U.S.

6  Attorney is not; correct?

7  MR. MANGAN:  Yes.  I mean, I think it's sort of a --

8  in this case, you know, in the first instance there's the

9  marshals' office, who determines where a person is housed.

10  Normally they'll do that through their own contractors.  In

11  this case they're working with the BOP.  And since it is now --

12  he is now housed with the BOP, there is a BOP contact at FCI

13  Milan, you know, who I think has been in contact with them and

14  they've been able to talk directly with him about their

15  concerns at the BOP facility.

16  So now that he's at BOP, I think everybody tends to talk

17  directly with that contact in Milan and the marshals are not

18  directly involved, sort of, on a day-to-day basis.  But it

19  would be those two agencies.  I agree with you it's not our

20  office.

21  THE COURT:  Well, the Court itself reached out to the

22  BOP and tried to be responsive to some of the defendant's

23  concerns.  We may have gotten him a sweater and a shirt and

24  some books in his native language.

25  The Court's aware of the challenges that present.  I'm not

1    clear on what the Court's role is, and I'm not clear why he's

2    being held in solitary.  Do you know?

3        MR. MANGAN:  I don't know, sort of, exactly what the

4    rationale was or, sort of, what limitation they have in terms

5    of access.  I don't know that.

6        THE COURT:  Very well.  So you've responded to --

7        MR. MANGAN:  I think -- actually, let me back up to

8    maybe give you a little more of an answer.

9        THE COURT:  Okay.

10       MR. MANGAN:  He's within, I think, what's called the

11   special housing unit.  I don't know how many others are in

12   there right now.  I think there was a time when there were a

13   couple others who were there.  And he is able to talk to other

14   inmates that are within that unit.

15       I don't know, sort of, who's there right now and how much

16   contact he has, but he has had interaction with other inmates,

17   so it's not -- I don't think it's -- solitary sort of conveys

18   exactly, sort of, the situation he's in.

19       But part of the rationale, Your Honor, goes back to issues

20   concerning when he was being detained in Belgium, there were

21   some concerns regarding his behavior there in terms of, one,

22   getting a --

23       THE COURT:  Well, I guess, you know, I'm trying not to

24   get involved in the nitty-gritty --

25       MR. MANGAN:  Okay.

1     THE COURT:  -- unless it's my role.  I was just asking

2  out of curiosity why is he in solitary, and --

3     MR. MANGAN:  I think it's just sort of at least be

4  able to -- in the special housing unit, they have better

5  control over who has access to the defendant and who the

6  defendant has access to.  I think that's both in order for them

7  to assure that he's not doing anything wrong but also to

8  protect him as well and make sure no one's doing anything

9  towards the defendant, and so I think that was part of the

10  concern.

11     THE COURT:  Very well.  Well, you've had a chance to

12  respond to the defendant's concerns about discovery and

13  awaiting trial, and you've spoken to his conditions as well.

14    Do you insist upon a rely or surreply, Mr. Kohnen?

15     MR. KOHNEN:  Respectfully, I will, Your Honor, with

16  the Court's permission.

17     THE COURT:  No lawyer I've asked has said no.  Go

18  ahead.

19     MR. KOHNEN:  Judge, working backwards, moving forward,

20  again, this is not something that we intend to bring to the

21  Court's attention that we -- for some solution that the Court

22  can give us now, but it is something we want to give the Court

23  a heads-up about.

24     THE COURT:  I appreciate that.

25     MR. KOHNEN:  And also just to get our terminology

1    straight, the special housing unit is a euphemism for solitary

2    confinement, also known as "the hole." He spends 23 hours per

3    day in his cell. He never interacts with another inmate,

4    period. They make sure of that in the special housing unit.

5            THE COURT: But you're not asking the Court to do

6    anything?

7            MR. KOHNEN: No. But I want to make sure, because you

8    asked the question, I want to make sure it's fully answered and

9    answered accurately.

10       Judge, the bottom line is he's being -- he's being

11    incarcerated.

