```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION


. . . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,        .  Case No. 1:18-cr-043
                                 .
          Plaintiff,             .  In-Person Status Conference
                                 .
      - v -                      .
                                 .  Wednesday, February 6, 2019
YANJUN XU,                       .  10:33 AM
                                 .
          Defendant.             .  Cincinnati, Ohio
. . . . . . . . . . . . . . . . .


                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE

For the Plaintiff:      TIMOTHY S. MANGAN, ESQ.
                        EMILY N. GLATFELTER, ESQ.
                        Assistant U.S. Attorneys
                        United States Attorney's Office
                        221 East Fourth Street, Suite 400
                        Cincinnati, Ohio  45202

For the Defendant:

RALPH W. KOHNEN, ESQ.                ROBERT K. McBRIDE, ESQ.
JEANNE M. CORS, ESQ.                 Taft, Stettinius & Hollister
SANNA-RAE TAYLOR, ESQ.                 LLP
Taft Stettinius & Hollister          1717 Dixie Highway
  LLP                                Suite 910
425 Walnut Street, Suite 1800        Covington, Kentucky
Cincinnati, Ohio  45202-3957

FLORIAN MIEDEL, ESQ.
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, New York  10004

Law Clerk:              Cristina V. Frankian, Esq.

Courtroom Deputy:       Steven M. Snyder

Court Reporter:         Luke T. Lavin, RDR, CRR
```

*Proceedings recorded by stenotype; transcript
prepared by computer-aided transcription.*

```
 1                    P R O C E E D I N G S
 2        (In open court at 10:33 AM.)
 3             THE COURT:  Good morning, ladies and gentlemen.  We
 4   are here in the open courtroom on the record on the criminal
 5   docket in the matter of United States of America versus Xu.  We
 6   are set for another status conference.
 7       Would the attorneys enter their appearances for the record.
 8   On behalf of the United States?
 9             MR. MANGAN:  Your Honor, Tim Mangan and Emily
10   Glatfelter.
11             THE COURT:  Good morning to the two of you.
12       And on behalf of the defendant?
13             MR. McBRIDE:  Good morning, Your Honor.  Bob McBride
14   on behalf of Mr. Xu.  I would like to, if I may, ask Mr.
15   Florian Miedel to introduce himself to the Court.
16             MR. MIEDEL:  Good morning, Your Honor.  Florian
17   Miedel.  I was admitted pro hac vice for this case.
18             THE COURT:  Welcome.  Are you with the Taft firm?
19             MR. MIEDEL:  I'm not with the Taft firm.  My practice
20   is in New York City.
21             THE COURT:  All by yourself?
22             MR. MIEDEL:  I have a partnership.
23             THE COURT:  Very well.  Welcome aboard.
24             MR. MIEDEL:  Thank you for having me.
25             THE COURT:  As Ms. Cors is here?
```

1    MS. CORS: Yes. Good morning, Your Honor. And Mr.
2 Kohnen is here as well.
3    THE COURT: Who?
4    MR. KOHNEN: Good morning, Your Honor.
5    THE COURT: Good morning, Mr. Kohnen. I see they
6 relegated you to the back bench.
7    MR. KOHNEN: It's a chair that I spent almost four
8 weeks occupying, so I'm comfortable there, Judge.
9    THE COURT: Very well.
10    Well, we're here for status, and that's what I would
11 anticipate hearing. The Court doesn't have any developments
12 per se.
13    Where are we on status from the government's perspective?
14 And then I'll hear from the defense.
15    MR. MANGAN: Sure, Your Honor.
16    Discovery is proceeding along. Where we are, I think at
17 the last conference with the Court we said that there was an
18 additional, sort of, second wave of discovery that we hoped to
19 get out in January. We actually got it out earlier this week,
20 so it is in the defendant's hands.
21    That involved a couple different things, one of which was a
22 hard drive that contained, you know, forensic images of a
23 number of devices, as well as some cloud accounts. I think
24 they had some concern about what the type of file was and, sort
25 of, what type of system they can read, and so we're going to

