```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION

. . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,       .  Case No. 1:18-cr-043
                                .
          Plaintiff,            .  In-Person Status Conference
                                .
          - v -                 .
                                .  Friday, April 12, 2019
YANJUN XU,                      .  10:30 AM
                                .
          Defendant.            .  Cincinnati, Ohio
. . . . . . . . . . . . . . . .


                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
```

APPEARANCES:

For the Plaintiff:     TIMOTHY S. MANGAN, ESQ.
                       EMILY N. GLATFELTER, ESQ.
                       Assistant U.S. Attorneys
                       United States Attorney's Office
                       221 East Fourth Street, Suite 400
                       Cincinnati, Ohio  45202

For the Defendant:

RALPH W. KOHNEN, ESQ.            ROBERT K. McBRIDE, ESQ.
JEANNE M. CORS, ESQ.             Taft, Stettinius & Hollister
Taft, Stettinius & Hollister       LLP
  LLP                            1717 Dixie Highway
425 Walnut Street, Suite 1800    Suite 910
Cincinnati, Ohio  45202-3957     Covington, Kentucky 41011

FLORIAN MIEDEL, ESQ.
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, New York  10004

Law Clerk:             Cristina V. Frankian, Esq.

Court Reporter:        Luke T. Lavin, RDR, CRR
                       Potter Stewart U.S. Courthouse
                       100 East Fifth Street, Room 103
                       Cincinnati, Ohio  45202
                       Telephone:  (513) 564-7500

*Proceedings recorded by stenotype; transcript
prepared by computer-aided transcription.*

1                    P R O C E E D I N G S

2        (In chambers at 10:30 AM.)

3            THE COURT:  We're here in chambers on the record on

4    the criminal docket in the matter of *United States of America*

5    *versus Xu*.  We are set for conference.  I'd like the attorneys

6    to enter their appearances.

7        On behalf of the United States?

8            MR. MANGAN:  Tim Mangan.

9            MS. GLATFELTER:  And Emily Glatfelter.

10           THE COURT:  Good morning to the two of you.

11       And on behalf of the defendant?

12           MR. KOHNEN:  Your Honor, good morning.  Ralph Kohnen.

13           MS. CORS:  Jeanne Cors.

14           MR. McBRIDE:  Good morning, Your Honor.  Bob McBride.

15           MR. MIEDEL:  Good morning.  Florian Miedel.

16           THE COURT:  Good morning.  We have a quorum.  My law

17   clerk's here with me.

18       We had a letter of April 5 from Mr. Kohnen, and we were

19   duly scheduled today anyway for a status conference.  The

20   suggestion was that we start on the issues raised in Mr.

21   Kohnen's letter and then proceed to additional issues.

22       Do you want to set the stage for our conversation?  We read

23   your letter carefully.

24           MR. KOHNEN:  Yes.  Thank you, Your Honor.

25       And let me start by thanking the Court for agreeing to do

this, meet with us all in chambers.  As I said in the letter, we're working pretty well with the government in terms of identifying the issues and trying to craft solutions.  I'm not going to say that we've reached agreement on all, but the lines of communication are good.  So it occurred to us that the smart thing to do in order to try to keep this from turning into an adversarial circumstance is maybe go someplace other than the adversarial, often adversarial courtroom.

The other thing that we would like, with the Court's permission, is that our proceedings here today be more conversational.  And by that I mean respecting everyone else, of course, and not interrupting.  I think that a real honest-to-goodness conversation is probably going to be more -- get us closer to the goal line.

With that in mind, Judge, one of the things that I want to let everybody know is, these are somewhat complicated problems with a lot of moving parts and several parties involved.  As a result, we've sort of divvied up responsibility among our lawyers who are here in chambers in dealing with these things and kind of addressing them.  It's, frankly, too much for one person to keep track of.  And I say that to the Court because I think that Ms. Cors is going to weigh in on certain things more than others, Mr. McBride and Mr. Miedel, et cetera.  We expect that Mr. Mangan will be the person we all point our fingers at and look for responses to.

1    No.  I'm kidding, of course.  But most of our conversation,

2  productive conversation, has been with Mr. Mangan, who we

3  understand to be sort of the lead attorney in this case.

4          MR. MANGAN:  Well, we're co-counsel.

5          MR. KOHNEN:  Oh, okay.

6          MR. MANGAN:  And while I was gone last week, I know

7  Emily was covering for me on a number of things.

8          MR. KOHNEN:  Okay.  We haven't yet had the pleasure of

9  much conversation with Ms. Glatfelter, but we'll look forward

10  to that.

11    Anyway, the key thing, I think, to start with is, in the

12  order of our letter, the access to counsel and discovery that

13  we and our client are having issues with.

14    As you know from the letter, our client is more than four

15  hours away from us, being held in solitary confinement.  I

16  can't do justice to the situation that this poor man finds

17  himself in as a detainee, having been convicted of nothing.

18  I'm going to try to show some restraint and not get too

19  exercised about it, because I don't think that's productive.

20  We've done a good job of explaining, I think, in the letter to

21  the Court the situation that he finds himself in.

22    We have to talk about those conditions, at least under the

23  rubric of the serious approaching Sixth Amendment concerns that

24  we have, and hopefully we can, without too much drama, limit it

25  to that.

1    We're not -- I'm going to be quiet in a minute here, Your

2  Honor, but we're not here just to complain and to point out the

3  issues.  We also would like to suggest some solutions,

4  collaborative solutions, but I want to be perfectly frank.  We

5  see where we're going to need the Court's help in fashioning

6  some of these solutions to the problems.

7    Let's start with the discovery.

8      THE COURT:  Well, let me just bust in for just a

9  moment --

10      MR. KOHNEN:  Sure.

11      THE COURT:  -- because we're having a conversation,

12  and we'll hear from everybody.

13    The Court is not unaware of his situation and how it

14  arises.  The placement in --

15    What is it, Milan?

16      MR. KOHNEN:  Milan (pronouncing).

17      THE COURT:  -- Milan is not mean-spirited generated.

18  It may be the only option.  The government's going to speak to

19  that.  I'm not confident we're going to fix his location.

20    But go ahead.  I'm eager to hear options.  We've been

21  looking at this on our own.

22      MR. KOHNEN:  I appreciate that, Your Honor.

23    And maybe just for context, so it's out there and, frankly,

24  so it's on the record, you know, Mr. Xu was arrested on April

25  1st of 2018, so he's now been incarcerated at the government's

1   behest for a year and 11 days.  I think today's the 12th.  This

2   is an investigation that began, as we can tell from the

3   discovery, well before November of 2017.

4        And when I say I offer that to the Court for context,

5   because one of the things that we are going to complain about

6   is the very slow progress that the government has made in

7   sharing its evidence, apparently marshaling its evidence,

8   analyzing its evidence, et cetera.  And that's pretty slow for

9   a guy who finds himself in solitary confinement.

10       Anyway, with respect to discovery, Jeanne?

11            MS. CORS:  Okay.  So there are a couple of issues

12  we're running into with discovery that we are hoping to have

13  some help with the Court.

14       The first issue is his access and ability to review

15  discovery that is in Mandarin.  So we have received -- our

16  initial discovery that we received, much of it was translated,

17  and we are bringing that up for him to look at and review with

18  counsel.  That is, I think fair to say, a very, very laborious

19  process, and it's been very limited based on our accessibility

20  to our client and the days.

21       Right now we are allocated Monday and Tuesday to be able to

22  visit with him.  And the reason for that, from BOP, is that

23  they need to have us visit him in the general visiting area.

24  So anytime that area is being used by the general population to

25  visit with their family or other people who are in solitary

1    need to meet with their counsel, we don't have access to our

2    client.

