# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:18-cr-00043 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | **DEFENDANT'S MOTION** |
| | : | **FOR DISCLOSURE OF *BRADY*,** |
| YANJUN XU, | : | ***GIGLIO*, AND JENCKS ACT** |
|    a/k/a Xu Yanjun, | : | **MATERIALS** |
|    a/k/a Qu Hui, | : | |
|    a/k/a Zhang Hui, | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| Defendant. | : | |

Defendant Yanjun Xu ("Mr. Xu"), by and through counsel, hereby moves the Court for an order compelling the government to search for, translate, and produce to the defense exculpatory and mitigating materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Mr. Xu requests further that the Court order the government to conduct its search, translation, and production of said materials immediately to give Mr. Xu sufficient time to make fair use of the materials at trial.

Mr. Xu also moves the Court for an order compelling the government to produce and translate all Jencks Act materials no later than 60 days before trial.

A memorandum in support of this motion is attached hereto.

1

25790846.2

Respectfully submitted,

*/s/ Ralph W. Kohnen*
Ralph W. Kohnen (0034418)
Jeanne M. Cors (0070660)
Robert K. McBride *(pro hac vice)*
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
kohnen@taftlaw.com
cors@taftlaw.com
rmcbride@taftlaw.com

Florian Miedel *(pro hac vice)*
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, NY 10004
Telephone: (212) 616-3042
Fax: (800) 507-8507
fm@fmamlaw.com

COUNSEL FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:18-cr-00043 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | **MEMORANDUM IN SUPPORT OF** |
| YANJUN XU, | : | **DEFENDANT'S MOTION FOR** |
| a/k/a Xu Yanjun, | : | **DISCLOSURE OF *BRADY*, *GIGLIO*,** |
| a/k/a Qu Hui, | : | **AND JENCKS ACT MATERIALS** |
| a/k/a Zhang Hui | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| Defendant. | : | |

  In early April 2018, the government indicted Defendant Yanjun Xu ("Mr. Xu") charging him in a far-reaching conspiracy to violate the Economic Espionage Act ("EEA") and with substantive counts. The indictment, which alleges a conspiracy dating back to 2013, is woefully deficient in providing even the most basic information to Mr. Xu regarding the terms of the alleged agreement, the identity of the alleged co-conspirators, and the universe of victims the government alleges to have been the targets of such conspiracy.

  As part of its investigation, the government collected a vast array of electronically-stored data and communications allegedly involving Mr. Xu and others. The majority of these records are in Mandarin and consist of communications sourced from stored email accounts and seized devices, including a laptop, cell phones, and SIM cards. In the many months since Mr. Xu was arrested and extradited to the United States, the government has drawn upon its substantial pool of agents and translators to review, identify, translate, and produce materials it deems helpful to *its* case. But, in total abdication of its affirmative duties under *Brady v. Maryland* and *Giglio v. United States*, the government has refused to undertake *any* similar search for evidence and materials favorable to the defense. Rather, the government has taken the extraordinary position

3

that it may satisfy its affirmative duty to search for and produce *Brady* and *Giglio* materials by producing *all* of the electronically-stored materials it has collected, left untranslated and housed in formats that would require a significant investment of time and resources on the part of the defense to reformat, process, search, review, and catalogue.

The government's contention that it satisfies its obligations under *Brady* and *Giglio* through a massive data dump of untranslated and unmanageable materials is unsupported by the law and should be rejected by this Court.

## FACTUAL SUMMARY

On April 4, 2018, the United States filed an indictment claiming Mr. Xu violated 18 U.S.C. § 1831(a)(5) [Conspiracy to Commit Economic Espionage], 18 U.S.C. § 1832(a)(5) [Conspiracy to Commit Trade Secret Theft], 18 U.S.C. § 1831(a)(1), § 1831(a)(4) & (2) [Attempted Economic Espionage by Theft or Fraud (Victim Company A)], and 18 U.S.C. § 1832(a)(1) and § 1832(a)(4) & (2) [Attempted Theft of Trade Secrets by Taking or Deception (Victim Company A)] ("Indictment"). (Doc. #1.) Although the Indictment seems to allege a worldwide conspiracy involving numerous victim companies and co-conspirators dating back to 2013, it is woefully short on facts that would allow the defense to identify with specificity the terms of the alleged agreement to violate the EEA, the identity of the co-conspirators alleged to have participated in the conspiracy, the overt act(s) done in furtherance of the alleged conspiracy, and the universe of victim companies that were the alleged targets of the conspiracy.

