UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

. . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,      . Case No. 1:18-cr-043
                               .
         Plaintiff,            . *Motions Hearing/In-Person*
                               . *Status Conference*
       - v -                   .
                               . Wednesday, January 22, 2020
YANJUN XU,                     . 10:05 AM
                               .
         Defendant.            . Cincinnati, Ohio
. . . . . . . . . . . . . . . .


REDACTED TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE

<u>APPEARANCES</u>:

For the Plaintiff:    TIMOTHY S. MANGAN, ESQ.
                      EMILY N. GLATFELTER, ESQ.
                      Assistant U.S. Attorneys
                      United States Attorney's Office
                      221 East Fourth Street, Suite 400
                      Cincinnati, Ohio  45202

For the Defendant:    RALPH W. KOHNEN, ESQ.
                      JEANNE M. CORS, ESQ.
                      PHILIP D. WILLIAMSON, ESQ.
                      Taft, Stettinius & Hollister LLP
                      425 Walnut Street, Suite 1800
                      Cincinnati, Ohio  45202-3957

Law Clerk:            Cristina V. Frankian, Esq.

Court Reporter:       Luke T. Lavin, RDR, CRR
                      Potter Stewart U.S. Courthouse
                      100 East Fifth Street, Room 103
                      Cincinnati, Ohio  45202
                      Telephone:  (513) 564-7500

- - -

*Proceedings recorded by stenotype; transcript
prepared by computer-aided transcription.*

```
 1                    P R O C E E D I N G S

 2      (In chambers at 10:05 AM.)

 3           THE COURT:  Okay.  Let's go on the record.

 4      We're here in chambers on the criminal docket in the case

 5  of United States of America versus Xu.  We are here for oral

 6  argument on four pending motions and for status conference.

 7        For purposes of the record, I ask that you enter your

 8  appearances.  Who appears as counsel for the United States of

 9  America?

10           MR. MANGAN:  Tim Mangan and Emily Glatfelter.

11           THE COURT:  Good morning to the two of you.

12      And on behalf of defendant Xu?

13           MR. KOHNEN:  Your Honor, good morning.  Ralph Kohnen.

14           MR. WILLIAMSON:  Philip Williamson.

15           MS. CORS:  Jeanne Cors.  Good morning, Your Honor.

16           THE COURT:  Good morning to the three of you.

17      My law clerk, Cristina Frankian, is present as well.

18        The fact that we are here in chambers does not obviate the

19  fact that we're here in part for oral argument on the pending

20  motions.  I find this more informal setting of chambers more

21  conducive to discussion and understanding than formal argument

22  in the courtroom.  But defense has asked for oral argument; the

23  Court is providing it today.

24        I believe my law clerk e-mailed you and indicated that I

25  don't need oral argument consisting of recitation of what is in
```

 1   the briefs.  The motion to dismiss and the motion for a bill of

 2   particulars, in particular, present questions of law.  We've

 3   worked hard on it, we're ready, but I'll give you an

 4   opportunity to say anything you wish if you wish.

 5       The motion for disclosure of *Brady* and *Giglio* materials, I

 6   need to understand more clearly what the difficulties are.  I

 7   find that the hyperbole in defendant's pleadings makes it

 8   difficult for me to truly understand what the difficulties are,

 9   and I'm hoping that oral argument, slash, status conference

10   will enable us to identify truly what presents and try and

11   effect practicable and reasonable remedies.

12       Of the four motions pending, one is a motion for pretrial

13   disclosure of 404(b) evidence.  Pursuant to the parties'

14   jointly-proposed calendar, that evidence is due on February 24,

15   2020.  I believe, therefore, that motion is moot.

16       The government has produced 9,000 pages of hot documents

17   that they intend to use to prove their case.  A review of those

18   documents reflects precisely what the government is going to go

19   forward on.  They produced those documents in indexed,

20   foldered, translated searchable documents.  The additional

21   productions are largely from the defendant's own devices and

22   records.

23       (The Court and law clerk confer privately.)

24           THE COURT:  So that's sort of my opening statement.

25   The defendant is the movant, so can we have argument, a

1  dialogue, and if need be, can I stop you and try and pinpoint

2  exactly what's going on and ask the government to weigh in.

3      Mr. Kohnen, will you be heard?

4          MR. KOHNEN:  Gladly, Your Honor.

5      First of all, with respect to the noted hyperbole in the

6  *Brady, Jencks, Giglio* motion, I hope the Court will --

7          THE COURT:  All motions.

8          MR. KOHNEN:  Okay.

9      -- I hope the Court will consider that at least as an

10  indication of how seriously we take these matters.

11          THE COURT:  I'm just telling you, in the spirit of

12  full disclosure, it's not helpful to the Court.  You guys are

13  sophisticated lawyers that know what presents and what the

14  specific issues are, and I'm glad we're having this

15  opportunity.

16          MR. KOHNEN:  Would you like to deal with any of the

17  motions in any particular order?

18          THE COURT:  Yeah.  The first two that I think you

19  fully briefed, they're questions of law.  If there's something

20  you want to supplement on the motion to dismiss or the motion

21  for bill of particulars, yes.  And I'll hear from anybody.

22          MR. KOHNEN:  Jeanne, do you have anything to add on

23  that?

24          MS. CORS:  No, I don't.

25          MR. KOHNEN:  I don't have anything.  We really don't

1    have anything to add on the motion to dismiss or the motion for

2    bill of particulars.  As the Court can tell, and we appreciate

3    the fact that you've read the memos, but the reason I mention

4    that is because, as I think you can probably tell, we see all

5    of these -- all three of these motions as connected to one

6    another.  And I think, to boil it down to its essence, the

7    connection really is -- can be as simple as one word, really:

8    information.  Not as in the charging document but as in

9    information, the body of material that we need.  We have --

10            THE COURT:  Can I interrupt and clarify?

11            MR. KOHNEN:  Sure.

12            THE COURT:  The government has not suppressed

13    evidence.  They've given you everything they have, and you're

14    not happy with the ability to manage it.

15            MR. KOHNEN:  Yeah.  And I think they've given us

16    everything they -- well, I don't think they've given us

17    everything they have.  I don't know if they've given us

18    everything they have.

19            THE COURT:  I'm just trying to make the point I don't

20    think it's an issue of suppression.  I think it's an issue of

21    manageability of what you've been given.

22            MR. KOHNEN:  Yeah, the CIPA material aside.  We have

23    no idea what's going on with that.

24            THE COURT:  The Court's on that.

25            MR. KOHNEN:  Okay.

1    Yeah, they've given us the material.  They've attributed it

2  to Mr. Xu.  To our satisfaction, at least, they haven't

3  demonstrated that it's exclusively from Mr. Xu.

4    But the more important thing is, it's not in a form that we

5  can use, and it's voluminous.  They have gone to great lengths,

6  apparently, to find -- through word searches, as they've

7  represented to us in prior conferences, and other things --

8  inculpatory material, and they've found those needles in the

9  haystacks, they've translated them, and they've produced them

10  to us.

11    Now they refuse to use those same capabilities to assist us

12  and to fulfill their obligation to seek and find exculpatory

13  material.

14        THE COURT:  And their obligation is to seek and find,

15  not to tab, organize, translate, and present for you,

16  particularly if they're your documents.

17        MR. KOHNEN:  Judge, I think it would be great if they

18  would start with an acknowledgment of their obligation to seek

19  and find and embark on efforts to do so.  To date they haven't

20  even done that, and to date they refuse to do that.

21    It would be easy for us to work out some kind of mechanism

22  to get the information identified and translated once they were

23  willing to do it.  My point in referring back to the 9,000

24  documents --

25        THE COURT:  Pages?

1        MR. KOHNEN:  -- 9,000 pages is they've now proven they

2   have the ability to do that, and yet they won't do it for us.

3      That's the first problem that we have, and I think it's the

4   only really significant problem.  Because if they were to

5   commit to do that, then I think the rest of this would fall in

6   line.

7        THE COURT:  Tell me what the problems are with the

8   format of what's been produced to you.

9        MR. KOHNEN:  I will start with that, but it's not just

10  the format that's our problem.

11       THE COURT:  You've gotten a bunch of documents.

12       MR. KOHNEN:  Right.

13       THE COURT:  And now you've got to --

14       MR. KOHNEN:  We now have readable electronic data.

15       THE COURT:  Okay.

16       MR. KOHNEN:  That's all we have.  It's not indexed;

17  it's not searchable.