12            THE COURT: Pursuant to law.

13            MR. KOHNEN: And another thing I want to clarify,

14    again, it's not something that we're presenting to the Court

15    for a decision, but when Mr. Mangan says, you know, this is a

16    problem that we're all going to have to work through, I think

17    there are only three people in this room that have to work

18    through it on a daily basis. And I want to remind the Court

19    that it's creating a burden on us, and it is impinging on our

20    ability to represent our client. We're doing our best we can

21    now, and we think we're doing an acceptable job, but we can see

22    the situation deteriorating as time goes on. I'm just --

23            THE COURT: Well, I appreciate you bringing it to the

24    Court's attention for purposes of having it on its radar

25    screen.

1      MR. KOHNEN:  Your Honor, with respect to the discovery

2  and the *Jencks* issue and the *Giglio* issue, the *Brady* issue,

3  Judge, let's be clear.  This is material that is in the

4  possession of the government.  The government is going to the

5  trouble of translating the material that they want to use

6  against our client for all of us and we'll all work through

7  that together, but they're not going to the trouble of looking

8  for and finding *Brady* material, *Jencks* material, *Giglio*

9  material and translating it into English, which is their

10  responsibility.

11      What Mr. Mangan is talking about, in euphemisms again, is

12  an alternative, what he suggests is a practical or a not

13  impractical alternative, which is the functional equivalent of

14  a massive document dump in Chinese.  That's unacceptable, Your

15  Honor.

16      Anything -- they've got to go through this discovery --

17      THE COURT:  So what do you propose the Court do, when,

18  about the discovery issues?

19      MR. KOHNEN:  I'm sorry?

20      THE COURT:  What do you propose the Court do, when,

21  about the discovery issues you're talking about?

22      MR. KOHNEN:  I suggest that the Court instruct the

23  government anything they intend to use needs to be translated,

24  anything they have that is or could be *Brady*, *Jencks* or *Giglio*

25  material, which is in their possession and they're obligated to

1   turn over, must be translated as well.

2       And if they have to go to the trouble of translating every

3   shred of information that they have obtained and are continuing

4   to obtain, that's a problem that they brought on themselves.

5   Judge, they're continuing to investigate the case after it's

6   been indicted.  Mr. Mangan as much as told you that.  And

7   rather than do that, or maybe simultaneous to that, perhaps

8   they should start interpreting, translating this material so

9   that it's of some use to us.

10      Character recognition software using Chinese characters to

11  try to find *Brady*, *Giglio* and *Jencks* material, which is Mr.

12  Mangan's suggestion, is patently ridiculous.  That's putting

13  yet another burden on us which is unfulfillable.

14          THE COURT:  So are you going to file a motion?

15          MR. KOHNEN:  We just heard about this plan yesterday.

16  I expect we likely will, unless we can get an order from the

17  Court here or a concurrence from the government.

18          THE COURT:  I'm simply asking, as I'm required to do.

19      I saw you pop up, Mr. Mangan.  Did you wish to be heard?

20          MR. MANGAN:  This is the same plan we discussed at the

21  first meeting with the Court.

22          THE COURT:  Okay.

23          MR. MANGAN:  And, Your Honor, I'm not sure how the

24  Court would reconcile them wanting us to translate every single

25  thing whether it's relevant or not, but at the same time, they

1  want to get to trial as soon as possible.

2          THE COURT:  And I'm not going to order you to do what

3  they request today.

4          MR. MANGAN:  Okay.

5          THE COURT:  I'm not yet persuaded.  I think the

6  approach is an approach.  I think Mr. Kohnen got fired up

7  because I asked his question of you myself.

8      Are you prepared to deal with these two attorneys?  There's

9  some indication that they're coming off a big win.  Have you

10 acknowledged that?

11         MR. KOHNEN:  We're ready, willing and able, Your

12 Honor.  And I want to make clear that we get along great with

13 these guys and we have for years, but these are very important

14 issues to us and to our client.

15         THE COURT:  I understand.  And, you know, what other

16 judge would remind you that these guys, you know, just rang the

17 bell.  I mean, it's difficult to win criminal cases to juries.

18 Have you ever heard of that happening in this district?

19         MR. KOHNEN:  Once or twice, Judge.

20         THE COURT:  All right.  Fair enough.

21     I don't know enough about where we are on the discovery

22 stuff to change what we have discussed all along.  If I have a

23 pleading and I have to deal with it, I will.  A motion may well

24 be necessary.