1  try to -- we had a discussion yesterday.  We're going to try to
2  get our technical people in touch with their technical people
3  and figure out the right format that will work for everybody.
4  But we have made that second wave of production to them, so
5  we're under way in that regard.
6     The next part with respect to the discovery that I would
7  bring up, there's an issue that they raised with us recently
8  regarding a consultant, and perhaps I can kind of let them
9  raise that issue and then we can respond to it.  But overall,
10 in terms of the status, I think we talked about getting that
11 second wave out in January.  We at least got it out here early
12 February.  I think we're on track to have a CIPA motion to the
13 Court.  I think previously we said it would be in March.  I
14 know I've got a week where I'm out of town in March.  We would
15 like to maybe set that for the first week or sometime early
16 April, if we could, if that's agreeable to the defense.  But
17 generally I think we're on track to make that CIPA section 4
18 motion to the Court, and then, obviously, we would set another
19 status conference at the Court's pleasure, whether that's
20 before or after that deadline.
21         THE COURT:  Very well.  Thank you.
22     On behalf of the defendant, where are we on status?
23         MS. CORS:  Yes, Your Honor.
24     With respect to discovery, I think, with all due respect,
25 we're going to have to disagree with the government on this.

1  Yesterday we received a hard drive with their second wave of
2  discovery.  We have been unable to access that hard drive at
3  all, and that is the issue that we're working through with the
4  government right now.  Hopefully, we will resolve that.  But
5  even if that issue is resolved, as I said, we haven't been able
6  to access this, but here's what we understand to be on this.
7      One is forensic images, including three iCloud accounts
8  that involve e-mails and other data.  We have been told from
9  our IT people that this hard drive contains 356 gigabytes of
10 data.
11     For the Court's information, just a quick look online
12 suggests that one gigabyte of data could have 677,000 pages.
13 So we are looking -- we have been told the e-mail accounts
14 themselves, which I believe are the iCloud accounts, are 9.84
15 gigabytes.  Using that 677,000-page number, we are possibly
16 looking at over six and a half million pages of documents.  At
17 this point we're unable to determine what percentage of those
18 are or are not in English.  We assume most of this is probably
19 in Mandarin.
20     So we have an enormous problem right now with respect to
21 the discovery we've gotten and particularly with respect to the
22 fact that the government has indicated they will not be
23 reviewing this for *Brady* material and translating what's here.
24 So we have been provided an enormous amount of data that we
25 really are not in a position right now to access, and even if

1   we can access, to effectively identify *Brady* and other
2   materials, impeachment materials.  You know, it's our
3   position --
4       And we are working on a motion.  We just got this, so we're
5   not in a position to file it today.
6       But, you know, it's certainly our position that the
7   government has an affirmative obligation to identify
8   impeachment material, *Brady* material, other materials, and that
9   they cannot satisfy that obligation by dumping on us, in a
10  foreign language, millions of pages of documents.
11      One other point I'd like to make on that, we have been told
12  that their agents are doing, quote, keyword searches and
13  identifying material that is then translated.  That is not, as
14  we understand it, a thorough review of all these materials.
15      And here's our issue with keyword searches.  In English,
16  that's difficult enough.  Right now we're talking about
17  Mandarin.  Looking online, there are 50,000 characters in
18  Mandarin.  The average person uses 8,000 characters in
19  Mandarin.  The modern dictionary has approximately 20,000
20  characters in Mandarin.
21      Mandarin, unlike English, does not have a subject.  The
22  sentences aren't easily translated.  So we don't even see a
23  feasible way to conduct some type of keyword search to identify
24  material we're going to need to protect our defendant and to
25  put on our defense.

```
 1        Also, given what we're receiving -- and Mr. McBride may
 2   have some additional comments on this -- but with respect to
 3   the CIPA process, while the government may be in a position to
 4   file their motion soon, we don't see how we will be in any
 5   position, given this amount of data that has not been
 6   translated or reviewed for Brady material, impeachment
 7   material, to be in a position to help advise the Court as to
 8   what our potential theories of defense might be.  So, you know,
 9   we do think we've got a significant problem here and that the
10   government has an affirmative obligation to do more than
11   they're doing to identify materials that need to be produced,
12   both under Rule 16, under Brady.
13        One other point we wanted to raise with respect to this, we
14   also have discussed with the government finding a way to get
15   our client access to this discovery by means of a hard drive, a
16   laptop, something clearly -- he does know Mandarin; we do not.
17   So we are working with BOP and have indicated to the government
18   that we will seek to do that.  So hopefully we can work through
19   that issue and we won't need to involve the Court in that
20   issue.
21             THE COURT:  Well, among the things I heard on the
22   issues you presented was that you're preparing a motion.
23   Presumably the Court's going to need a motion, then a memo
24   contra and a reply and citation to the law and I'll look at it
25   carefully.  I'm reluctant to speak off the seat of my pants.
```