3        So right now we're given Monday and Tuesday.  And if there

4    is availability elsewhere in the week, we might be able to

5    access that, but Monday and Tuesday are our days, and we're

6    basically limited from about 8:00, 8:30 to maybe 2:00.

7        And 2:00, 2:30, I think, is when you guys were asked --

8            MR. KOHNEN:  On Monday.

9            MS. CORS:  -- on Monday.

10       So we now have a new hard drive.  It has been reproduced to

11   us with some software so that we can review it.  We received

12   that yesterday.

13       What we are trying to do is to get to our client all this

14   discovery that's in Mandarin on a computer that he can spend

15   time in his cell, wherever, reviewing and helping us see what

16   is there.  That's critically important, because as I said, most

17   of it is in Mandarin.  We're not going to be able to review

18   this.  It's also generally almost all his communications, his

19   material, so he really is the ideal person.

20       We have been trying to work with BOP on this.  There are a

21   couple issues that come up immediately.  One, most of the new

22   discovery has been characterized under the protective order as

23   sensitive.  That's not material, under the protective order, he

24   is allowed to maintain in his possession.

25       We would like to discuss having that recharacterized as

1   general so that we would be able to leave it in his possession

2   to review.

3       Two, based on both the need for the software and the volume

4   of material, we think this is going to need to be on a laptop

5   that's a newer model laptop that he can efficiently use and

6   look through.  BOP has identified to us that they have a

7   laptop -- or, I mean, a computer that he could use.  They've

8   also informed us that it is old and is not a new computer.

9       So we are looking for help from the Court to be able to get

10  all of the discovery onto a computer, preferably a laptop, that

11  we can get to him at Milan that he can have, you know, daily

12  access to.  I think the plan would be, as I understand it from

13  BOP, whatever computer would be used would be stored in the

14  assistant to the warden's office, brought to our client in his

15  cell, when he is done, brought back.  And I think we would be

16  fine with that process in terms of where the computer is.

17      But we do need to get the discovery to him.  I mean, he

18  does have a lot of time right now, and he can be very, very

19  effective and helpful in helping us help him.

20          THE COURT:  It sounds like you're close to that

21  occurring.

22          MS. CORS:  The computer's going to be the big issue,

23  Judge, and the issue of how we deal with the protective order

24  and the characterization.  But, you know, BOP, just the

25  bureaucratic process, getting a computer in there that's not

1   theirs, we haven't made any headway on that.  And that's really

2   where we're looking for some help.  And maybe to break through

3   that, to be whether they source the computer and we pay for it,

4   whether we source the computer, load everything on and bring it

5   up and let them inspect it.  That's where the difficulty is

6   right now.

7            THE COURT:  Okay.

8            MR. KOHNEN:  Judge, just to follow up, this is a

9   computer that will not have any Internet access whatsoever.

10      Also, we're close, as you've indicated, but maybe not as

11  close as you may think, and let me explain.

12      We finally have this 400 gigabytes of material that is

13  readable by us with our equipment.  That in and of itself took

14  months, as you'll probably recall.  We got that yesterday

15  afternoon.

16      Whether it can be transferred to another hard drive, a

17  laptop's hard drive, with the software that makes it readable

18  on that new laptop is a question.  Whether our client is going

19  to be able to mark it or do something as he goes through it to

20  identify what's important to us is going to take yet some more

21  software or technology.  I'm not a techie.

22      Our IT folks are working to find solutions to that now.  We

23  just don't know how long it's going to take or whether we're

24  going to have to revert back to this 80-some-thousand-dollar

25  software that we want to -- I may be wrong about the price, but

1  rather expensive software that we wanted to avoid purchasing

2  from the get-go.

3       MR. MIEDEL:  Just, Your Honor, to be clear, the

4  discovery that we're talking about that we would like him to

5  review consists of data that was downloaded from his iCloud

6  account.  It's his stuff from his materials.

7     And so that's one of the reasons we wanted to discuss

8  reclassifying this material from sensitive to general, because,

9  obviously, he is in the best position to know what's there and

10  to go through it.  And it's his own stuff, so it's not

11  sensitive in that sense.

12       MR. McBRIDE:  I would add, if I may, Your Honor, also

13  it's very much the same in that respect as the original general

14  category of discovery that we were provided in the very first

15  production.

16       THE COURT:  Well, we'll hear from the government in

17  that regard.  I'm not confident that that's an issue I'm going

18  to be able to resolve today.  It may require briefing and in

19  camera review and all of that.  But we're going to have a

20  conversation today.  I now understand the issue that presents.

21     So you were talking about discovery.  What else did you

22  want to talk about before we permit the government to converse?

23       MS. CORS:  The only other issue there, we have some

24  other conditions I think we'd like to talk about, but sticking

25  with discovery, you know, the ability of counsel to have more

 1   time to work through the discovery with our client.

 2           THE COURT:  More time than two days at the

 3   institution?

 4           MS. CORS:  Correct.

 5           THE COURT:  Okay.

 6           MS. CORS:  I mean, here's part of the problem we run

 7   into.  To have an effective discussion about the discovery

 8   requires a translator there, an interpreter.

 9           THE COURT:  That's going to be true anywhere.

10           MS. CORS:  Correct.  I mention that only because it

11   makes this process of us going through the discovery with our

12   client take so much longer.  You know, we're doubling our time

13   to go through something that would -- we would go through with

14   someone who speaks English as a native language.  So, you know,

15   we're looking to have a discussion as to how we might be able

16   to get more time with our client to review materials.

17           THE COURT:  Very well.  Should we pause now and have

18   the government talk about discovery?

19           MR. KOHNEN:  Your Honor, I think that's a good idea.

20           THE COURT:  You've completed your trial?

21           MR. MANGAN:  We have.  I'm ready to dive back into

22   this one.

23           THE COURT:  Welcome.

24           MR. MANGAN:  So with respect to the main topics that

25   we've been talking about back and forth, we originally provided

1    on a hard drive, just to kind of back up a little bit, and it

2    had what's called the extraction files.  So that is sort of the

3    original forensic image that's made by the forensic folks over

4    at FBI without them doing an analysis or anything.  It's just,

5    you know, "Here is exactly what we have."

6        I realize, you know, as we've talked back and forth, they

7    consulted with some individuals they said they looked to hire

8    as, I believe, a forensic consultant to more or less put this

9    into a report and analyze it through our tools.  It would cost,

10   you know, some degree of money there.

11       So what we did, we went back to the FBI and said, "All

12   right.  Using your tools, you know, can we put this into a

13   different format to give that over to them so that it's in a

14   readable format," sort of on a -- what I would consider a sort

15   of lay people's computers without the normal tools, and they

16   were able to do that.

17       We just got that to them this week.  It has, more or less,

18   a reader file on it.  So you click on the reader and then,

19   through that software, you can go through the report.  It's

20   essentially sort of a working copy or a working version of

21   their analytical report.

22       One of the things we clarified with them, and I think this

23   was fine, was we wanted to make sure that, you know, look, the

24   FBI and we have an obligation to, you know, review material

25   that's produced under search warrant to make sure it complies

```
 1    with Attachment B.  So typically they don't put it in those

 2    final reports until they have, you know, whittled it down to

 3    what is relevant under Attachment B.

 4        So we've made clear to them, look, we're giving you the --

 5    just like we did the image -- we're giving you the whole thing,

 6    sort of un-- you know, in its native form, and we ask that they

 7    assure us that they're not going to come back and complain that

 8    we didn't do the analysis to narrow it down, and they said that

 9    was fine.  So we turned over the disk yesterday.  That's my

10    understanding.

11        Correct?

12             MR. McBRIDE:  Correct.

13             MR. KOHNEN:  May I interrupt.  What's Attachment B?

14             MR. MANGAN:  For a search warrant.

15             MS. GLATFELTER:  The execution of the search warrant,

16    what we have to subpoena for.

17             MR. KOHNEN:  The return?  Oh, the items to be searched

18    and seized, okay.  Sorry.

19             MR. MANGAN:  In any event, I think we've worked

20    through that issue.  Some of it was just getting it in the

21    right format and getting it over to them.  It took some time,

22    but I think we're at least at a better stage than we were the

23    last time we talked.  Because I know I could open up my

24    computer, I think you're able to do the same, and you can at

25    least start working through the data.
```

1        There is a lot there.  We don't disagree there's a lot to

2    go through.  It is a -- these are his devices.  Some of them

3    are images of the physical devices that were seized in Belgium.