On November 14, 2018, the Court entered the Agreed Protective Order Regarding Non-Classified Discovery ("Protective Order") (Doc. #25). To date, the government has made several productions of discovery material in varying formats and limited degrees of usability due to the fact that the data is almost entirely in Mandarin, the forensic image is effectively unsearchable and unmanageable without specialized software, and Mr. Xu's access to his defense team is

4

25790846.2

severely limited and restricted by Department of Justice officers within the U.S. Bureau of Prisons.

By letter dated November 9, 2018, the government produced its first batch of discovery. The production consisted primarily of materials the government intends to use during trial in its case-in-chief. The approximate 210 megabytes of data, produced by the government on CD, was limited in scope, well-organized, translated into English, and made easily searchable. Obviously, this is part, or perhaps most of the evidence, the government intends to use as it attempts to prove Mr. Xu guilty. On December 18, 2018, the government produced its next batch of discovery comprising approximately 11.9 megabytes of data.

On February 5, 2019, the government produced an exponentially larger volume of data to the defendant. Included in this production was a disc containing approximately 84 megabytes and hard drive containing approximately 358 gigabytes[1] of data. The contents of the hard drive, consisting primarily of ESI derived from multiple iCloud accounts and forensic images of seized phones, a laptop, and SIM cards, were inaccessible without further tools. Subsequently, the government produced two discs containing data from the backed up devices with a reader, however, the data is predominantly in Mandarin and still not in a format that can be effectively managed or searched without a substantial investment of time and additional resources. Similar to the first production, the government apparently included translations only of evidence it had deemed helpful to the prosecution.

On July 17, 2019, the government produced its fifth batch of discovery which included one disc containing approximately 600 MB of data. The contents of the disc included translated prison calls and letters, a search warrant return for a LinkedIn account, four email accounts and

---

[1] 1 gigabyte of data equals 1000 megabytes of data.

various phone reports which included phone images, recordings and calendar entries. On that same day, the government also produced a second disc containing approximately 427 MB of data from iCloud backups.

During recent status conferences with the Court, the parties discussed the production of Rule 16, *Brady*, and *Giglio* materials. The government indicated that it did not intend to undertake a search for exculpatory materials or materials the defendant could use to impeach government witnesses at trial. Rather, the government asserted that any disclosure obligations it had under *Brady* and *Giglio* were satisfied in full by its decision to turn over, in an untranslated and unmanageable format, all of the materials it collected during the course of its investigation that could contain materials favorable to the defense. *See* Feb. 6, 2019 Trans. 14:16-15:7; Dec. 19, 2018 Trans. 4:13-5:1; 7:2-10:4.

During a subsequent meeting with the government, defense counsel requested that all Jencks Act material be produced well in advance of trial to avoid any unnecessary delay or prejudicial effect. The government rejected this request and indicated that it did not intend to produce Jencks Act material until the week before trial at the earliest.

## LAW AND ARGUMENT

### I. The Government Has an Affirmative Duty to Identify *Brady* and *Giglio* Material

The United States has failed or refuses to satisfy its affirmative duty to disclose *Brady* and *Giglio* materials. It is well-settled that under the Fifth and Sixth Amendments to the United States Constitution, the government has an affirmative duty to disclose, upon request, evidence favorable to the defendant that is material to either guilt or punishment. In *Brady v. Maryland*, the Supreme Court recognized "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

6

25790846.2

punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) ("It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment."). The *Brady* rule applies both to evidence that is exculpatory in nature and evidence that a defendant could use to impeach a government witness at trial. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985).

"[I]t is the government's responsibility in the first instance to determine whether information in its possession is *Brady* material." *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) ("open-file discovery does not relieve the government of its *Brady* obligations."). Indeed, "the *prosecution* has the duty to *affirmatively* scour those records of the agencies considered the 'government' for purposes of the criminal case in order to determine and acquire those materials which would be considered *Brady* exculpatory and *Giglio* impeaching." *United States v. Salyer*, No. S-10-0061, 2010 WL 3036444, *3 (E.D. Cal. Aug. 2, 2010) citing in part, *Whitley*, 514 U.S. at 437. This obligation extends to evidence possessed by other government agencies that have participated in the investigation as a member of the prosecution team. *Whitley*, 514 U.S. at 437-38 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.").