18       THE COURT:  All right.  Let's talk about not

19  searchable.  I thought they produced virtually everything in

20  PDF.

21       MR. KOHNEN:  They probably have.

22       THE COURT:  So you can --

23      And you can help me if need be.

24      With software, you can pop it into a PDF that's searchable.

25       MR. KOHNEN:  I don't think --

1          Jeanne, maybe you can help us.

2          I don't think, number one, we have the software.  And I'm

3     not sure that the equipment that Mr. Xu has is capable of

4     accommodating that software.

5               THE COURT:  All right.  I'm going to interrupt and ask

6     Ms. Frankian to speak to that.

7               THE LAW CLERK:  If the information --

8               THE COURT:  Louder for me.

9               THE LAW CLERK:  If the information is already in a

10    PDF, even if it's in Mandarin, it's still searchable.  So, for

11    instance, all you need is the character, and you just copy and

12    paste it.  So Control F, Copy, Paste, and it will find it for

13    you.  You won't know what it means, but you'll find it.  And

14    then that will at least get you to the sections where that

15    particular character is.

16              THE COURT:  And you can translate that character.

17              THE LAW CLERK:  And then you can translate that.

18              MR. KOHNEN:  Right.  Which leads me to the bigger

19    logistical problem.

20              THE COURT:  Okay.

21              MR. KOHNEN:  Which, because of the logistical

22    difficulties, is a bigger problem, frankly.

23              THE COURT:  Tell me what it is.

24              MR. KOHNEN:  Mr. Xu is stuck at the Milan Federal

25    Correctional Institution.

1          THE COURT:  And he has an opportunity to review, in a

2   language he speaks, the documents that came from him.

3          MR. KOHNEN:  Allegedly came from him, but --

4       Yes, he does, but he's not a trained lawyer.  He doesn't

5   understand the American judicial system.  He doesn't know what

6   to look for.  It's that simple.  And even if he did know what

7   to look for, if we gave him the benefit of the first year of

8   law school, it wouldn't be us doing it.

9          THE COURT:  He can certainly identify the irrelevant

10  portions, the photographs that take up all this stuff, the

11  e-mails from Joseph Bank, whatever it is.  He can tell you

12  those are irrelevant and start to weed it down, can't he?

13         MR. KOHNEN:  Judge, there are relevance questions that

14  go to this court and the Court of Appeals and the Supreme Court

15  every day.

16      (Cellphone rings.)

17         MR. KOHNEN:  Pardon me.  I'm sorry about that.

18      No.  The answer is no, he's not capable to deal with --

19         THE COURT:  Telling you what's spam in his stuff?

20         MR. KOHNEN:  Spam is one thing.

21         THE COURT:  I consider Joseph Bank spam.

22         MR. KOHNEN:  It could be.  But what if Mr. Xu had a

23  receipt from Joseph Bank on the day he was alleged to have been

24  in Amsterdam?

25         THE COURT:  Well, then would he not tell you he was in

1  Joseph Bank in Russia at the time and you would go looking for

2  that document?

3      MR. KOHNEN:  My point, Your Honor, is we can't trust

4  him to do what lawyers have to do.

5      THE COURT:  And then I'm suggesting, in a practical

6  world, he can help you enormously by identifying what's clearly

7  not relevant.

8      MR. KOHNEN:  Yes.  But clearly not relevant --

9      THE COURT:  I'm just talking about --

10     MR. KOHNEN:  -- is just a small step --

11     THE COURT:  Okay.

12     MR. KOHNEN:  -- on the way to finding *Brady* material,

13  *Jencks* material, and *Giglio* material.  Again, fights repeatedly

14  in this court, in the Sixth Circuit, in the Supreme Court among

15  lawyers, sophisticated lawyers, about what really is *Brady*

16  material.  Right?  How are we going to trust not just a

17  civilian but a civilian from an entirely different culture to

18  screen that and to do that work?  It's just impractical.  It's

19  not just impractical --

20     THE COURT:  That assumes that it's the government's

21  responsibility to translate it and provide it all to you.  Can

22  you not get to work on figuring out what's in his own

23  documents?

24     MR. KOHNEN:  We are working furiously at that.

25     THE COURT:  I'm sure you are.  That's why you've got a

1    long time for trial.

2           MR. KOHNEN:  But you've got to understand, we don't

3    have the capabilities they have.  One of our filings made

4    reference to the unit that the Department of Justice and the

5    FBI has, which I'm sure these prosecutors or their

6    investigators took advantage of.  Okay?

7           THE COURT:  I think you have the technology, the

8    smarts, to get this done.

9           MR. KOHNEN:  We do.

10          THE COURT:  And I was just searching --

11          MR. KOHNEN:  We do, but we --

12          THE COURT:  -- for ways to practically be of

13   assistance.

14          MR. KOHNEN:  We do.

15          THE COURT:  You do have the ability?

16          MR. KOHNEN:  We do, but we don't have the time and we

17   don't have the manpower.

18          THE COURT:  Anything further?

19          MR. KOHNEN:  Judge, you know, I don't want to beat a

20   dead horse, but we get precious few hours per visit roughly

21   every other week with Mr. Xu.  I mean, I understand where the

22   Court's coming from, and we -- it is physically possible to get

23   it done, but it's not physically possible to get it done before

24   I retire from the practice of law.

25          MS. CORS:  If I could weigh in just on another

1   practical issue we're facing with respect to where Mr. Xu is

2   and the computer access he has.

3       Even assuming he has the knowledge regarding the case and

4   the legal knowledge to go through and identify what is relevant

5   in his mind, what is extraneous, we don't have a way to easily

6   have him identify that and get that information even to us

7   because we're not linked.

8       You know, normally in our firm we would use something like

9   Relativity or Summation, and people could tag documents, mark

10  them, put notes on them, and everyone would have access to

11  that.  We don't have that here.

12      I mean, what he has is a pretty old computer that he can

13  pull up this information, look at the equivalent of the screen

14  of his phone or a phone, or an e-mail account, and start going

15  through it.

16      But then there's really no practical way, even if he has

17  identified, you know, ten references in the phone data, to be

18  able, for us, to then easily understand and know what that was.

19  I mean --

20          THE COURT:  Why can't he identify that for you?

21  Although he can't do it with some sophisticated software, he

22  can write it down, can't he?  I'm just trying to understand.

23          MR. KOHNEN:  Judge --

24          THE COURT:  Let me -- let me hear the response to

25  that.

1              MS. CORS:  He, I suppose, could say, "If you go into

2      this device, this folder, this number," we might be able to

3      then backtrack into that, but that becomes extraordinarily time

4      consuming and difficult to get us that information and again

5      we're back to, you know, at most we're getting maybe eight

6      hours in a two-day block to meet with him.  That -- honestly,

7      everything that's taking place then tends to be answering his

8      questions and still trying to get through the discovery.

9          So I don't think it's practical for him to be able to

10     navigate these devices, somehow pinpoint what is relevant, and

11     then tell us.

12             THE COURT:  Okay.

13             MS. CORS:  The other problem is, you know, it comes

14     back to some of these other motions.  But from our perspective,

15     we're at a deficit, even as lawyers, in terms of knowing -- you

16     know, talking about certain character searches, even if we were

17     able to identify characters -- and I think that's a big "if"

18     given the number of Chinese characters there are in the

19     different dialects -- we have very little information at this

20     point about the core case.  And, you know, usually you have

21     that information and then you develop search terms based on

22     that information.

23         So we're at a deficit with information and we're at a

24     deficit with respect to the language and this issue of

25     characters.

1            THE COURT:  You wanted to say something?

2            MR. KOHNEN:  Judge, mechanics.  I was just going to

3       say, you know, he can't even sit down with a piece of paper and

4       a pen -- or a pencil, probably, more likely -- and jot down

5       Bates numbers because the material they gave us doesn't even

6       bear Bates numbers.

7          So maybe to way overuse a bad analogy, he might be able to

8       shrink the haystack a little bit for us.

9            THE COURT:  He might what?

10           MR. KOHNEN:  He might be able to shrink the haystack a

11      little bit for us, but we're still not going to be able to find

12      the needles.