25     As to the speedy trial requirements, even if CIPA cases are

1    not automatically deemed complex, the Court is inclined to find

2    that in this specific case the voluminous discovery, as well as

3    the procedural requirements given the nature of the offense and

4    nature of the prosecution, including translating documents,

5    designating discovery in categories for purposes of production

6    under the protective order, not to mention CIPA, background and

7    clearance for court staff and the like, the Speedy Trial Act

8    timeline is impracticable under the circumstances.

9        What do you make of that, Mr. Kohnen?

10        MR. KOHNEN:  Your Honor, we can't disagree with that

11    finding as things exist now, but we think that going forward we

12    may present to the Court some reasons to see the case

13    differently in the future.

14        THE COURT:  Very well.

15        Well, the Court grants the requested continuance in time.

16    Time should continue to toll until the next hearing date.  The

17    Court finds that the ends of justice served by granting a

18    continuance in this case outweigh the interests of the

19    defendant and the public in a speedy trial.  I stated the basis

20    for that finding.

21        So I would propose that we set another date to reconvene.

22    And I guess I heard March CIPA filing, and I'd like to touch

23    base.

24        Ms. Frankian, do we have a date to propose, and should I

25    order the government to accelerate its discovery to be done by

1  some specific date?

2        THE LAW CLERK:  Judge, I can propose dates either in

3  January after the second wave of discovery or in March after

4  the CIPA motion.

5        THE COURT:  Do you want to confer with the Court in

6  person in January or March?  What's the government's

7  preference?

8        MR. MANGAN:  I think -- I think if we're talking about

9  scheduling this for a status conference, which is what it

10  sounds like --

11        THE COURT:  Right.

12        MR. MANGAN:  -- we would prefer something probably in

13  February or March, at least in terms of it being the most, you

14  know, beneficial to everybody.

15        THE COURT:  It would be beneficial to me to see the

16  CIPA filing when you are able, but you were talking at some

17  point in March.

18        MR. MANGAN:  Right.  But I didn't know if the Court

19  would want a status update before we even got to that point, so

20  that's why I'm throwing out February as well.

21        THE COURT:  What's your proposal when we have another

22  status conference?  I'm always eager to convene with this

23  group.

24        MR. KOHNEN:  Judge, I think the end of January or very

25  early February is a good idea; if nothing else, just to keep

1    the Court updated on whatever happens to be going on in this

2    case.

3              THE COURT:  Very well.  Let us look at the calendar

4    and propose something.

5              THE LAW CLERK:  January 31st at 2:00 o'clock?

6              THE COURT:  January 31st work, at 2:00 o'clock?  It's

7    an opening bid.

8              MR. KOHNEN:  Judge, I'm sorry.  I'm going to be out of

9    town that Friday -- or that Thursday.

10             THE COURT:  Okay.  I wouldn't want to proceed without

11   you.

12             THE LAW CLERK:  February 6th at 10:30?

13             THE COURT:  February 6 at 10:30 is the new bid.  Tell

14   me if it doesn't work.

15             MR. MANGAN:  That's fine for the government, Your

16   Honor.

17             MR. KOHNEN:  That works for us, Your Honor.

18             THE COURT:  Okay.  Did we say a time on the 6th?

19             THE LAW CLERK:  10:30.

20             THE COURT:  February 6 at 10:30.  Time is tolled till

21   then.  I hope that you continue to make progress.  I'm

22   delighted that you're working together professionally and

23   efficiently.

24       Is there more today on this?  If there is, tell me.

25   Anything further from the government?

1      MR. MANGAN:  No, Your Honor.

2      THE COURT:  And the defense?

3      MR. KOHNEN:  Nothing.  Thank you, Your Honor.

4      THE COURT:  Very well.  The Court prepares to recess.

5      COURTROOM DEPUTY:  All rise.  This court is in recess.

6   (Proceedings concluded at 12:31 PM.)

7                        - - -

8               C E R T I F I C A T E

9      I, Luke T. Lavin, RDR, CRR, the undersigned, certify

10  that the foregoing is a correct transcript from the record of

11  proceedings in the above-entitled matter.

12

13                          s/Luke T. Lavin_____
                            Luke T. Lavin
14                          Official Court Reporter

15                       - - -

16

17

18

19

20

21

22

23

24

25