1      MS. CORS:  That's fine, Your Honor.
2      THE COURT:  But we discussed this previously at the
3 last status conference and the Court expressed its opinion from
4 the Court's seat of the pants, and if you want to tee this up,
5 I need pleadings on it.  It sounds like this case is complex.
6 We'll talk about that a little bit more as we proceed.
7      But if this were a case where all the documents were in
8 English and the government produced all the relevant documents
9 and, you know, there were 6.5 million pages, what would the
10 defense response be?  "I need time to review it."  I get that.
11 But what do you propose in the final analysis?  You'd rather
12 they didn't disclose that much information?
13      MS. CORS:  Well, look.  I mean, I think --
14      THE COURT:  Careful.
15      MS. CORS:  Sorry, Your Honor.
16      In terms of what they've collected, that was a decision
17 they made as to what materials they were going to go out and
18 affirmatively seek.  Those materials are now in the
19 government's possession.  And it's our position that they chose
20 to collect the information; they have an affirmative obligation
21 under the law to identify *Brady* material, impeachment material.
22      THE COURT:  That's a peripheral issue that we're going
23 to need to address.  But if the government produces a whole
24 bunch of evidence, I mean, what's the response other than to
25 give the defendant adequate time to review it?  This is a

1  hypothetical.  It's all in English.  There are millions of
2  pages of documents.
3          MS. CORS:  I think the response is, one, yes, provide
4  the defense time to review it.
5      We also have an issue here, though, that I would raise
6  again, which is, you know, our client is very interested in
7  getting this case to trial.  He is detained in solitary
8  confinement 23 hours a day.
9      So I don't have a good answer as to how the government
10 should meet its burden.  I think that's something they need to
11 address.  But I would say it is their burden, and it's their
12 burden to identify material for us.  We should not just get a
13 data dump.
14         THE COURT:  I think you're talking about their
15 responsibility for disclosing *Brady* material and the like.  I
16 was simply inquiring in the abstract when there are a whole
17 bunch of documents, there are a whole bunch of documents, and
18 counsel needs time to review it.  I get that.  On the *Brady*
19 issue, we're going to have to thrash that through, and I need
20 briefing on that.
21         MS. CORS: Okay.  But, yes, I would agree with Your
22 Honor.  In terms of just the number of documents, the defense
23 would need time to review those.
24         THE COURT:  Okay.
25      Perhaps I jumped in early.  Had you expressed what you