4    But the other ones, which are much larger, are the iCloud data,

5    and those consist of device backups from various devices,

6    different phones, including an iPad as well.

7        And those are his own -- you know, that is his own data,

8    his own information, but it's sizeable.  People aren't always,

9    you know, aware of how much they have on their devices and how

10   much has been backed up.

11           MR. KOHNEN:  They rarely are.

12           MR. MANGAN:  It is a mix of, you know, some personal

13   things and work-related things, you know, we would suggest.

14   And so that's why it was designated as sensitive on our end.

15       The initial materials that went out in the first tier

16   related specifically to this case and the exchanges that were

17   done back and forth between the individual here and the

18   defendant.

19       A lot of these materials get into his activities beyond

20   this case, perhaps with similar people in the U.S. or similar

21   people around the world.  It involves and has communications

22   with other members of the MSS organization, so it is broader.

23   Some of those work activities, you know, implicate other

24   companies, victim companies, other activities around the world.

25   And so that's why we viewed it as sensitive, just so the Court

1    understands our viewpoint on that.

2        It does include, we realize, you know, some of his personal

3    data as well.  It's just all commingled.

4        So now that it's turned over, I think we're in agreement on

5    a number of these things.  He needs time to look at these.

6    They are in almost entirely Mandarin.  And I guess that he has

7    time to review it.  He has the language skills, you know, to

8    make sense of it in a way that, perhaps, a defense team, you

9    know, would take more time and resources.

10        We've spoken with -- we've all talked through the same

11    person at BOP, who has been very helpful, I think.

12            MR. KOHNEN:  We'll note our disagreement.

13            THE COURT:  Mr. Coates, perhaps, or something like

14    that?

15            MR. MANGAN:  Clore.

16            MR. KOHNEN:  Clore.

17            MR. MANGAN:  Well, he says fine things about you,

18    Ralph.  I won't tell him you disagree.

19            MR. KOHNEN:  No, he's a nice guy.

20            MR. MANGAN:  My understanding is they are willing to

21    do essentially an accommodation that would allow a computer

22    to -- like a roll-in, we're using the term "roll-in," so it's

23    not just sitting there 24 hours a day but they would give him

24    access within his cell as opposed to having to reserve time at

25    the library.

1    Part of the issue they have is, they have this library for
2    this special housing unit, and everybody -- they all want to
3    review their discovery because it gets them out of their cell.
4    They've got terrorists up there who just want to go and watch
5    their discovery because it's jihadist videos, and so they've
6    got to accommodate these things.
7    We think it would work to give him sort of his own computer
8    that they can roll in, you know, and pull back out.  And then,
9    you know, the BOP would keep custody of that and it would be
10   dedicated to his use.
11   My understanding from them is they would at least first
12   like to see if one their computers would work for this before
13   they entertain the idea of bringing in an outside computer.  He
14   said they have adjusted to things before where they've had to
15   get updated computers.  They can handle that.
16   I think we just got the disk to you this week, so I think
17   it would be prudent to at least try going that route first, let
18   the BOP see if they can make it work on one of their current
19   computers that they're comfortable with and address it that
20   way.
21   With respect to the classification, you know, I already
22   explained why we want it designated as sensitive.  I don't have
23   the language right in front of me, but it's essentially that he
24   does not maintain custody of these things.  So we don't have
25   a -- he's still allowed to review them.

1       We don't have a problem under the current classification of

2   sensitive of doing this roll-in/roll-out and the BOP maintains

3   custody of the disks and the computers.  We think that would --

4   we think.  At least it's our position that that would still be

5   in compliance with that designation level.

6       So those are kind of the main -- you know, our main

7   responses to the core issue, which I think is his ability to

8   review those materials.

9       As for the visitation dates, that's kind of out of our

10  purview a little bit and our control.  My understanding is the

11  same, that you have Monday and Tuesday to go up there.  I

12  believe they can do some Wednesdays in that Mr. Clore has said,

13  look, he can work with them on some additional time, but what

14  helps him the best is a lot of advance notice, you know, a

15  schedule, and kind of a schedule going forward or at least

16  that's a little further in advance than calling on Friday and

17  saying "We're coming Monday" would be helpful.  So that's my

18  understanding.  But that's kind of between the BOP.  That's not

19  really something we can help facilitate, I don't think.

20      But, you know, our core concern is theirs in terms of we

21  understand there's a lot of discovery.  He needs to get it,

22  time to review.  I think this would -- I think we're working

23  towards a solution that would at least allow him to do that.

24  Obviously, we need to find a computer that will work, and

25  hopefully that's enough time for him to do this.  But I think

1    we're working towards a solution.

2       Obviously, we're just now looking at these forensic files

3    this week.  You know, I'm getting them in that format for the

4    first time.  Obviously, they're Mandarin, so I can't make much

5    more sense out of it than they can, but you can at least start

6    to get the feel for how to work through the software, what you

7    can play.  It will need to have speakers, because there are

8    audio files on there.  There are videos, things of that nature.

9       But our suggestion would be we try to work through this

10   next step with the BOP about getting the roll-in laptop,

11   maintaining the designation, and seeing if we can make that

12   work.

13           THE COURT:  Well --

14           MR. MANGAN:  Do you have anything else, Emily?

15      I'm sorry.

16           MS. GLATFELTER:  We've talked a lot about our feelings

17   on the matter, the Department of Justice and the defense, and I

18   think one voice is BOP and some of the information that Dan

19   Clore provided to us.  And some of the regulations that they

20   have and the reason we can't just take a computer in there

21   right now and give it to the defendant is the safety and

22   security of the institution.

23      And so the people that they're maintaining as pretrial

24   detainees in that unit are people that are security risks.  And

25   every difference you have between these individuals is a source

1    of contention, and the ability of -- or it's important to

2    maintain the security of that unit.

3        And so, for example, I know that perhaps defense would like

4    to have a computer or laptop that he has in his cell 24/7.

5    That's not a possibility, from BOP's perspective, in terms of

6    the inequity between the people in the unit and the safety and

7    security.  And not only Dan, Dan understands it, but the people

8    under him.  And it's the ability to explain it to the guards

9    who are there every day, why is this person being treated so

10   much differently than everyone else in this unit.

11       And so those are some of the interests that Dan is trying

12   to balance.  I think, as discussed recently, the fentanyl, sort

13   of, explosion going into the institution has changed

14   dramatically how they deal with incoming mail, how they deal

15   with publications coming in.  Anything from outside the BOP

16   system getting into the prison is a security risk for them, and

17   so they're trying as hard as they can to work through this, but

18   they also have real concerns on their end as well.

19       And so I just wanted to express that to the Court, that,

20   you know, when we get these letters or when we find out -- we

21   call BOP and talk to them, talk them through this and

22   understand like why we can do this or why we can't and what

23   their concerns are as well.

24            THE COURT:  Well, I would pause at this point and

25   express my visceral reaction that the government is working

1    very hard to be responsive to the issues.  The Court has spoken

2    with BOP, and BOP has valid policies and procedures and

3    interests that you reference correctly.  But it sounded to me

4    like you're making enormous progress, and I would ask at this

5    point if there -- the laptop works out and he's able to have

6    his laptop in his cell during waking hours and review it and

7    then the laptop gets rolled out, have we not addressed as best

8    we can the sensitive designations?  He's able to see it.  He

9    just can't keep it in his possession.