The advent of high-volume ESI cases has not altered the government's affirmative duty to search for and produce exculpatory and impeachment materials. Even with the evolution from paper to electronic files, the government is still required to learn of and disclose exculpatory and impeachment evidence in a manner and time that enables a defendant to make effective use of

7

the material at trial. *See, e.g., United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994); *United States v. Graham*, No. 1:05-CR-45, 2008 WL 2098044, *7 (S.D. Ohio May 16, 2008) (addressing timing of voluminous electronic and paper discovery and requiring that "[n]o discovery production should be permitted beyond a fair and reasonable deadline sufficiently in advance of the trial date to afford defense counsel adequate time to review and analyze the discovery materials except upon a showing of good cause.").

The government does not satisfy its *Brady* and *Giglio* obligations by merely producing as Rule 16 discovery, all of the materials it has compiled. The government cannot require the Defendant to "wade through piles of documents or gigabytes of disclosed discovery to find [*Brady* material], and if he is lucky, the information will bite him as much as a fisherman may eventually hook a fish by casting aimlessly without bait, if he casts long enough." *United States v. Salyer*, 271 F.R.D. 148, 154 (E.D. Cal. 2010) *opinion adhered to as modified on reconsideration*, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010). Nor does the government satisfy its affirmative duty to search for and disclose *Brady* and *Giglio* material by producing a large set of ESI under an "open-file" theory of discovery. *Hsia*, 24 F. Supp. 2d at 29. "[A]t some point . . . a duty to disclose may be unfulfilled by disclosing too much; at some point, 'disclosure,' in order to be meaningful, requires 'identification' as well." *Salyer*, 2010 WL 3036444 at *6. "The government cannot meet its *Brady* obligations by providing [defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack." *Hsia*, 24 F. Supp. 2d at 29; *see also Graham*, 2008 WL 2098044 at *6 (recognizing that in matters where the volume of discovery turned over by the government is massive, "the government cannot be permitted to remain inert in the face of large volumes of

unsorted discovery materials[,] [n]or can the government be permitted to refuse to share databases and search engines with defense counsel.").

That *Brady* requires the government to search for and identify exculpatory and mitigating information in the context of a large ESI discovery production makes common sense both in terms of the unclassified materials and materials subject to the Classified Information Procedures Act ("CIPA"). The government knows the theories of its case and is therefore best suited to identify exculpatory and government impeachment evidence. *United States v. Blankenship*, No. 5:14-cr-00244, 2015 WL 3687864, *7 (S.D. W.Va. June 12, 2015) ("[T]he United States, having determined the nature of the charges and having knowledge of the evidence and witnesses it intends to produce to prove those charges, is in a far better position than the Defendant to know what evidence might be exculpatory and/or impeachment material under *Brady*."). Additionally, the government has the tools, resources, and established procedures in place that allow it to efficiently search, translate, and review the data it has gathered.[2] And, the government alone knows the individuals and organizations that are part of the prosecution team and who, therefore, may be in possession of *Brady* and *Giglio* materials.

---

[2] At the December 19, 2018 status conference, the government described its review procedures to include the ability to do keyword searches for "things" they "deem relevant" and the use of a two-tier "triage" and translation process. Dec. 19, 2018 Trans. 7:9-19.

The government also has access to translation resources through companies such as Advanced Language Systems International, Inc., which according to its website, is a "premier language and IT services provider for the US Federal Government . . . ." *See* http://www.alsi-inc.net/. Additionally, the government also appears to have access to translation services through the National Virtual Translation Center ("NVTC") which is "an FBI-managed federal government center created to serve the U.S. government's translation needs . . . [including] to provide timely, accurate, and cost-effective translations in support of national interests." *See* https://www.fbi.gov/about/leadership-and-structure/intelligence-branch/national-virtual-translation-center. "The center offers a *comprehensive set of language services* to the federal government, with source material processed in a wide variety of formats: handwritten, typewritten, and *electronically or digitally produced documents*; microfilm; audio; video; and web-based content." *Id*. (emphasis added). "NVTC's personnel and linguists are located throughout the U.S. and connect via various networks with our Program Office in Washington, D.C. and other satellite locations around the country to perform their work . . . [t]he NVTC's *highly sophisticated* virtual network removes geographic boundaries." *Id*. (emphasis added).