13         But I think most importantly, I don't want to lose sight of

14      the legal obligation that the government has here.  They have a

15      duty to find and turn it over to us.  They can't -- and our

16      hyperbole is we should have been less, because I hope this

17      message is clear.  It's their obligation.  Okay?  *Brady*, *Kyles*

18      *versus Whitley*, all the cases that come along, it's their

19      obligation, of the material that they possess, to find it and

20      to turn it over to us.

21         That was actually memorialized in a memo to all of these

22      prosecutors in January of 2010, January 4th of 2010, almost

23      exactly ten years ago, by a deputy attorney general named Ogden

24      that they recognize this obligation.  For whatever reason, the

25      prosecution in this case is ignoring that, is refusing to

1    recognize that obligation.

2           THE COURT:  I reject it out of hand.

3       I'm looking at *Warshak*, which you didn't even cite until it

4    was brought to your attention.  Be that as it may, what else do

5    you want to say before I hear from the government?

6           MR. KOHNEN:  I think we did a pretty darned good job

7    of distinguishing *Warshak* in our reply brief.  And if the Court

8    would like to hear more on that --

9           THE COURT:  No, thank you.

10          MR. KOHNEN:  -- we're happy to do it.

11          THE COURT:  I'll look at your reply brief.

12          MR. KOHNEN:  I hope you will, Judge.

13          THE COURT:  I have.

14          MR. KOHNEN:  Okay.  Because the *Warshak* case was

15   completely different than this case.

16       I think also that the Court has to recognize, must

17   recognize, the facts of this case and the circumstances that we

18   have here are completely unique.  This is a helpless defendant.

19   I mean, this is a much more difficult situation than Steve

20   Warshak and his mother and his employees found themselves in.

21   And I'm familiar with the Warshak case because I signed that

22   Indictment.

23          THE COURT:  I understand.  We each have a role to

24   play.  Was there more you wanted to say at oral argument?

25          MR. KOHNEN:  Anything to add?

1          MS. CORS:  I think the only other point, and, you

2    know, we do flush this out, but in terms of the duty to provide

3    *Brady*, at its core when you look at any of these open file

4    cases, the courts, where they have permitted open file, it's

5    been on the basis that both sides are equally in a position to

6    find the information.  And given the limited information we

7    have about this core case, what companies are at issue, what

8    trade secrets are at issue, who these co-conspirators are, we

9    aren't in a position, even as lawyers, to properly identify

10   *Brady* material to the same extent that the government is right

11   now.

12        And I think that is a key issue that each of those courts

13   addressed and, in the cases the government cites, found that in

14   fact the defendant was in a position, an equal position, to

15   find *Brady*, and that's just not the situation we're in right

16   now.

17          THE COURT:  Very well.

18        Did you have anything you wanted to weigh in at this point,

19   or pivot to the government?

20          THE LAW CLERK:  I did have a question.  The 9,000

21   pages that were presented, is that not the core case?

22          THE COURT:  What was the question?

23          THE LAW CLERK:  The 9,000 pages that have been

24   translated and presented, is that not a sufficient outline of

25   the case?  I think at one point Mr. Mangan had said that

1    whatever documents they intend to use in their case they'll

2    translate or they have translated and given to you and that

3    they'll do so going forward.

4        Doesn't that give you the information that you need

5    regarding the case, or is there something that's still missing?

6    Just for purposes of trying to come up with a practical

7    solution.

8            MR. KOHNEN:  We don't know.  I mean, that's their

9    representation some time ago.  Now, the breadth of the case,

10   and particularly with respect to the conspiracy counts and the

11   either intrinsic or 404(b) evidence, depending on how you look

12   at it, has expanded greatly.  At least that's our conclusion

13   based on these supplemental productions that are pretty large.

14       The one thing I'll --

15           THE COURT:  Will you speak up, please.

16           MR. KOHNEN:  Yeah.  I'm sorry.

17       The one thing I'll repeat is, that was identified to us by

18   the government, and I'm repeating essentially what you just

19   said, but as their core case.

20       In our view, the case, at least the evidence that they

21   intend to have available to them, has expanded greatly.  I

22   don't know if the core case and its 9,000 documents have

23   expanded greatly.  But I want to stress that all of that, by

24   their own admission, is inculpatory in nature and not

25   exculpatory.

1          THE LAW CLERK:  Would it be helpful for you to

2     provide -- do you know what keywords were used to search for

3     the documents that they gave you?

4          MR. KOHNEN:  No.  And as I'm sure you know, we had

5     suggested at the very end of our reply memo that we would like

6     to use those tools they have with our own search terms.

7          THE COURT:  Did you have anything more?

8          THE LAW CLERK:  Just whether the government would be

9     willing to add some search terms.

10         THE COURT:  Well, let's hear where we are.  We've

11    heard oral argument from the defense.  Who wishes to be heard

12    in response to what we've heard and had presented to us?

13         MR. MANGAN:  I will, Your Honor.

14         THE COURT:  Good.

15         MR. MANGAN:  With respect to this particular issue,

16    there are a few things I wanted to highlight, particularly that

17    came from their reply memo, because that's when they kind of

18    got deeper into the issues that were raised in *Warshak*.  And

19    they raised a few things in describing the discovery that

20    concerned us in terms of -- that may have muddied the waters a

21    little bit.

22         I did want to offer to the Court, before I jump into some

23    of the details, to try to clarify, you know, exactly what we've

24    been doing.  We took the letters that we produced with the

25    discovery, and, you know, with each one it has a spreadsheet

1   that lays out here's what's in this production, we called them

2   tiers, you know, with the Bates labels and then the

3   classification levels.

4        And it has come out in pieces.  We've got, you know, six or

5   seven tiers.  But I put all the letters and the spreadsheets

6   together that we can submit to the Court and provide to you so

7   that you can have a full understanding of how we've tried to

8   present things so that they would not be unduly onerous.

9        I also have -- at one point when we provided the

10  translations to them and our Bates labeling, they had a concern

11  that, well, it's hard to find that translation in the

12  electronic version that's in the report.  And so they asked

13  for, sort of, a way to cross-reference the translations to the

14  electronic report.

15       So last July we had provided them with a letter and then a

16  different spreadsheet that goes through a cross-reference for

17  each of those items.  And then for many of those

18  cross-references we gave attachments that have screen shots of

19  it to help sort of guide them through the process of finding

20  where those translations were.

21       And some of this, we wanted to mark it in case the Court

22  was willing to look at this, or at least accept it, in the

23  record.  We think it's important to show, based on what they

24  placed in the reply, the efforts that we've gone to to try to

25  make this manageable and not onerous on the parties, but it

1   also gives the Court a little bit of an understanding, just in

2   terms of screen shots, as to what it looks like when you look

3   at some of these electronic reports.

4       So with that background, I wanted to touch on a few points,

5   Your Honor.  First, they identify or they made a statement that

6   the government has been producing items from a myriad of

7   sources, many of which are not related to Mr. Xu.  That is not

8   our understanding in terms of what is at issue.  We believe

9   what is at issue is we take in a number of electronic devices

10  or accounts -- so we had e-mail accounts, we had an iCloud

11  account -- that we attribute to Mr. Xu.  I understand they can

12  contest that.  And within the iCloud account, which has been,

13  frankly, the most voluminous issue, it has backups of a couple

14  phones that had a lot of data on them.

15      And then we also have devices that were recovered in

16  Belgium at the time of the arrest of Mr. Xu and his colleague.

17  Those, frankly, are smaller in terms of the volume of data.

18  The largest item and where most of the translations have come

19  from has been from that iCloud account and the backups within

20  it.

21      When the FBI went through and tried to triage what they

22  wanted to translate --

23      And by the way, given who Mr. Xu is or who we contend he

24  is, the FBI has, you know, tried to find what they thought

25  would be relevant.  They certainly had an incentive to look for

1    things.

2        -- they were triaging and looking for, okay, who were other

3    individuals who might have been in MSS.  We think this person

4    is.  You know, Joe Smith is a colleague we think is in MSS.

5    Let's start triaging those and seeing if we need to pull those

6    conversations or those messages and translate them.

7        When we got the translations, as we said, we produced

8    those.  They are part of the 9,000 pages.  We are not going to

9    present anything that is not within the 9,000 pages of

10   translated documents.  Obviously, there was testimony, but --

11           MR. KOHNEN:  Can you repeat that?  Sorry.

12           MR. MANGAN:  I said it before as well.

13           THE COURT:  Can you read that back.

14       (Record read.)