1  wanted to express in regard to status, or does somebody else
2  want to be heard on status from the defendant's perspective?
3  I'm not fishing for more lawyers.
4     MS. CORS: That's okay, Your Honor.
5     MR. McBRIDE: No, Your Honor. With respect to the
6  CIPA issue, we do not have an objection to the government's
7  request for additional time. We think that's probably prudent.
8  We will need a significant period of time to get through the
9  voluminous discovery also. So at a later date we may be able
10 to give you an assessment, Your Honor, for at least an initial
11 recitation of what our theories of defense may be.
12    THE COURT: Very well. That's helpful.
13    MR. McBRIDE: Thank you, Your Honor.
14    THE COURT: Thank you. Is there more from the defense
15 perspective?
16    MR. McBRIDE: I don't believe so at this time, Your
17 Honor. May I --
18    THE COURT: Well, I was going to ask if the prominent
19 lawyers wish to be heard.
20    MR. McBRIDE: Thank you, Your Honor.
21    THE COURT: That would include the visitor.
22    MR. KOHNEN: Oh. Thank you. The visitor is Sanna-Rae
23 Taylor from our office, Your Honor.
24    THE COURT: Great. And her capacity is?
25    MR. KOHNEN: Pardon me?

```
 1            THE COURT:  Her capacity is?
 2            MR. KOHNEN:  Well, she's so far pulled the laboring
 3   oar on the draft of the memo that we've been discussing.
 4            THE COURT:  Awesome.  She's an attorney?
 5            MR. KOHNEN:  And she's a good one too, Your Honor.
 6            THE COURT:  I can't wait.
 7            MR. KOHNEN:  I think you'll enjoy her work product.
 8            THE COURT:  No doubt.
 9            MR. KOHNEN:  The one thing I did want to point out for
10   the Court, just for the Court's information, stepping away for
11   a minute from the Court's abstract question dealing only in
12   English, the one thing I think you should know or perhaps be
13   reminded of is that the government has translated and intends
14   to translate and share with us into the English language the
15   material that they intend to use in their case-in-chief, and
16   perhaps in a rebuttal case.  So we're going to be dealing with
17   an easily readable subset of the documents that Ms. Cors
18   described when seeing what the government intends to bring at
19   us.
20      What the government's not doing is a similar thing from the
21   stuff that they're obligated to provide to us in *Brady*, and I
22   think that's a pretty important distinction.
23            THE COURT:  That's helpful.  I'm glad you spoke up.
24      What is the gentleman newly arrived from New York's name?
25   I'm sorry.
```

1        MR. MIEDEL:  Florian Miedel.
2        THE COURT:  Have you talked to the other lawyers about
3    how difficult I am?
4        (Laughter.)
5        MR. MIEDEL:  I'll assert privilege on that one.
6        THE COURT:  You know, that's a good answer.  You know,
7    is there anything you wish to be heard on today?  This is
8    typically what I do.  I mean, I pick on people.
9        MR. MIEDEL:  Well, that's fine, Your Honor.  I'm used
10   to that.
11       The only thing I would say, it's an issue that Ms. Cors
12   raised peripherally, which is the access of this, all this
13   massive discovery that -- for our client and his ability to
14   review it.  And I can just say from the perspective of our
15   district in New York, it's a common practice in complex cases
16   with voluminous electronic discovery to provide inmates,
17   detained defendants, with a laptop computer so that they can
18   review the discovery.  And it's in a controlled setting, so in
19   a sense that they will be taken to a room by a guard.  They
20   can, you know, review the discovery for whatever, six or eight
21   hours, and then they are taken back to wherever they are.  So
22   they don't have the discovery with them, but they can review it
23   under supervision.
24       And I think that is a way that Mr. Xu could be involved in
25   his defense in a more constructive way.

```
 1              THE COURT:  I'm glad we didn't let that slip.  I mean,
 2   I agree entirely, but the BOP is not necessarily responsive to
 3   this district judge.  What I heard Ms. Cors say is that she's
 4   working with the BOP and the government.  If I can be helpful,
 5   fine.  But absolutely.  I mean, he speaks the language.  He
 6   ought to be able to see the documents.  But I don't make the
 7   rules of the BOP, as they remind me frequently.
 8              MR. MIEDEL:  All right.
 9              THE COURT:  Thank you for speaking up.
10       All right.  The defense has been fully heard.  They've
11   turned the spotlight on, and my response in large part is:
12   File a motion.
13              MR. MANGAN:  Okay.
14              THE COURT:  But if you wish to defend your --
15              MR. MANGAN:  Just to follow up on a couple of the
16   points, Your Honor.
17       First of all, they raised the issue about getting laptop
18   access in our call yesterday.
19              THE COURT:  Right.
20              MR. MANGAN:  We've spoken with the BOP this morning.
21   I think that is workable.
22              THE COURT:  Good.
23              MR. MANGAN:  So I think we can work on something like
24   that.  They would keep custody of, whether it's the hard drive
25   or the CD, but there is a library that is available there to
```