10            MS. CORS:  If we can have agreement with the

11    government and the Court that he can have access to these

12    materials during the day --

13            THE COURT:  Right.

14            MS. CORS:  -- and have the computer wheeled back out,

15    certainly from my perspective that solves the problem of our

16    client reviewing the discovery.

17        Where I think we may have still a disagreement is there

18    isn't a laptop at BOP.  In talking with Dan Clore, who, you

19    know, is trying to work with us but within a bureaucratic

20    system that it moves very, very slowly, the computer they have

21    identified is not a newer computer.  I don't even believe it

22    can read a Blu-ray disk, which is what some of this discovery

23    is on.

24        We recognize the security issues.  We have thought through

25    those security issues, and we have some suggestions as to how

1   we might break through and get our guy this discovery soon.

2       In terms of a laptop, if the Bureau of Prisons is not

3   comfortable with us loading the laptop and providing it to

4   them, it seems to us a reasonable option is to have us pay for

5   the laptop and have the Bureau of Prisons source the laptop

6   themselves from Milan, buy it on Amazon, do whatever, you know,

7   they want to do, which allows them to know what computer is

8   coming into the facility.

9       What I am concerned about is we have been trying to work

10  through this bureaucratic system at Milan, and it has taken a

11  very, very long time.  I have no reason to believe at this

12  point that the computer they have is going to work.  I am

13  concerned that we're going to give it another month to work

14  through that and be right back here asking for the same thing.

15      So if there is a way that the Bureau of Prisons could be

16  comfortable getting a computer in there now, I think that

17  benefits all of us, and letting our client look at this.

18      The other point I would mention is, you know, yes, they

19  have regulations.  I think we'd all agree our client is a very

20  unique pretrial detainee at Milan, and so trying to apply the

21  same rules and regulations to Mr. Xu as to others might not

22  always be appropriate and may require some modification so that

23  we can get him the discovery he needs to look at.

24          THE COURT:  What do you make of the notion that we

25  shouldn't spin our wheels on the computer the BOP currently has

1   but pursue permission from them that the defense pays for a

2   computer that Milan buys and just get on with it?  What do you

3   make of that?

4           MR. MANGAN:  I think there's a reasonable plan A and

5   plan B.  We only got the disks in the current format to them

6   this week, so I understand you haven't had a chance to even

7   take them up to Milan and have them try it out.  To me, it at

8   least seems worth, on the next trip, to provide them to Mr.

9   Clore and say, "What can you do," you know, "What can you do

10  with this?"  And then if they can't deliver, then I think, you

11  know, it's a legitimate question can we get this moving with a

12  differently-sourced laptop.

13      He hasn't been given the opportunity yet just because we

14  only got that to them this week.  So, to me, it seems like

15  there's a logical step one and step two.  I understand they

16  want to do that quickly.  I have no objection to that.  To me,

17  this is a logistics issue.  Let's see if they can make it work,

18  and if they don't, then there has to be an alternative.

19      We are in agreement to Ms. Cors' first point that if they

20  can do the roll-in and he can have access during the day, we

21  have no objection to it, with this discovery under the

22  sensitive designation.

23          THE COURT:  Well --

24          MR. KOHNEN:  Judge, may I?

25          THE COURT:  Yes.

1           MR. KOHNEN:  Mr. Clore has essentially already told us

2    that their equipment will not work.  Rather than spend eight

3    and a half hours round trip running the disk up there to test

4    it, I would respectfully submit that we can go forward on what

5    Mr. Clore has already told us.  But if we can't, if we want

6    assurance, I'm confident that a simple phone call to Mr. Clore

7    or Milan's BOP folks will confirm what I have just represented

8    to the Court and their equipment is incapable.

9           The other thing is, a laptop is crucial because of the

10   other, I'll call them, logistics issues that we've discussed

11   here:  access to the computer room, et cetera.

12          We need to move forward.  He needs a laptop.  The U.S.

13   Attorney's office is part of the Department of Justice.  The

14   Bureau of Prisons is part of the Department of Justice.  The

15   Federal Bureau of Investigation is part of the Department of

16   Justice.  Each of those three organizations can move with

17   lightning speed when they want to.

18          The FBI's computer forensics capabilities, if only through

19   this case, have been demonstrated to be remarkable, cutting

20   edge.  They could analyze any laptop that we provided to them,

21   that the U.S. Attorney's office provided to them, or that the

22   BOP provided to them to make sure it was safe to go forward as

23   we're suggesting.

24          You know, I don't want to get too crazy here, but there

25   comes a point where Mr. Xu's rights are going to start to trump

1    all of these other concerns, all these other roadblocks, from

2    our perspective, that are popping up due to inaction,

3    bureaucracy and/or foot-dragging, and we want to smooth those

4    out and move forward.

5             THE COURT:  Well, I think we need to inquire

6    immediately of the BOP as to whether this roll-in laptop is

7    manageable with a laptop other than one they have currently in

8    their possession.  And is that something the Court should

9    inquire on or the government?  Do you have a sense?

10            THE LAW CLERK:  I can call him today and ask whether

11   he thinks there's any chance that the laptop will work.

12   Ultimately, I think the disk needs to go up there whether it's

13   to get the material onto the BOP's laptop or one that is

14   purchased.

15        So I don't think that, you know, ultimately taking the disk

16   up there is a wasted trip, necessarily.  And I would assume

17   that if he thinks that, you know, potentially his laptop, the

18   BOP's laptop can work, maybe you can take the disk up on your

19   next trip up there, and then if it doesn't work, maybe just

20   leave it there, if that's an option.

21        And if we know in advance that -- or if we tell them in

22   advance, look, they're coming up to test this disk.  If it

23   works on the laptop, great.  If not, can you have one ordered

24   right away and we'll leave the disk with you.  And then that

25   way -- so it's not, you know, take the disk up there, it

1    doesn't work, bring it back, call him, order the laptop, take

2    the disk.  You know what I mean.  It would be a little more

3    seamless.

4         But, of course, if he says, no, there's just no way this is

5    going to work, it's not even worth trying, then at that point

6    we can figure out how to get another laptop.  But if he thinks

7    there's a chance, take the disk up, we'll tell him when to

8    expect that you would arrive with it, he'll have the laptop

9    ready, test it out.  If that doesn't work, we'll ask him to

10   just be ready to order a new one, if that's something we can

11   accommodate.  Would that work?

12             MR. KOHNEN:  I don't think they even have any laptops

13   up there.  I think they're all antiquated desktops, but I could

14   be wrong.

15             MR. McBRIDE:  That they roll in.

16             THE LAW CLERK:  Oh, okay.  Well, we're dealing with a

17   desktop, I guess.

18             THE COURT:  Well, is there an objection to the Court

19   communicating with this gentleman at the BOP today to inquire

20   as to their position on options?

21             MR. MANGAN:  That's fine with us, Your Honor.

22             MR. KOHNEN:  We encourage it.  Thank you, Judge.

23             THE COURT:  All right.

24             MR. MANGAN:  Do you already have his information?

25             THE LAW CLERK:  I do.

1          MS. CORS:  If I could just mention --

2          THE COURT:  Yes.

3          MS. CORS:  -- though, a couple of the issues I think

4    that are relevant in terms of this computer access.  One, some

5    of this is on a Blu-ray, so there's a question of whether that

6    computer can access a Blu-ray disk.

7       Two, there is this reading software that is on -- that

8    needs to be used to access the material.  So it's also a

9    question of -- I don't know if they're able to run the name of

10   that software, I don't know what the name of it is, but run

11   that by BOP to see if this computer can actually run the

12   software that you need to use to review this material.