Given the many complexities of this case (including the limited factual allegations contained in the Indictment, the substantial volume of discovery, the language barrier, and the unmanageable format in which the discovery was produced), it is simply not possible for the defense, on its own, to conduct an effective search for *Brady* and *Giglio* materials. The government has produced an extraordinarily large volume of electronically-stored materials in Mandarin, untranslated (except for limited materials the government has deemed helpful to its case), and in a format that is unmanageable and cannot be searched effectively. The difficulties the defense team face in navigating this discovery to locate potential *Brady* and *Giglio* materials are compounded by the bare-bones allegations in the Indictment that fail to provide the defense with critical facts regarding the scope of the alleged conspiracy and the government's case that it would need to be able to conduct a meaningful search. That Mr. Xu – other than translators, the only member of the defense team to understand Mandarin – is being detained at FCI Milan in solitary confinement with a restricted visitation schedule only exacerbates these problems.

Fairness and justice dictate that Mr. Xu must have the same ability to meaningfully access and use the data as the government. Otherwise, and without the assistance from the Court requested here, the defense would be unfairly subjected to the government's strategy as to how it gathered and distributed the discovery, and to its wrong-headed theories regarding its obligations regarding the sharing of *Brady*, *Giglio*, and Jencks Act material.

Any argument by the government that the sheer volume of the discovery and the fact that it is mostly in Mandarin prevents the government from searching and identifying *Brady* and *Giglio* materials, should be flatly rejected. The government is the master of its own investigation and it cannot now complain that the volume of data it has seized is too vast to search for *Brady* material. *See Salyer*, 2010 WL 3036444 at *4 ("If the government argues that it is now

10

'impossible' to comply with the burden of reviewing evidence for identification purposes, the government more or less made its own bed in this matter by making it impossible."). Furthermore, the government has demonstrated that it is capable of searching and translating the discovery it has produced. Otherwise, it would not have been able to produce in translated format the materials that it intends to use in its case-in-chief.

The overriding obligation of the government is to treat a defendant with fairness. Fairness is the *sina qua non* of the Constitutional right to due process. The government's duties under *Brady* and *Giglio* flow directly from this due process requirement. In light of the many unique aspects of this case that make it difficult if not impossible for the defense to conduct an effective search for *Brady* and *Giglio* materials on its own, due process requires the government to fulfill its affirmative obligations under *Brady* and *Giglio* to search for and produce all exculpatory materials and materials the defendant could use to impeach the government's witnesses at trial that are in the government's possession whether or not subject to CIPA.

## II. The Government Must Be Required to Provide *Brady* and *Giglio* Translations

It is within the authority of this Court to require the government to provide English language translations of criminal discovery. *See e.g.*, *United States v. Santiago*, No. 12-cr-00566, 2013 WL 1688865 (E.D. Pa. Apr. 18, 2013) (requiring translations of 1,329 wiretapped and recorded Spanish-spoken telephone conversations where translations were necessary to effective representation, the translations would not be unduly burdensome, and the government was better able to manage the administrative tasks associated therewith); *United States v. Sherifi*, No. 7:12-cr-20-BR, 2012 WL 2237074, *3 (E.D.N.C. June 15, 2012) (requiring English translations of recorded conversations where no defense attorney spoke the language and upon showing that the burden on the government was not significant). The government clearly has the resources to

11

identify and translate *Brady* and *Giglio* materials, as evidenced by the translations the government has already searched for, found, and produced as the evidence it intends to use in its case-in-chief.

There are additional complicating factors in this case that strengthen the need for an order directing the government to translate all *Brady* and *Giglio* materials, including that (1) none of the defense attorneys speak Mandarin; (2) defense counsel is constrained in their ability to consult with Mr. Xu regarding the discovery due to Mr. Xu's detention at FCI Milan and his limited visitation schedule; (3) a translator must be present to facilitate communications; and (4) the bulk of the discovery has been produced to the defense in a format that cannot be searched effectively.