15           MR. MANGAN:  And we will have witness testimony.  What

16   I'm talking about is, so, for example, for the iCloud account,

17   what we've translated out of that account and what we've pulled

18   out, presented to them, will be the subset, if you will, from

19   which we will pull our evidence related to that evidence, if

20   that makes sense to the Court.

21       In other words, we're not going to suddenly show up with

22   something in Mandarin from a different part of the iCloud that

23   we did not previously translate.

24       Hopefully, I've made that more clear instead of more muddy.

25   But when you go through that, they translated all that

1    information, so my understanding is what's left or sort of

2    what's at issue is are the items that were not translated.

3        I do want to mention, within those things that were

4    translated, we're not going to use all of them.  Sometimes they

5    found conversations between people, they thought it was going

6    to be important, they're talking about dinner arrangements,

7    they're taking pictures of their dinner.  You know, there are

8    things in there that we're not going to use all of this stuff.

9            THE COURT:  That's within the 9,000 documents?

10           MR. MANGAN:  Yes, yes.

11           THE COURT:  Okay.

12           MR. MANGAN:  So you're not going to find that every

13   line of that was on point.  They were trying to triage and find

14   the things that were relevant as best they could.

15       A couple other things to be mentioned.  When they talk

16   about things came from a myriad of sources outside of Mr. Xu, I

17   don't know who they're referring to other than maybe the

18   devices that his colleague had on him.

19       My understanding is, you know, the dispute here relates to

20   the untranslated pieces of the electronic evidence that we

21   contend went with Mr. Xu or his associate in Belgium.  There

22   was nothing else that we grabbed from other sources, frankly,

23   as far as electronic evidence that is not translated.

24       Secondly, they mentioned -- I took offense to this -- that

25   the government padded the discovery with irrelevant documents.

1   I don't know how we would do that, first of all.  You know, if

2   we had taken the iCloud document -- or taken the iCloud

3   account, pulled what we thought was relevant and produced that,

4   they would have screamed that we didn't produce the whole

5   account.  We produced the whole account and the translations.

6   How they can say that constitutes padding, I don't know.  I

7   don't know what we would have done differently.

8       We have tried to be as clear as possible in terms of what

9   we're producing, as far as where the translations are coming

10  from.  So I do take offense to saying that we padded the

11  discovery with irrelevant documents.

12      They mention in there that xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxx.  In the effort to, you know, clarify some of

14  the items that are in the discovery and items that they are

15  asking about either as parts of the conspiracy or potentially

16  it's 404(b), we specifically identified, xxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.  You

18  know, Here are the details related to that charge.  Here's the

19  evidence that we will use from that that is not already in Mr.

20  Xu's devices.  And so we produced those, they're Bates labeled,

21  they're in the production.

22      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

1    He has text messages with the individual.  Those are part

2    of what has already been translated and what has already been

3    produced.  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4    xxxxxxxxxxxxxx we produced as well and put them in a separate

5    category.

6        These additional documents, you know, xxxxxxxxxxxxxxxxxx

7    xxxxxxxxxxxxxxxxxxxxxxxxxxx, it's less than 300 pages.  It's like

8    this (indicating).  So for them saying that we've expanded the

9    scope and xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10   xxxxxxxxxxxxxxx.

11       When they mention that we've made discovery unduly onerous

12   or overly onerous, mainly they refer to the BOP situation,

13   which we cannot control.  We're trying to work with it, because

14   I think everybody throughout the case has been trying to find

15   accommodations to make that as reasonable as possible.  But

16   with respect to *Brady* obligations, we are doing everything we

17   can.  We are not doing anything to make discovery overly

18   onerous or unduly onerous, as required -- or as stated in

19   *Warshak*.

20       With respect to the data, a couple things that I do want to

21   pull out for the Court.  When you look at these -- we call them

22   UFED reports.  So take the iCloud account.  When it was

23   produced, I think as you'll recall, we originally took the

24   account in its raw data format and provided that electronic

25   information to the defense in the raw, sort of, forensic

1   format.  And they said, "Well, you need software.  You need to

2   hire somebody to do that to be able to read it."  Fine.

3       So we went back and took that same account, ran it through

4   something that creates what we call a UFED report.  It's an

5   electronic report so that, when you pull it up, it has a table

6   of contents on the left-hand side and you can click on those

7   things.  So, for example, it might have e-mails.  It might have

8   SMS messages, which are texts.  It might have phone calls, just

9   a phone log.  It's a little bit scary, frankly, what all it

10  finds on there.

11      It will have a timeline.  You can hit timeline, and it will

12  pull up all of the data on the report, whether it's a call or

13  an e-mail or a text or a picture, and it will put it in

14  chronological order so you can actually -- it will pull from

15  the different sources and put it in chronological order.  It

16  will have pictures, it will have videos, audio.  It will break

17  it down into various categories.  And then when you go and

18  click in those, it might bring up -- you know, so, for example,

19  SMS messages, it might look like this.  So it's a table, and

20  then either it shows you the actual message in a table format,

21  or if it's a document or an audio, you click on it and then you

22  can get into the content.

23      So with respect to phone numbers, you can look for phone

24  numbers.  You can look at things chronologically.  They said

25  you can't search things by date.  This is actually, more than

1  any other piece of information, this kind of format you can

2  narrow things down by date through the timetable.  If you --

3  you know, a number of these folks in the WeChats, they're

4  identified either by name or a nickname or a phone number, so

5  you can pull specific people.

6      You know, beyond that, yeah, there's a lot in there, but we

7  did our best to try to cull it down to provide, as you called

8  it, hot docs, which is essentially, you know, the way that we

9  were trying to proceed with this case in an orderly fashion.

10     Then the last thing I'll say, Your Honor, is I don't know

11 what I would look for to find exculpatory information in this,

12 because we have sort of an odd case where -- and they have the

13 right to do this -- but, you know, we contend he is a certain

14 person and they contend he is not, or they may assert that he

15 is not at all who we say he is.  So everything that we find

16 that asserts any connection to MSS or that work we would

17 consider inculpatory.  Anything that we would consider -- an

18 alias we might consider inculpatory; they might consider it

19 exculpatory.  We produced those as well where he's used other

20 names because we consider that inculpatory.

21     If there is a search term, I don't know what it would be.

22 I just don't know what I would look for specifically in there.

23 But we've done the best we can, and we've tried to make this as

24 orderly as possible.

25     Given the allegations that were put in the reply, we would

1    like to offer, you know, these two exhibits so that the Court

2    at least can have as much detail as you would like to

3    understand what the government is doing in this case with

4    regard to discovery.

5        If I could have one moment, one minute.

6            THE COURT:  Yes.

7            MR. MANGAN:  Is there anything else?

8        (Mr. Mangan and Ms. Glatfelter confer privately.)

9            MR. MANGAN:  So Ms. Glatfelter is pointing out a

10   better page in terms of the screen shot.  But this shows you on

11   the left, it's a little dark, but it kind of shows you the

12   table of contents and the tabs, the type of tabs that you could

13   click on within the UFED report to find things.

14           MS. GLATFELTER:  And up on the top right, you could

15   put in the phone number.  For example, if you wanted to see if

16   Mr. Xu was in contact with particular phone numbers or people,

17   you would put it up in that right-hand corner.  You could

18   search the report, and it would cull the contacts.  Every time

19   that phone was in contact, the last contact, whether it's been

20   an SMS message, whether it's been a WeChat message, those would

21   all come up.  And you could see the same thing in the timeline.

22       So that UFED report is certainly searchable in some of the

23   ways that they want to search.

24           MR. MANGAN:  But that's really all I have to say, Your

25   Honor.  Obviously, it's whatever questions --

1          THE COURT:  My visceral reaction is I would like those

2     documents in the record.  If I do that, I think you get a reply

3     memo only as to those documents, if you wish.  I'm not sure

4     that's required.  That's my initial reaction to that.

5          MR. KOHNEN:  But for the record, Judge, we have no

6     objection to them, to their submitting it to the Court.

7          THE COURT:  Thank you.

8          MR. KOHNEN:  But we would like to get -- you know,

9     just have a look at them.  We've received them all, I believe.

10          MR. MANGAN:  Yeah.

11          MR. KOHNEN:  And I'm going to take the prosecutors at

12     their word.

13          THE COURT:  Right.

14          MR. KOHNEN:  But I don't want to spend the time here

15     to confirm that.