1  those that are in the special housing unit.  I think the only
2  limitation is, of the four guys there, they can only have one
3  at a time in there, but they can work that out.
4      So I think that's something that we can work on, and that
5  should be helpful --
6          THE COURT:  Good.
7          MR. MANGAN:  -- in terms of having the defendant
8  review the discovery.
9      And I think, to sort of piggyback on what Mr. Kohnen said,
10 we did produce with the hard drive, which are the actual
11 accounts --
12     And they are readable with certain software.  I think it's
13 just a matter of they don't have that particular software.  We
14 need to figure out a way to match up, you know, their
15 capabilities and the file format.
16     But in addition to that hard drive, which contained all of
17 the raw data that we turned over -- and these are, by the way,
18 you know, the devices and the accounts of the defendant -- we
19 also produced a CD, which contain the translations that we do
20 have of what has been pulled from some of that data.  We turned
21 that over to them.  Those are our translations.  So that's
22 available to them as well, as we speak here.
23     What we tried to point out to the Court previously is that,
24 you know, look, we are giving them access to the data in the
25 same format that we have.  To the extent we get anything

1  translated, we will give them that translation, and we will not
2  attempt to use anything at trial that we have not already
3  translated and provided to them in a translated form.
4      Beyond that -- and we can respond to their motion,
5  obviously, in writing -- we believe that satisfies all of our
6  obligations both under Rule 16 as well as the additional
7  obligations under *Brady*.
8      The only other issue, then, before we get to the calendar,
9  Your Honor, would be I mentioned before -- they didn't bring it
10 up -- there was an issue that they raised in our conference
11 yesterday about possibly having an individual who is in China
12 designated as a consultant, which has certain ramifications
13 under the protective order.  That would make the person part of
14 the defense team.  That would then give the person access to
15 discovery materials up to but not including the attorneys' eyes
16 only materials.
17     We have a concern about that, that giving a -- you know,
18 designating such a person as a consultant, giving them access,
19 would sort of water down and ruin the original idea of the
20 protective order.  I would simply ask at this point, if they
21 get to that point where they would like to designate the
22 consultant, we would ask that they -- I appreciate that they
23 raised it with us, first of all, by phone.  We do have a
24 concern with that, and we would ask that they -- you know, we
25 either address it with the Court before going forward and

1  actually providing anything to that person.
2          THE COURT: Very well.
3     I was just looking at the transcript of the status
4  conference we had initially when we talked some of this
5  through. I would encourage you to look at it yourselves.
6     The government raised one new issue, and that's the issue
7  of a consultant. Before you retain or before you get geared
8  up, is that something that needs to be brought to the Court's
9  attention by a motion, from the defendant's perspective?
10         MR. McBRIDE: Your Honor, with the government opposing
11 or having concerns about it, I think it would be prudent for us
12 to raise that with the Court and let the Court evaluate it and
13 rule on it.
14    If I may generally address what our thoughts are on this.
15 This individual is a lawyer in China. We do not expect to use
16 him as a lawyer, he would not see the attorneys' eyes only
17 information, and we would not permit any physical evidence to
18 go into China or be taken with him.
19    We would allow him to, when he's here, if he comes here,
20 review the appropriate discovery available under the protective
21 order to consultants, but what we want to use him for is sort
22 of legs on the ground in China for us to do some investigation
23 into the allegations that have been raised, so we may be using
24 information that comes from the discovery to help him form what
25 we'd like him to investigate, Your Honor.