13      And there's a lot of data, so I think the speed with which

14   it's going to load in and allow anyone to look at it is going

15   to be an issue.

16         THE COURT:  So those are three of the issues.

17         MR. KOHNEN:  Can I make a suggestion?  We've got our

18   IT people trying to identify solutions for us.  What I would

19   suggest is that we get back to them as soon as we can after

20   we've met here today and come up with a list, probably a more

21   complete list than Ms. Cors just laid out, so that we can arm

22   Ms. Frankian with those questions to ask of Mr. Clore before

23   she reaches out to him, if that's all right.

24         THE LAW CLERK:  That's fine.

25         MR. MIEDEL:  Your Honor, also I think it would be

1    helpful for the Court to communicate with the BOP just so that

2    the BOP, Mr. Clore in particular, understands just how

3    important it is for this access.

4        Because it concerns me a little bit about what Ms.

5    Glatfelter reported about her conversation with Mr. Clore,

6    about the sense of inequality among inmates or the fact that

7    guards may feel that he's getting special treatment and he

8    shouldn't.

9        I think, as we all know, it's very common for different

10   pretrial detainees to have different access to discovery.  At

11   least in the district where I practice, it's very common that

12   defendants who have large amounts of, voluminous amounts of

13   discovery on computers will have access to a laptop, whereas

14   other detainees may not because their cases don't require it.

15       So I think it's useful for the Court to sort of suggest the

16   Court's interest in making sure that Mr. Xu does, in fact, have

17   access to the discovery during the daylight hours every day so

18   that that doesn't get undermined by people working at the BOP.

19            THE COURT:  Well, with respect, I would like to be

20   involved in Ms. Frankian's call to the BOP so they know I'm on

21   the line and am engaged in it and this is of concern.

22            MR. KOHNEN:  I think that will accomplish that.

23            THE COURT:  But I want you to understand that I'm

24   going to be responsive to reasonable BOP concerns.

25            MR. MIEDEL:  Sure.

1          THE COURT:  Where do you practice, New York?

2          MR. MIEDEL:  Yeah.

3      (Laughter.)

4          THE COURT:  Very well.

5          MR. McBRIDE:  Your Honor, may I raise one more

6  concern?

7          THE COURT:  Yes.

8          MR. McBRIDE:  In your conversation with the BOP, I

9  would ask you to consider, is I'm very concerned about the

10  information itself because of our protective order.  I was a

11  national security prosecutor, like Mr. Mangan is, for a long

12  time, and I know full well that not only do things leak into

13  prisons, they leak out of prisons, and I'm not disparaging

14  anybody.  Mr. Clore has been great to work with.

15      But in these procedures that we put forth, if the Court

16  feels that an appropriate approach is to have the BOP try the

17  software and so on, and try the data, I'd ask that security of

18  that data and that information be paramount.

19      One of the things we were thinking of is perhaps once the

20  data is set on a computer, whether it's a laptop we provide or

21  the computer the government provides, that it be password

22  protected so that perhaps Mr. Xu is really the only one, and

23  defense counsel, with access to that information.

24          THE COURT:  I respect your experience.

25          MR. McBRIDE:  Thank you, sir.

```
 1              MR. KOHNEN:  Mr. Clore, however, has already -- and I

 2    think this is maybe what Mr. McBride's getting at.  Mr. Clore

 3    has already told us that nothing comes in, no electronic media

 4    come into that facility that are password protected.  And so we

 5    may be --

 6              THE COURT:  Because?

 7              MR. KOHNEN:  I'm not sure.

 8              THE COURT:  Okay.

 9              MS. CORS:  What he indicated to me is it's just a

10    security measure, that in terms of their policy, they need to

11    be able to look at and review anything that's going into that

12    facility.

13        So, you know, they can't take it on faith that we're giving

14    a disk that's password protected that only Mr. Xu can look at,

15    that it contains discovery and nothing else, so --

16              THE COURT:  Well, that seems to make some sense.

17        What do you make of that, sir?

18              MR. McBRIDE:  Your Honor, it does make some sense for

19    the incoming information, Your Honor, setting it on a computer,

20    verifying whether it is what it is.  But once it's set, however

21    we decide to proceed, I think an additional precaution of

22    having it then password protected, not encrypted but password

23    protected so that Mr. Xu has access to it -- he's obviously not

24    going to be putting anything else on it -- so that Mr. Xu,

25    then, and the defense team are the ones that have access to it.
```

```
 1  Make it as protected as it can be under the protective order,
 2  Your Honor.
 3       THE COURT:  But the prison officials need to see
 4  what's coming in and they need to be able to see what's on a
 5  laptop being reviewed by an inmate, so they're certain it's
 6  discovery and not building specifications for the institution.
 7       MR. KOHNEN:  Judge --
 8       MR. MANGAN:  If I could just -- I think there's two
 9  things.  One is, it's a question of what you're password
10  protecting.  The CD itself or a disk, you know, can have its
11  own password protection.  That's typical in discovery.  And
12  when it is produced into a prison, BOP knows that password, you
13  know, so that they can look at it.
14     I think -- tell me if I'm wrong -- what they're talking
15  about is they want to password protect the computer so that Mr.
16  Xu would only have that password but not the BOP.  I'm trying
17  to understand if there's two different conversations going on
18  here.
19       MR. McBRIDE:  Well, I think either of those solutions
20  is fine.  And I think that perhaps if Mr. Clore had access to
21  it, because he is really --
22       MR. KOHNEN:  Right.
23       MR. McBRIDE:  -- the point of contact for us.  He
24  could have the password and look at it with Mr. Xu to make sure
25  it is what it is and then let Mr. Xu go ahead and do -- whether
```

1   they do a periodic inspection, Your Honor.  I think any of

2   those things are acceptable, and all I'm asking is the Court

3   consider ways to minimize that risk.

4           THE COURT:  I understand.

5           MR. KOHNEN:  And what we may want to do along those

6   lines, Your Honor -- again, this is probably so much i-dotting

7   and t-crossing -- is consider at least whether there is a need

8   for another addendum to the protective order just to cover this

9   stuff.  I think everybody's going to recognize, you know, where

10  the threshold would be that we do need to do that and suggest

11  that to the Court.  We're going to keep that in our peripheral

12  vision.  At the same time, I don't want you to be surprised if

13  we come up with that.

14      But again, at least for the context and perspective, to

15  give you an idea of how tightly things are controlled around

16  Mr. Xu, how constrained -- sometimes restrained, frankly -- he

17  is, when we have a telephone conversation with him, a guard

18  insists on staying in the room with him.  I'm not sure where

19  they think he would flee to, or perhaps they think we might

20  share plans for the prison via phone.  But that's how tightly

21  the screws are on him.

22          THE COURT:  And all persons at the institution.

23          MR. KOHNEN:  No, that's not true.

24          THE COURT:  Okay.

25          MR. KOHNEN:  But he and the other fellows at issue.

```
 1              THE COURT:  Right.
 2              MR. KOHNEN:  I think there are only, at any given
 3    time, two or three, aren't there?
 4              MS. CORS:  Uh-huh.
 5              MR. KOHNEN:  Anyway, just, again, for perspective, I
 6    guess what I'm maybe trying to say is, even this is going to be
 7    a big ask of BOP.
 8              THE COURT:  Very well.  The Court's prepared to make
 9    the ask.
10              THE LAW CLERK:  Can I just ask one question?
11      So one of the restrictions on sensitive discovery is that
12    defense counsel can't disseminate that material to anyone other
13    than the members of the defense team.  So I just want to make
14    sure that taking the disk and giving it to the BOP is not going
15    to cause any concern.  I mean, it's --
16              MR. MANGAN:  Right.
17              THE LAW CLERK:  We've all agreed.
18              MR. MANGAN:  Right.  We can sort of include the BOP as
19    sort of a party within how we define things.  But with respect
20    to all of this, we don't have any concerns with the BOP having
21    custody of things.
22              THE COURT:  Well, we probably ought to have that
23    memorialized in an addendum.
24              MR. MANGAN:  And we're fine with that.
25              THE COURT:  You all will work on that.
```

1      Well, I'm very pleased with the progress we're making.

2   What were some of the other things you wished to converse

3   about?