### III. The *Brady* and *Giglio* Disclosures Should be Made Immediately

With respect to timing, the general rule is that the prosecution must turn over the materials in time for the defense to make effective use of them at trial. *Bencs*, 28 F.3d at 561. *Brady* stands for the proposition that due process requires a prosecutor to disclose material exculpatory evidence to the defendant *before* trial. *See*, *Brady*, 373 U.S. 83; *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). Following that principle, and in light of the significant impediments the defense already faces in reviewing the discovery and making effective use of it at trial, the government should be required immediately to search for, translate and produce all exculpatory materials and materials the defense could use to impeach government witnesses at trial. Factors that are likely to slow down the defense's ability to review and make effective use of the *Brady* and *Giglio* materials produced by the government include that: (1) the volume of discovery is enormous; (2) Mr. Xu is limited in his ability to review discovery in consultation with counsel; (3) defense counsel is located four hours away and is restricted to limited days and hours when they can meet with Mr. Xu; (4) substantive

12

communications between Mr. Xu and defense counsel require the presence of a translator; and (5) each portion of the discovery must be reviewed in context of the larger body of untranslated materials, which is an arduous and time-consuming process.

### IV. The Government Should be Required to Disclose Jencks Act Materials in Advance of Trial

Mr. Xu also requests the Court to enter an order requiring the government to make a pretrial production of all statements subject to the Jencks Act, 18 U.S.C. §3500, no later than 60 days prior to the commencement of trial, so as to remove unnecessary barriers to the efficient trial of this case. The Jencks Act generally requires the government to produce any previous statements made by a government witness after such witness testifies on direct examination at trial. Courts understand its practical implications and thus routinely encourage the practice of pretrial disclosure of Jencks Act material in order to expedite the progress of the trial and to avoid any potential *Brady* issues. *See e.g.*, *United States v. Minsky*, 963 F.2d 870, 876 (6th Cir.1992) ("While technically the government may withhold Jencks Act material until the conclusion of the direct examination of the witness, the better practice—and that followed in most federal courts today—is for the government to produce such material well in advance of trial so that defense counsel may have an adequate opportunity to examine that which is not in dispute and the court may examine the rest *in camera,* usually in chambers. This avoids the inevitable delay of the trial when the material is withheld until the witness concludes his direct examination."); *United States v. Hubbard*, 474 F. Supp. 64 (D.C. Cir. 1979).

In the present case, Mr. Xu has been named in a multiple count Indictment. Witness statements have undoubtedly been provided in different forums and cases (including for example, *United States v. Ji Chaoqun*, 1:18-cr-611 (N.D. Ill.)), and such statements are believed to be extensive and include lengthy testimony and investigative reports. Furthermore, these

13

statements are believed to directly relate to the allegations pending in the present case, and also to involve accounts of witnesses' personal misconduct, which the government must produce pursuant to *Brady* and *Giglio*. Disclosure of all these materials, even one month before trial, is insufficient under the unusual circumstances of this case. It would be very difficult, if not impossible, to review the Jencks Act statements at the end of the direct testimony of the witness without significantly delaying the trial or prejudicing Mr. Xu. To avoid such unnecessary delay and prejudicial effect, the Court should require the government to produce all Jencks Act material at least 60 days before trial. Thorough review of such material is absolutely necessary in order for counsel to effectively represent Mr. Xu's interests as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

## CONCLUSION

Wherefore, Mr. Xu moves this Court for an Order compelling the government to fulfill its affirmative obligations by requiring the government to: (1) immediately search for, translate, and produce to the defense all *Brady* and *Giglio* material; (2) search for, translate, and produce to the defense all Jencks Act material no later than 60 days before trial; and (3) provide an index identifying the location and source of both unclassified material and material subject to CIPA.

Respectfully submitted,

*/s/ Ralph W. Kohnen*
Ralph W. Kohnen (0034418)
Jeanne M. Cors (0070660)
Robert K. McBride *(pro hac vice)*
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
kohnen@taftlaw.com
cors@taftlaw.com
rmcbride@taftlaw.com

Florian Miedel *(pro hac vice)*
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, NY 10004
Telephone: (212) 616-3042
Fax: (800) 507-8507
fm@fmamlaw.com

COUNSEL FOR DEFENDANT

25790846.2

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties in this case by operation of the Court's CM/ECF system. Parties may access this filing through the Court's system.

*/s/ Ralph W. Kohnen*