16          THE COURT:  Understood.

17          MR. MANGAN:  Fair enough.  We provided copies, but

18     this is the correspondence we sent to them.

19        We would ask, Your Honor, if we could keep it under seal,

20     because it does go through certain names and classifications.

21          MR. KOHNEN:  No objection to that, Judge.

22          THE COURT:  The Court's comfortable with that as well.

23          MR. KOHNEN:  And just -- oh, sorry.

24          THE COURT:  Do you have questions or comments for the

25     government?  You had a question when we started, Ms. Frankian.

1    Based on what they've said, do you have anything you wish to

2    inquire of the government?

3         THE LAW CLERK:  Would the government object to telling

4    the defense what search terms you used so that if there are any

5    additional -- I mean, I'm sure a lot of it was, you know,

6    names, phone numbers, and things like that.  But if, for

7    instance, you ran a search for the word "university" and just

8    translated wherever that popped up or something like that.

9         MR. MANGAN:  I'd have to -- my only reluctance is

10   being able to reconstruct how they triaged, because sometimes

11   they might be looking -- sometimes it might be a name,

12   sometimes it's more of a personal connection or -- so I think

13   the analysts who were trying to look through it, it might have

14   been a winding road.

15    So that's my only hesitation, is can I fully reconstruct

16   exactly what each person looked for.  If the Court ordered, we

17   could certainly go back and try to endeavor to do that.  I

18   just -- it wasn't like, sort of, the simple thing where you

19   get, let's say, a complete e-mail file and you just do search

20   words, you know, like in a corporate case, to pull something.

21   This was, I think, a little bit different because they were --

22    You know, certainly there were certain companies they could

23   look for and I think they did look for.  Certain universities

24   came into play.  But I think as they found different MSS

25   individuals, I think, you know, it changed.  So if there's a

1   number, phone number, that they didn't know who it was, they

2   might have done more searches to figure out who this is, does

3   it seem like a person they're interested in.  If they looked at

4   it and realized, "Oh, no.  This is his gardener," they might

5   have disregarded it.

6        So that's, without sort of knowing, you know, every single

7   thing that they did, that's my only hesitation, is I don't know

8   that I can fully reconstruct it, but we could try to do it,

9   whatever the Court would ask.

10            THE LAW CLERK:  So maybe -- I'm sorry.

11            THE COURT:  Is there a follow-up question to that

12   about them providing search terms?

13            THE LAW CLERK:  Perhaps it would be easier if the

14   defense wanted to provide search terms not for the purpose,

15   necessarily, of translating them but just to see is there a way

16   that you can easily go through, as easily as possible go

17   through and just identify where that particular name or that

18   particular word comes up, and just provide those so that at

19   least they can go straight to that e-mail or that --

20            MR. MANGAN:  That might -- that might be something we

21   could do.

22            THE COURT:  So I'm not holding anybody to it yet, but

23   you don't find something extraordinarily prohibiting your

24   giving them your best recollection of the search terms you

25   used?

1          MR. MANGAN:  I'll want to go back and, sort of, talk

2     with the FBI and try and understand how best they can

3     reconstruct that.

4          THE COURT:  And if they have search terms, you might

5     consider using those for them?

6          MR. MANGAN:  Yeah, I was going to say, the second

7     point in terms of them providing search terms might get more to

8     the heart of what they're complaining about, and that would

9     certainly be easier to execute.

10          THE LAW CLERK:  The reason I asked about them

11     providing the search terms was just so that the defense doesn't

12     provide a list that they've already searched.  But it seems

13     like it's harder for them to reconstruct what they've already

14     done, rather than the defense providing it, as opposed to the

15     other way around.

16          MR. MANGAN:  Yeah.  There might be a deduplication

17     issue there, but --

18          THE COURT:  Did you have other comments or questions

19     for the government?  Because I'm going to give them a reply,

20     and then I'll want to clarify something, and I want to touch

21     base on the calendar.

22          THE LAW CLERK:  No, Judge, I don't think --

23          MR. MANGAN:  I'll say one thing.  If that's the way

24     the Court goes or we agree to do something where they provide

25     search terms, we do not agree that that is what is compelled by

1  *Brady* --

2          THE COURT:  Right.

3          MR. MANGAN:  -- and that we have not satisfied it, but

4  in order to help, we are certainly open to that.

5          THE COURT:  I think that's an important and understood

6  statement.

7      Did you want to reply in oral argument?

8          MR. KOHNEN:  Yes, Your Honor.

9      First, I want to say thank you for the progress we've made

10  on this issue.

11          THE COURT:  Thank you.

12          MR. KOHNEN:  Also I want to -- again, clarification

13  first.  With respect to the UFED reports, as they refer to

14  them, we're not yet able to work with them.  We've got a

15  vendor, but because of the protective order and other factors,

16  we have to completely divorce all of this stuff from our

17  existing systems at the office.  And we're working now with a

18  new software to use to work.  I think it's Summation.  Unless

19  the software -- I mean, I've seen printouts of the UFED stuff

20  that they referred to and I've seen some of those screens, but

21  I didn't know it was searchable.

22          THE COURT:  Well, let's see if we can clarify that

23  now.

24      Can we?

25          MR. KOHNEN:  We'll work on that.

1          MR. MANGAN:  The CD that it's on comes with its own

2     reader, but there is no separate software that's required.

3          MR. KOHNEN:  Okay.

4          MR. MANGAN:  You can take a computer out of the box

5     and plug this in and you can read it and work with it.  I

6     believe there was an issue earlier when we --

7          Correct me if I'm wrong, Ms. Cors.

8          When we sent the document that had our cross-reference,

9     they had some questions about trying to find things, and we got

10    on the phone, and I remember it was Ms. Cors and then two other

11    associates or paralegals.

12         MS. CORS:  Two technologically savvy.

13         MR. MANGAN:  Okay.  Well, then two -- you were right

14    with them, but the other two seemed more savvy.  And so we

15    all -- they got on the system, and we had it up as well, and we

16    had a conference call and we tried to walk through, "No.  You

17    click on this and then you click on this," because I think they

18    were having trouble opening the audio files.  We helped them

19    kind of find, "No.  You go to the right-hand side and you

20    click, right click, and it will open."  And so we worked

21    through a few of those issues.

22         That was some time ago, and I have not heard anything until

23    today that they had issues.

24         MR. KOHNEN:  Judge, and I am probably the least

25    technically savvy person, maybe second-least, so I may have

1   overstated the problem, or misstated.

2       I don't know yet whether Mr. Xu has the capability to

3   search the UFED reports, but I'll get an answer to that

4   question very soon.

5           MS. CORS:  I don't believe that he does, because right

6   now he's using a computer with an English keyboard.  I'm not

7   aware of any way for him to actually search what's there.

8       Unless you guys know a way.  I mean, he doesn't have

9   Internet access.

10          THE COURT:  Ms. Frankian?

11          THE LAW CLERK:  I think even with the English

12  keyboard, because a Chinese keyboard has English letters on it,

13  so it would -- and so it would just convert.  It's pinyin, so

14  you just put it in phonetically and it just converts it to the

15  character.  So if he were -- and that's very likely the way,

16  you know, that he was typing just in his, you know, sending

17  e-mails to friends and family.  And I don't believe that you

18  need any particular software for it to do that.  I think

19  there's just a setting that you can select.

20          MR. KOHNEN:  Except for the reader that they

21  mentioned.

22          THE COURT:  I didn't hear you.

23          MR. KOHNEN:  Except for the reader that Mr. Mangan

24  mentioned, or Ms. Glatfelter.

25          THE LAW CLERK:  I believe it was on the disk already.

1    MR. MANGAN:  That is how you interact with it.  You

2 click on the reader, it opens up the document, and you're off

3 and running.

4    MS. GLATFELTER:  You can work it from the CD, or you

5 can -- I've saved it on my hard drive.  So I have a file I open

6 up, and it goes right to it.

7    THE COURT:  So we're going to hear a little bit more

8 of your reply?

9    Just to lighten your load, it's T.S. Black, "Technically

10 Savvy Black."  Go ahead.

11    MR. KOHNEN:  Thank you, Judge.  The first I've heard

12 of that.

13    We have no problem with the -- Mr. Mangan said they tried

14 to present these things so that they would not be onerous.  And

15 he said that they provided them in stages and he said that he

16 provided English, they were English translations.