1            THE COURT:  And my suggestion was that we get this
2    briefed out before it's on fire.
3            MR. McBRIDE:  We will do so immediately, Your Honor.
4            THE COURT:  Very well.
5       I mean, somebody needs to file a motion, if it's a motion
6    for whatever.  The defense has said they're going to address
7    it, and the fifth lawyer is taking notes.
8       Very well.  I have one more issue, but is there anything
9    else you all wanted to bring to the Court's attention at the
10   status conference?  I guess we'll talk calendaring momentarily.
11           MR. MANGAN:  No, Your Honor.
12           THE COURT:  Defense?
13           MR. McBRIDE:  Nothing from the defense, Your Honor.
14           THE COURT:  All right.
15      In this case, given the nature of the prosecution, the
16   sensitive nature of the discovery, the volume of the discovery,
17   the need to translate those documents, the uniquely onerous
18   procedural requirements required of the Court and the parties,
19   and the issues ultimately to be presented in this case, the
20   Court continues to find that this case presents as unusual and
21   complex such that it is unreasonable to expect adequate
22   preparation for pretrial proceedings or for the trial itself
23   within the time limits established under the Speedy Trial Act.
24      The Court further finds that the ends of justice served by
25   granting a continuance in this case outweigh the interests of

1  the defendant and the public in a speedy trial.  Accordingly,
2  the Court intends to toll time between today and the new date
3  we set to reconvene.
4      Having so ruled, when do you propose that you have another
5  status conference with me in the courtroom, from the
6  prosecutor's perspective?  Are you talking about your motion
7  coming in early April?  They're going to need a lot of time to
8  respond.
9      I find it helpful to touch base with you periodically.
10 What do you propose?  We'll start the bidding.  When do you
11 want to see me?  Well, that's probably a bad way to put it, but
12 when should we have a status conference?
13          MR. MANGAN:  Unless the Court would want to see us
14 before that CIPA deadline, we were suggesting early April for
15 that.  I realize that part of the process the Court needs to go
16 through in evaluating the motion is seeing some kind of filing
17 *ex parte* from the defense about what their anticipated strategy
18 or defenses would be.  I don't know when they'll be ready to do
19 that.  It may be some time down the road.  They may not be able
20 to tell you when that is until after we file the motion.
21     So, to me, sometime in mid-April after we've made the
22 filing might make sense.  That's just my opening suggestion.
23          THE COURT:  All right.  The bidding has begun.
24     When do you wish to have an in-person status conference
25 again, sir?

```
 1            MR. McBRIDE:  Your Honor, we would ask for 60 days.
 2   The complexity of the case, the issues that may arise, I would
 3   ask that the Court help us stay on track by having relatively
 4   frequent status conferences.
 5            THE COURT:  Well, I think you're both on the same
 6   page.  It's early February.  Early March, early April.  So
 7   sometime in April we should convene in person?
 8            MR. McBRIDE:  Yes, Your Honor.
 9            THE COURT:  Well, while we've all got our calendars,
10   maybe we could begin the bidding.  I'm likely to be busy on the
11   15th of April, but we could also meet on that day.
12      Do you want to throw a suggestion out, please, Ms.
13   Frankian.
14            THE LAW CLERK:  April 12th at 11:00 AM.
15            THE COURT:  April 12 at 11:00 o'clock.  It's a Friday.
16   Does that work for the government?
17            MR. MANGAN:  It does, Your Honor.  Thank you.
18            THE COURT:  And the defense?
19            MR. McBRIDE:  It does, Your Honor.
20            THE COURT:  Very well.
21      Well, thank you for making the appearances.  It's helpful
22   to me.  And I'll look forward to seeing you down the road.
23      The Court prepares to recess.
24            COURTROOM DEPUTY:  All rise.  This court is now in
25   recess.
```

```
 1        (Proceedings concluded at 10:58 AM.)
 2                         - - -
 3                    C E R T I F I C A T E
 4        I, Luke T. Lavin, RDR, CRR, the undersigned, certify
 5   that the foregoing is a correct transcript from the record of
 6   proceedings in the above-entitled matter.
 7
 8                                 s/Luke T. Lavin
                                   Luke T. Lavin
 9                                 Official Court Reporter
10
                                   - - -
```