4            THE LAW CLERK:  Judge, on the --

5            MS. CORS:  We have two issues, Judge, and these aren't

6   discovery per se, but they really do go to our client's mental

7   state and his ability to help us.  We have been trying to work

8   through these issues with BOP and have not made much progress.

9      The first issue is letters from the family.  As of end of

10  January, our client has yet to receive a single letter that has

11  been sent from his family.  This is not from lack of trying to

12  work with BOP on this issue.

13     So to step back -- and this ties into his -- the lack of

14  reading materials in Mandarin.  There has been an ongoing issue

15  about getting him anything to read in Mandarin.  We have yet to

16  break through that.  I understand that Mr. Clore has decided he

17  is going to order some books in Mandarin for Mr. Xu, so that

18  issue might be solved.

19     In the process, as I understand it, there was a discussion

20  about letting the family include some third-party materials in

21  his letters for him to read something, which they did, which

22  were voluminous, 20, 30 pages with writing.

23     That then became a holdup at BOP with respect to

24  translation.  We offered to translate the materials ourselves

25  and send in both the Mandarin version and the translated, which

1    he was receptive to.  He then was blocked from people up the

2    chain in doing that.  So materials ended up sitting on his

3    desk, all these letters untranslated, not provided.

4        We talked to him, we talked to the family and said, look,

5    start sending him shorter letters that aren't going to require

6    delays in translation, and they have been doing that.  Those

7    letters still have not gotten to him.

8        Again, you know, we have proposed one solution, which is us

9    translating them.  If that's not acceptable, you know, we're

10   looking for some help to break this backlog, to get this guy

11   letters from his family.  It's been a long time, and it's

12   becoming a significant issue and a real concern on his part.

13   He only has two 15-minute calls with family a week.  These

14   letters are pretty important.

15       THE COURT:  The Court would be inclined to inquire

16   about that.

17       MS. CORS:  Thank you, Your Honor.

18       MR. KOHNEN:  Thank you, Judge.

19   And again, just for context purposes, this is a man in 2019

20   who doesn't have access to the Internet, he doesn't have access

21   to e-mail, he doesn't have access to the television, he doesn't

22   have access to radio.  He doesn't even have access to

23   literature, however broadly defined, in even English, let alone

24   Mandarin.  He's literally wasting away in a cell.

25       And I don't want to overdramatize it, but with the Court's

1  permission, I'll send you a cite to a study that was done by

2  Yale University Law School about circumstances, about what

3  happens to detainees who are held in conditions like this, and

4  it's not good.

5      That's one of our primary concerns about -- you know, when

6  I say we're getting close to a Sixth Amendment problem here, it

7  really is so.

8      THE COURT:  My understanding on the books in Mandarin

9  was that the policy was that it had to come directly from the

10 publisher.  And maybe we're now making progress on that and

11 they're threatening to order something directly from the

12 publisher?

13     MS. CORS:  Correct.  So we -- from the beginning, we

14 had been informed that we could not bring the books in, and

15 that was fine.  So then the question became could Milan source

16 those books directly from wherever, the publisher.  I think

17 Amazon's become an issue in terms of security.  And we said

18 that was fine.  We would pay for that.

19     Kind of back to the bureaucracy.  The concern then was,

20 well, if we get him a book today and he reads it this week and

21 he wants another book next week, are we now in the business of

22 ordering books?  And that was the initial block on obtaining

23 reading materials in Mandarin.

24     I think we've made progress, but as of Monday he still

25 didn't have a book.  So I think we would still ask the Court

1    when, you know, you speak with Mr. Clore to raise that issue

2    and make sure that we are making progress to get him some

3    materials.

4           THE COURT:  Fair enough.  And on the issue of letters

5    from family, that gets held up because the institution has to

6    translate them?

7           MS. CORS:  Yeah.  And, you know, I can't say we fully

8    understand this.  So the institution is sending them out for

9    translation, which I understand, but they're referring to an

10   extremely high cost to do so.  Again, we're not sure why these

11   letters can't be reviewed -- first of all, why do they have to

12   be translated?  For national security reasons, if they have to

13   be reviewed, can they be reviewed and not translated to speed

14   up the process?

15     If that's not possible, aren't there translators affiliated

16   with the Department of Justice who could step in to do this job

17   without some high cost to Bureau of Prisons?  I've never

18   understood that part of it.

19          MR. KOHNEN:  And we've done a little research on that,

20   Your Honor, if you're interested in hearing about it.  But the

21   Department of Justice operates an organization known as the

22   National Virtual Translation Center.  They have over 1400

23   linguists employed there capable of translating 121 different

24   languages, including all of the Chinese dialects.

25     In addition, the FBI itself has 1600 foreign language, at

1   least, proficient special agents.  So this is not something

2   that can't be done.  We're at a loss for why it's not being

3   done.

4           THE COURT:  And the defense is not interested in

5   paying for the translation of the letters from the families to

6   expedite delivery?

7           MR. KOHNEN:  Well, we offered to with our own

8   translator.  I don't know what the --

9           THE COURT:  I see.

10          MR. KOHNEN:  She, I will tell you, is a far cry less

11  expensive than what Mr. Clore is telling us his translators

12  cost.

13          MS. CORS:  Yeah.  What Mr. Clore told us is even if we

14  were to provide the letters with the translation into English,

15  which we had talked about and he was amenable to, when he ran

16  that up the chain he was told that, irrespective of whether we

17  provide a translation, the policy is still going to require

18  that they obtain their own translation.

19          THE COURT:  And you're not eager to pay for that?

20          MS. CORS:  I wasn't even, first of all, aware that

21  that could be an option.  I think, you know, we would suggest

22  that we would prefer not to pay for that to allow our client to

23  have letters from home.  I mean, he's already incurring a lot

24  of expense to get us up there.

25          MR. KOHNEN:  I think it's the least the Department of

1   Justice can do.

2          THE COURT:  Did you want to be heard on the issue that

3   we're discussing here?

4          MR. MANGAN:  We haven't been privy to a lot of these

5   discussions, so I -- and since the Court is already planning to

6   speak with Mr. Clore, I think I'd only muddy the waters.  I

7   think you might be better off going straight to the horse's

8   mouth.

9          THE COURT:  Do you wish that I refer to him as such?

10      (Laughter.)

11         MR. MANGAN:  Depends which end he prefers.

12         THE COURT:  Thank you, Mr. Mangan.

13      You had a question, perhaps?

14         THE LAW CLERK:  The Monday and Tuesday visits, is it

15  easier to have -- so if we discuss possibly having more days

16  set aside, is it easier to have full days, so like two days but

17  you can stay there from, you know, 7:00 AM to 5:00 PM, or is

18  it, you know, just a few hours every day, or what would be more

19  helpful?

20         MR. McBRIDE:  My suggestion, since I'm the person who

21  is actually reviewing the discovery with Mr. Xu, is -- I have a

22  couple of issues I think might interfere with longer days.

23  First, the BOP does have limited personnel.  They also have a

24  routine.  They have inmates and detainees that must be fed.

25      Quite frankly, after four hours of going over the

1    information --

2        Which are pretty intense, because we have to have the

3    interpreter there.  And I'm talking now about the English

4    translations.