17    I want to be clear with the Court.  We don't have any

18 problem with the English translations.  We can read and

19 understand English very well.  And we've had those translated,

20 the ones that we think that are significant, into Mandarin.

21 Okay?  We don't have a problem with how they've presented it.

22 They've sent us nice letters and informative indexes, as you'll

23 see.  What we're talking about is all of this material that

24 they gathered that is in Mandarin that likely would be helpful,

25 pieces of which likely would be helpful to us.

1    I've had the pleasure of working before this Court, and

2    there's all kinds of things that don't seem to others to be

3    relevant during the cross-examination of a witness, et cetera,

4    that from the defense perspective becomes very useful.  And so,

5    you know, we have to get at that stuff.  And I really -- that's

6    why I really appreciate this new willingness to sort of help

7    accommodate us and search through that data.

8    But I want to be clear.  You know, everybody, except for

9    us, is assuming that all of this stuff belonged to Mr. Xu and

10   belonged exclusively to Mr. Xu.  I want the record to be clear

11   that we're going to challenge the authentication of this stuff

12   from day one, because we've seen shared e-mail accounts, shared

13   iCloud accounts.  We've seen -- Mr. Mangan refers to aliases of

14   Mr. Xu.  But we've connected some of these alleged aliases to

15   actual people.

16   So these are all questions that remain open, and there are

17   things that, with a competent review of the Mandarin material

18   that's been sent to us, we can probably distinguish, at least

19   on occasion, which separate individual is saying what through

20   the same e-mail.  It's going to be very critical to our

21   defense.  And I was reluctant to flag it, but it's that

22   important to get at it.

23   So, you know, the translated -- so we're sort of back to

24   square one here, because the translated material is only

25   inculpatory.  Mr. Mangan did a pretty good job --

1    I didn't understand much of it, but that doesn't have

2    anything to do with his job.  That has to do with my

3    capabilities.

4    -- of describing the method by which they searched for

5    inculpatory material.  It seems to me, especially given the

6    unique circumstances of this case, that they can employ or

7    deploy a similar method to help us help them fulfill their

8    obligation to find exculpatory material.

9         THE COURT:  I understand that that is your argument.

10   And can you click that page.

11   Go ahead.

12        MR. KOHNEN:  The other thing I just want to touch on,

13   this claim from Department of Justice lawyers that they can't

14   control the conditions of Mr. Xu's confinement, we just find it

15   really hard to believe.

16   Example:  If the United States Attorney were to talk to the

17   Bureau of Prisons and the U.S. Marshals Service about an

18   alteration of this gentleman's conditions of confinement, it

19   would happen.  If a deputy attorney general talked to the

20   Bureau of Prisons about this man's conditions of confinement

21   and sought a change, it would happen.

22   So it's not that they don't have the power to do it.  It's

23   that the Department of Justice, which is also the parent

24   department of the Bureau of Prisons, has the power to do it.

25   They don't do it.  And they have their own reasons, but I want

 1   to make sure the record's clear, because this is a serious,

 2   serious impediment to us being able to do our work to represent

 3   our client.

 4        Ms. Cors?

 5        If I may, Your Honor.

 6             THE COURT:  Yes.

 7             MS. CORS:  The only other point I would reference, I

 8   mean, there appears now there is discovery xxxxxxxxxxxxxxxx

 9   xxxxxxxxxxx.  We don't have access to any of those materials to

10   conduct any search for *Brady* materials from whatever universe

11   of materials have been collected by the government in each of

12   those.  So, you know, if there is any *Brady* materials in those

13   universe of documents, only the government right now would be

14   in a position to be able to identify those and get them to us.

15             THE COURT:  Do you have any inquiries, Ms. Frankian?

16             THE LAW CLERK:  No, Judge.

17             THE COURT:  Did you want a surreply?

18             MR. MANGAN:  I think you've heard everything, so --

19             THE COURT:  Well, we got off track on the conditions

20   of his being held.

21             MR. MANGAN:  I would just say, with respect to the

22   documents that we examined and we believe were relevant related

23   xxxxxxxxxxxxxxxxxxxxxxxxxxxx, we have produced them.  We

24   understand our *Brady* obligations with respect to those as well.

25        My understanding was the main issue that they were framing

 1  was specific to this electronic evidence and the accounts that

 2  we have identified, but we do understand our obligations in

 3  that regard.

 4          THE COURT:  And what have you done in that regard?

 5          MR. MANGAN:  We've produced -- I think I already

 6  mentioned we produced xxxxxxxxxxxxxxxxxxxxxxxxxxxxx --

 7          THE COURT:  Right.

 8          MR. MANGAN:  -- xxxxxxxxxxxxxxxxxxxxx.

 9          THE COURT:  Incriminating documents?

10          MR. MANGAN:  Yes.  But we've also spoken with the

11  people involved.  We realize we have to coordinate with them to

12  understand what else they have.

13          THE COURT:  Okay.  All right.

14          MR. KOHNEN:  Judge, when appropriate, I just wanted to

15  alert the Court to a couple of things, a couple of issues that

16  we see coming up.

17          THE COURT:  Okay.

18          MR. KOHNEN:  And I'll wait for my turn.

19          THE COURT:  We're almost there.  So you're going to

20  give us these exhibits.

21      Do you want a date by which you need to file a reply, if

22  any, to the exhibits?

23          MR. KOHNEN:  Judge, I think that the chances of us

24  needing a reply are exceedingly small.  But for the -- on the

25  way-off chance that we might want to present some kind of

1  response to the Court, I would ask for a week to do so.

2          THE COURT:  All right.  A week from today it will be

3  ripe whether you file or not.

4      It's been helpful.  I appreciate the work that you all are

5  doing.

6      Anything you want to inquire about before I move to

7  calendar and whatever else he wants to bring to my attention?

8          THE LAW CLERK:  So do we want to set a date for you to

9  provide the government with a list of search terms?

10          THE COURT:  Are you interested in that?

11          MR. KOHNEN:  Absolutely, yes.  It may be a little

12  premature for a date depending on what -- I think Tim has to,

13  Mr. Mangan has to figure out if we actually can get it done.

14  Maybe not.

15          MR. MANGAN:  Maybe I misunderstood.

16          MR. KOHNEN:  Are you talking about a date for search

17  terms?

18          THE LAW CLERK:  Uh-huh.

19          MR. KOHNEN:  Yeah.  I mean, we're happy to do that

20  if --

21      Will your folks be able to deploy the same tactics and

22  strategies that they used to find inculpatory material in

23  looking for exculpatory material?

24          MR. MANGAN:  Without talking with them, I believe they

25  could.  The forensic piece to all of these, by the way, is in

1   your hands as well.  We would use the tools that they have

2   where they are able to, you know, as a forensic examiner, open

3   them and do searches, so --

4         THE COURT:  Nevertheless, although you don't believe

5   it's your obligation, if they gave you some search terms, you'd

6   be willing to run them?

7         MR. MANGAN:  Yes.  And if we encounter any issues,

8   we'll advise everyone.

9         THE COURT:  And can we limit how many search terms

10  we're talking about?

11        MR. MANGAN:  That was going to be my next question.

12        THE COURT:  Two or three, or, I mean, what's the

13  ballpark number?

14        THE LAW CLERK:  May I ask just one question?

15        THE COURT:  Yes, yes.

16        THE LAW CLERK:  In light of the fact that any search

17  terms they provide you would search for using the same software

18  or the mechanism that they have access to as well --

19     Is that -- did I understand that correctly?

20        MR. MANGAN:  Yes.

21        THE LAW CLERK:  You don't have any method of searching

22  that they don't have access to?

23        MR. MANGAN:  We have -- the forensic examiners have

24  tools where they can open it up and, you know, what they call

25  exploit the document or exploit the file.

1    The raw data was provided to the defense.  They did not

2    choose to engage someone to do that kind of work.  So our

3    forensic examiner took and put it into a UFED report, which is

4    what we did provide to them, so that someone can just open it

5    up and search through it on their own.

6        But they may have other tools.  That's what I need to

7    check.

8            THE LAW CLERK:  Okay.  I thought that maybe the easier

9    way to do it would be for you to get -- or maybe they can come

10   to your office and you can show them how you search for the

11   first term, and then they can go back to their office and

12   search for the rest of the terms themselves, or something like

13   that.  That way they don't have to provide you with all of the

14   terms and then be limited to that.  They can search for as many

15   terms as they want, and you give them a demonstration of how

16   you would go about it.