5        -- I think four hours, five hours is probably the max. in

6    any one session you can spend with him.  If we're to have two

7    four-hour blocks, I don't know there's any facility for us to

8    eat.  We'd have to leave, and then we have to come back through

9    the security procedures, which themselves take at least a half

10   an hour to access a day, and it requires the BOP to have an

11   individual there at the desk checking our credentials, putting

12   us through the scanner, putting all the materials through.

13       My suggestion is if we could get more four- to five-hour

14   blocks in succession, maybe Monday to Wednesday or even

15   Thursday, that would be easier for us to go up, spend four or

16   five days there with the interpreter, three or four days with

17   the interpreter -- we always go up on Sunday evening -- and

18   then being able to do a large block of discovery day after day

19   after day, and then maybe returning the next week or the week

20   after as the logistics permit.

21           THE LAW CLERK:  Okay.

22           THE COURT:  Well, we have a sense for the things we

23   should discuss with the BOP official today.

24       Was there more on your conversation plate, Mr. Kohnen?

25           MR. KOHNEN:  We probably could --

1    THE COURT:  Could talk all day?

2    MR. KOHNEN:  -- talk for the rest of the day on some

3 of the issues, Your Honor.  But what I will tell you is -- what

4 I'll stop at is we are getting tremendous pressure from Mr. Xu,

5 from his family, and at least at this point murmurings, which

6 will turn into drumbeats, from the Chinese consulate to get

7 this case tried.  Mr. Xu's family -- I'm not going to comment

8 about Mr. Xu's communications with us on the subject -- is

9 borderline apoplectic when they heard an estimate that this

10 case likely wouldn't be tried until a year from now.

11    We want to do everything we can to get this case moving and

12 to get this case set for trial.  There was a little debate

13 among the defense lawyers this morning when we met as to

14 whether or not we should ask the Court for a trial date today.

15 I don't remember what the consensus was, but I do want to just

16 at least go that far to let you know how serious we are about

17 that.

18    We, as Ms. Cors indicated, have a plan to streamline the

19 review of this absolutely massive amount of material that the

20 government has dropped on us.  We're done whining about it.

21 This is the last, if things go as planned.  And we've got a

22 plan for Mr. Xu to triage it and work with his own data and

23 identify where the many needles are in these massive haystacks.

24    But we're going to start a drumbeat of our own pretty soon

25 to get a trial date set that everybody should meet for more

1  reasons than I have to say, all of which I'm sure the Court can

2  imagine.

3     Anything else, guys?

4        THE COURT:  Well, in that regard, what happens next in

5  this litigation?  What is the path to trial?  What needs to

6  occur?

7        MR. KOHNEN:  We've got plans for pretrial motions.

8  We've refrained from filing them because of the complicated

9  case findings and the ends of justice findings, realizing that

10  we're all really still just trying to get our feet under us.

11        THE COURT:  Right.

12        MR. KOHNEN:  We don't anticipate that we're going to

13  bombard the government and the Court with a flurry of motions.

14  We are going to ask for *Brady* and *Jencks* material early,

15  because we think it's critically important, particularly if, as

16  part of the CIPA process, the Court and the government are

17  going to expect us to make some semblance of a defense or

18  theories of defense as part of that process.

19     We're going to be asking the Court for permission to send

20  out Rule 17 subpoenas.  We're going to probably file some

21  motions for orders *in limine*, probably file a motion for a gag

22  order -- the United States Attorney has referred in media to

23  our client as a spy; we can't have that anymore -- and things

24  of that nature.

25     Anything else I'm missing, Bob?

```
 1          MR. McBRIDE:  No, sir.

 2          MR. KOHNEN:  We're going to be asking for notice of

 3   404(b) evidence as soon as possible so that we can address that

 4   as well.

 5      For the Court's information, and I think as we put in the

 6   letter, nothing we've seen yet in the discovery was obtained

 7   through any method other than traditional law enforcement

 8   tools.  The CIPA process, the very small amount that I expect

 9   we'll be exposed to, may change that, but at this point we

10   don't have reason to believe that.

11      So it's not as complicated as we could convince ourselves

12   it is.

13          THE COURT:  What does the government see as the way

14   forward to trial?

15          MR. MANGAN:  Obviously, there's, it sounds like, a

16   series of motions that we will need to address at some point.

17          THE COURT:  Right.

18          MR. MANGAN:  There's -- you know, we've just filed the

19   CIPA 4 filing.  The Court needs whatever time the Court decides

20   it needs to review that.  And then I believe as part of that

21   process you need, outside of our view, you know, their

22   statement of what they have as anticipated defenses.  I don't

23   know how long the defense needs to get that to you.  But I

24   think on sort of the core non-classified discovery, I think the

25   issues have been more about these logistics that we already
```

1    talked about as opposed to getting ready for trial.

2        The core part of it, in terms of what you see in the

3    Indictment, was produced to them very early on in the first

4    tier of discovery.  So what we're talking about now is sort of

5    these other issues, sort of, that start broadening his

6    activities.

7        We think that part of it is addressing the CIPA portion of

8    it, but then secondarily setting up whatever motion deadlines

9    need to be set, whether there's going to be experts or not.  I

10   don't know if that was one of the issues that Ralph raised, but

11   certainly if either side is going to be doing that, we need to

12   put a deadline in place for that, and then we'd be ready for a

13   trial.

14       But, to me, that's how we see it.  There's a CIPA issue,

15   and then we've got these other motion deadlines or expert

16   deadlines that would need to be put in place.

17           THE COURT:  And when would you expect to be able to

18   present to the Court your CIPA statement, which is nature of

19   the defense or something?

20           MR. KOHNEN:  Yeah.

21           THE COURT:  You're the one who is eager to move this

22   along.

23           MR. KOHNEN:  Right.  And we've been discussing that

24   internally.

25           THE COURT:  I'm sure.

1    MR. KOHNEN:  I'm not really in a position to say that

2  we've come up with anything.

3    THE COURT:  Okay.

4    MR. KOHNEN:  But I will tell you that probably any

5  articulation of our theories of defense are going to be pretty

6  broad.  I'm tempted to say our theory of defense is going to be

7  that the government is going to fail to meet their burden of

8  proof --

9    THE COURT:  Right.

10    MR. KOHNEN:  -- and leave it at that, because we don't

11  really want to be pigeonholed.  We know, of course, that those

12  theories can be supplemented and then that can prompt the Court

13  to decide whether or not to release additional information

14  which only it has *ex parte*.

15    As soon as we're asked for it, we'll get a response to the

16  Court.

17    THE COURT:  Do you think it would be helpful for the

18  parties, outside the Court's presence, to come up with a

19  proposed calendar going forward, including motion deadlines,

20  just to start to get some focus on where you're headed?

21    How long does the government think it would take to present

22  this case, a couple of days?

23    MR. MANGAN:  The actual trial might go a little longer

24  than that, but I don't think we're talking a month either.

25  We'd like to probably maybe have some time to caucus with our

1    folks in D.C., both about the trial length but also about

2    proposed schedule.  We don't mind, you know, offline talking

3    with the defense about just some ideas and find out if we're in

4    the same ballpark or not.  We haven't done that yet.

5            THE COURT:  Well, the sooner you do that, the better.

6    My trial calendar is overwhelmingly stacked up.

7            MR. KOHNEN:  We were worried about that, Judge.

8            THE COURT:  That was a joke.

9            MR. KOHNEN:  Oh.

10           THE COURT:  It's stacked up.

11           THE LAW CLERK:  I don't know that it's a joke.

12           THE COURT:  The law clerk --

13           MR. McBRIDE:  May disagree with you.

14       (Laughter.)