17           MR. MANGAN:  We can try that.  I mean, bear in mind

18   part of what we're talking about is we need to search in

19   Mandarin.

20           THE LAW CLERK:  Right.

21           MR. MANGAN:  So we can start that way and, if it

22   doesn't work, we can take the terms to the FBI and see if they

23   can have better luck with it.

24       Does that make sense?

25           THE LAW CLERK:  Uh-huh.

1       THE COURT:  So you guys are going to confer on this

2  and try and come up with a plan consistent with what we've

3  talked about and let us know in 30 days?

4       MR. MANGAN:  That would be fine, Your Honor.

5       THE COURT:  Is that okay?

6       MR. KOHNEN:  I think that's a good idea, Judge.

7    What do you think, Jeanne?

8       MS. CORS:  My only other comment, I mean, originally

9  we talked about the government using the search terms that

10  they've already used to help identify *Brady*.  I would ask that

11  that not be off the table.  I mean, we still are at an

12  information deficit, from our perspective, that would make it

13  extremely difficult, if not impossible, to come up with set

14  search terms to apply to this data without knowing what

15  companies are we talking about, what trade secrets was Mr. Xu

16  allegedly trying to obtain.  I mean, we still have an

17  indictment that covers, potentially, companies throughout the

18  world, and so --

19       THE COURT:  And I guess you need the Court to rule,

20  and we're prepared to.

21       THE LAW CLERK:  And I mean, I haven't seen it, so I

22  don't know, but I would assume there is a finite number, there

23  are a finite number of companies and potential co-conspirators

24  identified in the 9,000 documents they've provided.  So if you

25  were to just assume that everything in the -- assuming that's

1    correct, if everything -- you just limit it to the 9,000

2    documents, or excuse me, 9,000 pages of documents, is that -- I

3    mean, are there, you know, hundreds or thousands of companies

4    identified in those 9,000 pages?

5            MR. KOHNEN:  I think that's -- I mean, that's a good

6    question.  Because what you're asking is, essentially, is that

7    what sets the universe, what limits the size of the universe.

8    And while it's a good question, the problem is going to be with

9    respect to the 404(b) stuff and other material, I expect.

10           THE LAW CLERK:  And that would be resolved --

11       I'm sorry.  Can I see the calendar?

12           MR. MANGAN:  I think it's February 24.

13           THE LAW CLERK:  That you would disclose it?

14           MR. MANGAN:  I think that's the initial disclosure.

15           THE COURT:  Yeah, February 24.

16           THE LAW CLERK:  So at the very least -- and then you

17   needed the Court's ruling on some of it.  So by, you know, May,

18   for instance, you would know, not only would the government

19   have identified it, but to the extent that the defense is

20   arguing that any of this is not proper 404(b) evidence, you

21   would also have an answer to that by May, which I would assume

22   would be helpful in sort of narrowing down that universe.

23           MR. KOHNEN:  I think May might be a little ambitious

24   after I identify one of the problems I see down the road at the

25   appropriate time, but --

1          THE COURT:  Well, we'll get to that momentarily.

2          THE LAW CLERK:  I was just going off the briefing

3    schedule.

4          MR. KOHNEN:  The most basic reason why I'm reluctant

5    to settle on a date -- and I think we're past this now, but

6    just so you know -- on a date to provide them with the search

7    terms is we're -- with Mr. Xu we're still finishing up tier

8    five of the discovery.  So we've got all of tier six still to

9    go through with him and tier -- I believe there's a tier seven

10   as well.  We're doing it, I promise, as quickly as we can, but,

11   you know, we're limited.

12         THE COURT:  Well, you've told us that, and that's fine

13   and we'll deal with it, but you guys are going to confer in the

14   next 30 days and see if there's some progress to be made.

15       Bear with me.  You made a statement that I had read back

16   that was a pretty broad statement, and then I thought you

17   clarified it.  You said you're not introducing any documentary

18   evidence but for from the universe of 9,000 pages, but then you

19   said "from his stuff that we seized."

20       Were you telling me that there are no exhibits coming in

21   beyond those contained within the 9,000 hot documents?

22         MR. MANGAN:  I wanted to make sure I understood the

23   question there.

24       That all of our exhibits would come from the 9,000

25   documents that we've provided?

1          THE COURT:  (Nods head up and down.)

2          MR. MANGAN:  I'm just trying to think and make sure

3    there's nothing.

4          THE COURT:  It was a broad statement.

5          MS. GLATFELTER:  Right.  Well, there could be, for

6    example, physical exhibits, like physical evidence seized.

7    Right?  And there could be summaries of those documents from

8    the 9,000.

9          MR. MANGAN:  But that's all still within the 9,000.

10          MS. GLATFELTER:  Right.

11          THE COURT:  But you're not going to pull something out

12    of his iCloud that's not in the 9,000 documents and seek to

13    introduce that.  That was the thrust of your --

14          MR. MANGAN:  Correct.

15          MS. GLATFELTER:  Yes.

16          MR. MANGAN:  Yes, that is correct.

17          THE COURT:  Did you want to clarify anything, Mr.

18    Kohnen?

19          MR. KOHNEN:  Not on that subject, no, Your Honor.

20    Thank you.

21          THE COURT:  Has discovery reflected the identity of

22    all unindicted co-conspirators that you're going that rely on?

23    Do you understand the question I'm asking?

24      Ms. Frankian, you wrote it, or something similar.  Do you

25    want to restate it?

1          THE LAW CLERK:  I don't remember how I wrote it, but I

2     think your question is, are the names of every known --

3          (Mr. Mangan and Ms. Glatfelter confer privately.)

4          MS. GLATFELTER:  We're just making sure we understand

5     exactly what you're --

6          THE LAW CLERK:  Is the name of every known unindicted

7     co-conspirator contained somewhere within the discovery that

8     was provided?

9          MR. MANGAN:  I think so.

10         MS. GLATFELTER:  Right.

11         MR. MANGAN:  Unless you have a different answer.

12         MS. GLATFELTER:  No.  I think you clarified it by

13     saying "known," so --

14         MS. CORS:  And that's within the 9,000 documents?

15         MR. MANGAN:  Yes.  That was the question.

16         THE LAW CLERK:  Okay.

17         THE COURT:  The question was whether in discovery the

18     identities of all known unindicted co-conspirators has been

19     disclosed.

20         MR. MANGAN:  Correct.  Yes.

21         THE COURT:  Not necessarily in the 9,000 documents?

22         MR. MANGAN:  No, within the 9,000 documents.

23         THE COURT:  Okay.

24         MR. MANGAN:  I thought I was --

25         THE COURT:  I think that's important for you to have

 1   heard.

 2           MR. KOHNEN:  I agree.  It's very important.

 3           MR. MANGAN:  And just as a --

 4           MR. KOHNEN:  And I'm glad that it sets limits.

 5           MR. MANGAN:  I think as sort of a minor caveat, some

 6   folks within that translated, you know, discovery are referred

 7   to as nicknames.  So when you said identified, they're in

 8   there, but there may be a nickname or something like that,

 9   so --

10           THE COURT:  Fair enough.

11           MR. MANGAN:  Okay.

12           THE COURT:  Do you each have any other -- well, maybe

13   we should pause and hear what you've got on your list, Mr.

14   Kohnen.

15           MR. KOHNEN:  Judge, I really just want to give the

16   Court a heads-up.  In the beginning this morning and then later

17   during the proceedings the 404(b) issue was raised, and I want

18   to -- we believe that the question of what is and what is not

19   404(b) evidence is going to be something that is pretty hotly

20   contested and something that's going to take a fair amount of

21   the Court's time, and I just want to give you up a heads-up on

22   that.

23      Mr. Mangan and Ms. Glatfelter have on occasion, and we're

24   grateful for this, given us clues with references to a trial

25   within a trial and a conspiracy within a conspiracy.

1                MR. MANGAN:  I don't think we've used that phrase.

2                MR. KOHNEN:  Well, we found it in the transcripts.

3      But "intrinsically connected, inextricably intertwined," to us,

4      all these are pretty sophisticated buzzwords for 404(b) and

5      non-404(b).  In fact, in June after we heard these phrases a

6      couple times, we started our research and we realized that this

7      is -- we're going to have a tiger by the tail here.  There's

8      going to be a lot of argument over whether something is

9      intrinsic, which is -- by its nature it can't be 404(b), or

10     extrinsic, for example.  And that's sort of the master rubric

11     under which the Court is going to be asked to decide some of

12     these things.