15           THE COURT:  I'm going to caucus with my law clerk.

16           THE LAW CLERK:  It may be easier to wait to set a

17   motion deadline or to even discuss a motion deadline until you

18   know how long it will take for your client to get the

19   discovery.

20       I mean, you know, once he starts to look it over, he may

21   tell you that, you know, it's going to take him a month to look

22   over everything.  So it may be easier to wait until, you know,

23   the laptop issue is accomplished before --

24           THE COURT:  I think that makes eminent good sense, and

25   I misspoke previously.

1       MR. KOHNEN:  I agree.  And I also think that might

2  prompt us all to keep our eyes on that prize.

3       THE COURT:  Right.  I was just trying to get a sense.

4  When are you going to try this?  It's April.  This summer, next

5  fall?

6       MR. KOHNEN:  We sure want to -- we'd like to do it

7  probably not long after Labor Day.

8       MS. CORS:  I mean, just to add, in terms of the

9  discovery -- and I could be wrong, but my assumption is that

10  once our client has full access to these materials, he is going

11  to be able to parse through it very quickly and know what is

12  extraneous, what is relevant for us to look at more quickly

13  pretty promptly.

14    And again, he's got full days.  So I would even be

15  surprised if he would need a full month to identify relevant

16  material.  He might, but he's not going to need six months.

17       THE COURT:  I have a better sense for potential time

18  playing out, and we will try this when it's ready.

19       MR. KOHNEN:  That's all we can ask, Judge.  Thank you.

20       THE COURT:  Was there more on the plaintiff's

21  agenda -- or defense agenda today?

22       MR. KOHNEN:  No.  Thanks, Judge, for your time.  And

23  again, thanks for accommodating us in this environment.

24       THE COURT:  I thought you were remarkably restrained.

25       MR. KOHNEN:  Thank you, Your Honor.

1          MR. MANGAN:  I disagree, but --

2       (Laughter.)

3          MR. MANGAN:  -- we're on the record.

4          THE COURT:  Was there more that the government wanted

5   to address today?

6          MR. MANGAN:  I don't think so.  No, Your Honor.  I

7   think we would just need a new status report date and an ends

8   of justice to that date.

9          THE COURT:  Indeed.

10      When do you propose?  Maybe the defense would have a sense?

11         MR. KOHNEN:  Mr. McBride, I'll defer to you.

12         MR. McBRIDE:  Your Honor, I would respectfully suggest

13  another 60 days.

14         THE COURT:  Very well.  It's mid-April, mid-May,

15  mid-June.

16         THE LAW CLERK:  Can I turn off your flashlight?

17         THE COURT:  I can't turn it off.  I don't know what

18  the problem is.

19         MR. McBRIDE:  I have that same problem, Judge.

20         THE COURT:  Thank you, sir.

21         MS. CORS:  Actually, I do too.  I have to have my kids

22  do it.

23         THE LAW CLERK:  Wait.  Okay.  I don't know how to use

24  your phone.

25         THE COURT:  I was looking at Flag Day.  You can look

1    at whatever you choose.

2              MR. KOHNEN:  It's funny.  I was right there too.

3              MR. MIEDEL:  Flag Day, the 14th, that sounds good.

4              MR. KOHNEN:  I'm going to be in --

5              THE LAW CLERK:  I think we're in trial.

6              THE COURT:  Okay.  I was teasing.  You can look at the

7    calendar and make a proposal.

8              MR. KOHNEN:  I'm going to be in San Francisco on Flag

9    Day.

10        (Mr. Kohnen and Ms. Cors confer privately.)

11             MR. KOHNEN:  Judge, one thing I think we can deal with

12   in between is, we'd like the Court's permission to bring sort

13   of a subset of all the counsel of record to the status reports

14   and things of that nature to save travel schedule and our

15   client's money.

16             THE COURT:  The gentleman from New York needs to be

17   here every time we convene.

18             MR. MIEDEL:  No question.

19             MR. KOHNEN:  He looks forward to it.  He starts

20   calling us weeks ahead of time.  It's become a bit of an

21   annoyance, frankly, but --

22        (Laughter.)

23             THE COURT:  I was teasing.  I think this makes some

24   sense.

25             MR. KOHNEN:  Okay.

```
 1              THE COURT:  What do you propose?  Do you just want
 2    to --
 3              MR. KOHNEN:  I think, Your Honor, we're just going to
 4    do it ad hoc.
 5              THE COURT:  Fine.
 6              MR. KOHNEN:  We may, you know, give your chambers a
 7    heads-up that somebody's not going to attend and see how that
 8    goes initially.
 9         Frankly, your chambers have been really accommodating, and
10    we appreciate that too.
11              THE COURT:  Very well.  So which of the four lawyers
12    really doesn't want to come back and see me?
13              MR. KOHNEN:  Well, Your Honor, I don't feel this way,
14    but there's been a consensus that I might stay in the office.
15    So I don't know.  We'll see.
16              THE COURT:  Well, whatever you choose.
17              MR. MANGAN:  Do we get a vote?  Do we get a strike?
18    Can we have a couple strikes?
19         (Laughter.)
20              THE COURT:  Good for you, Mr. Mangan.
21              MR. KOHNEN:  I guess I can go to San Francisco on Flag
22    Day anyway, huh?
23              THE COURT:  What do you --
24              THE LAW CLERK:  June 17th or 18th.
25              MS. CORS:  That's fine.
```

```
 1            MR. MANGAN:  That's fine for us.

 2            THE LAW CLERK:  Is there a preference?

 3            MR. KOHNEN:  Can we do the 18th?

 4            THE LAW CLERK:  Sure.  1:00 o'clock?

 5            MR. MANGAN:  Sure.

 6            THE COURT:  Well, on that date and time someone will

 7     appear on behalf of the defendant and the government will

 8     convene with us, and hopefully we will have made substantial

 9     progress.

10        This was helpful for me personally today, and I appreciate

11     it.  I should observe that I appreciate your approach, Mr.

12     Kohnen.

13            MR. KOHNEN:  Thank you, Judge.

14            THE COURT:  I think it was much smoother to have a

15     conversation in chambers rather than a moot court session in

16     the courtroom.  And I'm enormously impressed with the

17     cooperation that's going on.  I think both sides are trying to

18     get this moved forward, and it's a credit to all of you.

19        I don't suppose you've discussed outside the Court's

20     presence resolving the matter in some way other than a trial?

21            MR. KOHNEN:  No, we have not, Your Honor.

22            THE COURT:  I wouldn't stand in the way.  So having

23     said that, perhaps we have done what we can today.

24        Is there more from the government?

25            MR. MANGAN:  No, Your Honor.  Thank you.
```

1          THE COURT:  More from the defense?

2          MR. KOHNEN:  No.  Thank you, Judge.

3          THE COURT:  Very well.  Well, as you well know, I

4   don't often get a chance to say it, but --

5      We're going to do an ends of justice finding.  The ends of

6   justice served by granting the requested continuance outweigh

7   the interests of the defendant and the public in a speedy

8   trial.  Due to the complexity and voluminousness of discovery

9   and pretrial preparation, failing to grant the continuance

10  would likely result in a miscarriage of justice.

11     So time is tolled from today until the new date.  The Court

12  continues to be of the mind, as previously certified, that this

13  is complex litigation.

14     Having said all that, I was getting geared up for my

15  closing statement.  I don't get a chance to say it often.  With

16  the exception of Mr. Kohnen, you're free to go.

17     (Laughter.)

18          THE COURT:  Actually, you can go too, Ralph.

19          MR. KOHNEN:  Thanks.  Thanks, Judge.

20     (Proceedings concluded at 11:41 AM.)

21                         - - -

22

23

24

25

1

C E R T I F I C A T E

2          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5

6                               s/Luke T. Lavin
                                _____
                                Luke T. Lavin
7                               Official Court Reporter

8                               -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25