13        It's a really important problem or important issue to at

14     least get everybody on the same page on pretrial, because when

15     you think about it, if we haven't settled this, then the first

16     time we trot up to the bench and ask the Court to decide what's

17     relevant or irrelevant even under 403, you're going to -- I'll

18     be presumptuous here -- but you're going to wish that we'd all

19     educated ourselves together on this subject.

20        We need -- what we're really going to ask for, then, is not

21     just disclosure of 404(b) evidence but identification and

22     disclosure of non-404(b) intrinsic stuff that we're going to

23     fight over.  I know that's a little bit unique and it would be

24     a little bit unique request of the government, but I think it's

25     the only way.  And we can talk with these guys about this

```
 1   offline, but I just want to give the Court a clue.

 2       The other thing that's unique to this case that is starting

 3   to rear its ugly head in the pleadings, as you've seen, is the

 4   Rule of Specialty.  This could become a complicated problem, or

 5   it could remain a simple issue.  We're not sure.  But as you

 6   probably have thought about, at least I have a lot, the Rule of

 7   Specialty comes into play going all the way back to when the

 8   government presented this case to the grand jury, because it

 9   was the Indictment that the grand jury returned that they

10   submitted to authorities in Europe in order to get the --

11           THE COURT:  Extradition?

12           MR. KOHNEN:  -- extradition approved.  Now, the Rule

13   of Specialty sets tight limits on what can be done with that

14   case and its breadth, frankly, going forward.

15       So this may present a unique problem that we may have to

16   raise with the Court as well.  And I just want to -- I'm not

17   here to argue.  I'm just here to inform.

18       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, we get worried

25   about how much of this was the grand jury made aware of, how
```

1   much of this was the separate sovereign from which he was

2   extradited made aware of, how much of this is admissible.

3       I will tell you that our preliminary research says that --

4   and full disclosure -- there's a split in circuits about

5   whether a defendant can even raise the Rule of Specialty,

6   whether he or she has standing to do so.  And the Sixth Circuit

7   hasn't really decided.

8       But these are things down the road that I just wanted to

9   start the wheels turning on here in chambers.

10          THE COURT:  I appreciate the two heads-up, or maybe --

11  yeah.

12      Did you want anything further today?  Did you want to

13  respond to the two heads-up, Ms. Frankian?

14          THE LAW CLERK:  No, Judge.  I mean, the only thing I

15  was thinking is maybe setting an earlier motion *in limine*

16  deadline or maybe breaking out the intrinsic versus extrinsic

17  for purposes of 404(b), which from my perspective, just an

18  issue -- I mean, I would think that rather than the government

19  identifying it, that that would be a subject of a defense

20  motion *in limine*.  But again, if they're willing to break it

21  out, I -- just ignore what I said.

22          MR. MANGAN:  I think, Your Honor, at the end of our

23  motion for bill of particulars we tried to lay out a number of

24  specific examples that we believe are part of the conspiracy.

25      We haven't finished it, but I think you'll find our Rule

1  404(b) disclosure will look very similar in terms of us saying

2  we believe this is direct evidence of the conspiracy; however,

3  in an abundance of caution, if the Court rules otherwise, we

4  believe it is admissible under 404(b) for this reason.

5      So in order for us to sort of cover both, we'll probably

6  list a lot of the same, same items that have already been

7  identified both in our reply as well as in our discovery.

8      So I don't think -- I think we'll all know, sort of, what

9  the list of items are.  How you want to kind of rule on them

10  pretrial is maybe another question.

11          THE COURT:  Very well.  Well, the calendar calls for

12  your motion by February 24, and your response and reply is set

13  forth as well.

14          THE LAW CLERK:  They would just give notice and

15  then --

16          THE COURT:  Notice.

17          THE LAW CLERK:  Right.

18          THE COURT:  Opposition by March 16.

19          THE LAW CLERK:  Right.

20          THE COURT:  Reply by April 13.

21          THE LAW CLERK:  Uh-huh.

22          THE COURT:  And then it's before us.  You pointed that

23  out a while ago.

24      Well, we'll brace ourselves for continuing incoming matters

25  of concern, and we will be responsive.  Is there more we ought

1    to discuss today before we adjourn?

2        On the calendar, we're getting ready to docket it?

3            THE LAW CLERK:  Yes, unless we need to make any

4    changes just based on the way it's been developing.

5            MR. MANGAN:  We don't have any on our end.

6            MS. CORS:  I don't think we have anything.

7            MR. KOHNEN:  I don't think we do.

8            THE COURT:  Very well.

9        Anything further on behalf of the government?

10            MR. MANGAN:  No, Your Honor.  I think there's an

11   Addendum B that the defense is going to submit for the

12   protective order related to their translator.  We had sent them

13   an edit to it, and I think with that edit, I think we've got

14   something agreed.

15       Is that correct?

16            MS. CORS:  Correct.

17            THE COURT:  Good.

18            MR. MANGAN:  So just as a heads-up, that will be

19   coming your way.

20            THE COURT:  Thank you.

21            MR. MANGAN:  Did you have anything else?

22            MS. GLATFELTER:  No.

23            THE COURT:  Anything further from the defense?

24            MR. KOHNEN:  No.  Thank you, Judge.

25            MS. CORS:  No.

1    THE COURT:  It's been a high honor and great

2  privilege, and you're excused.  We'll go off the record.

3    Yes?

4    MS. CORS:  Thank you.

5    THE LAW CLERK:  Sorry.  Do we want --

6    THE COURT:  Back on the record.

7    THE LAW CLERK:  Do we want to set another status

8  conference, and do you want to just reiterate an ends of

9  justice finding.

10    THE COURT:  I'll reiterate the ends of justice finding

11  that, given the complexity of the case and the need for

12  adequate time to review discovery and prepare, consider motion

13  practice, the Court finds that the case is not able to be tried

14  within 70 days, and, in fact, the time running from now until

15  the new trial date, the time is tolled pursuant to the ends of

16  justice, all in an effort to avoid a miscarriage of justice.

17    What was the other item?

18    THE LAW CLERK:  Do we want to set another date?

19    THE COURT:  Status.  Can you and I just discuss that

20  offline to figure out what's coming and set a status?

21    THE LAW CLERK:  Sure.

22    THE COURT:  Or do you want to do it now?

23    THE LAW CLERK:  No, that's fine.

24    THE COURT:  When do you guys want to get together

25  again?  When the Court's ready?

```
 1              MS. GLATFELTER:  (Nods head up and down.)

 2              MR. MANGAN:  That would be fine with us.

 3              THE LAW CLERK:  Sometime after 30 days, so after

 4    you've conferred about the --

 5              MR. MANGAN:  Give you an update on the --

 6              THE LAW CLERK:  Right.

 7              MR. MANGAN:  Sure.

 8              THE COURT:  So we'll get an update probably by e-mail,

 9    both sides, within 30 days on those issues, and then we'll

10    figure out when the next status report really is required,

11    because we'll be buried in your motions.

12              MS. CORS:  Yeah.  We may want to set that status after

13    the 404 briefing is complete.  I forget what that final date

14    was.

15              THE COURT:  That was what I was wondering.  I think

16    it's --

17              THE LAW CLERK:  April 13th.  It says the reply is due

18    April 13th on the 404(b).

19              THE COURT:  So the suggestion is we wait until that's

20    come in for a status.

21        Well, we're going to hear a status within 30 days on the

22    stuff we have discussed.  We'll set it for status conference

23    and update that's workable for you thereafter, probably not

24    before the 404(b) stuff ripens.

25        Okay.  You're free to go.  Thank you.  We're adjourned.
```

1        MR. KOHNEN:  Thank you.

2        MS. CORS:  Thank you, Judge.

3     (Proceedings concluded at 11:22 AM.)

4                    - - -

5              C E R T I F I C A T E

6        I, Luke T. Lavin, RDR, CRR, the undersigned, certify

7  that the foregoing is a true and correct transcript from the

8  record of proceedings in the above-entitled matter and

9  incorporates the redactions ordered by the Court.  Redacted

10 characters appear as an "x" in the transcript.

11

12

13                    s/Luke T. Lavin
                    _____
                    Luke T. Lavin
                    Official Court Reporter
14

15                    - - -

16

17

18

19

20

21

22

23

24

25