02:00:00

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION
                              -   -   -
3    UNITED STATES OF AMERICA,       : CASE NO. 1:18-cr-0043
                                     :
4               Plaintiff,           :
                vs.                  : TRIAL EXCERPT
5                                    :
     YANJUN XU, also known as XU     : 27th of OCTOBER, 2021
6    YANJUN, also known as QU HUI,   : 9:39 A.M.
     also known as ZHANG HUI,        :
7                                    :
                     Defendant.      :
8                             -   -   -
                EXCERPT OF TRANSCRIPT OF PROCEEDINGS
9                  TESTIMONY OF ADAM ROBERT JAMES
             BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
10                            -   -   -

11   APPEARANCES:
     For the Plaintiff:
12                        Timothy S. Mangan, Esq.
                          Emily N. Glatfelter, Esq.
13                        Assistant United States Attorneys
                          221 East Fourth Street, Suite 400
14                        Cincinnati, Ohio 45202
                                    and
15                        Matthew John McKenzie, Esq.
                          United States Department of Justice
16                        National Security Division
                          950 Pennsylvania Avenue NW
17                        Washington, D.C. 20530
                                    and
18                        Jacqueline K. Prim
                          Special Assistant, Paralegal
19                        United States Department of Justice
                          National Security Division
20                        950 Pennsylvania Avenue NW
                          Washington, D.C. 20530
21
     For the Defendant:
22                        Ralph William Kohnen, Esq.
                          Jeanne Marie Cors, Esq.
23                        Sanna-Rae Taylor, Esq.
                          Taft Stettinius and Hollister
24                        425 East Walnut Street, Suite 1800
                          Cincinnati, Ohio 45202
25                                  and

```
 1                          Robert K. McBride, Esq.
                            Amanda Johnson, Esq.
 2                          Taft Stettinius and Hollister
                            50 East RiverCenter Boulevard
 3                          Suite 850
                            Covington, Kentucky 41011
 4                                      and
                            Florian Miedel, Esq.
 5                          Miedel & Mysliwiec, LLP
                            80 Broad Street, Suite 1900
 6                          New York, New York 10004

 7       Also present:     Mae Harmon, Interpreter
                           Robin Murphy, Interpreter
 8                         Yanjun Xu, Defendant

 9       Law Clerk:        Cristina V. Frankian, Esq.

10       Courtroom Deputy:  Rebecca Santoro

11       Stenographer:     Mary Schweinhagen, RPR, RMR, RDR, CRR
                           United States District Court
12                         200 West Second Street, Room 910
                           Dayton, Ohio 45402

13

14          Proceedings reported by mechanical stenography,
         transcript produced by computer.
15                                 *** *** *** ***

16

17

18

19

20

21

22

23

24

25
```

1                    **INDEX OF WITNESSES**

2               WEDNESDAY, OCTOBER 27, 2021

3                      DIRECT   CROSS   REDIRECT   RECROSS

4  **PLAINTIFF'S WITNESSES**

5  ADAM JAMES                5       31        47         48

6

7

8                    *       *       *       *       *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          | 1  | P-R-O-C-E-E-D-I-N-G-S                           3:18 P.M.                 |
|          | 2  | (Proceedings reported but not transcribed.)                              |
| 09:39:50 | 3  | THE COURT:  Let's call for the jury.                                     |
| 09:41:30 | 4  | THE COURTROOM DEPUTY:  All rise for the jury.                            |
| 09:41:32 | 5  | (Jury in at 9:41 a.m.)                                                    |
| 09:42:05 | 6  | THE COURT:  You may all be seated.  Thank you.  The                      |
| 09:42:08 | 7  | 15 jurors have arrived.  Good morning and welcome back.  I               |
| 09:42:12 | 8  | told you this a couple of times; I want you to believe it                |
| 09:42:15 | 9  | deep, deep inside.  The Court and the community and the                  |
| 09:42:18 | 10 | participants appreciate your work.                                       |
| 09:42:22 | 11 | We're going to continue with the testimony of this                       |
| 09:42:26 | 12 | gentleman.  He's still under oath.                                       |
| 09:42:28 | 13 | The government may proceed.                                              |
| 09:42:31 | 14 | **ADAM ROBERT JAMES, PLAINTIFF WITNESS, PREVIOUSLY SWORN**               |
| 09:42:31 | 15 | MR. McKENZIE:  Thank you, Your Honor.  For the                           |
| 09:42:36 | 16 | record, this is Matthew McKenzie for the government.                     |
| 09:42:39 | 17 | THE COURT:  Very well.  Can you orient those                             |
| 09:42:45 | 18 | microphones, please.                                                     |
| 09:42:46 | 19 | MR. McKENZIE:  Is this better, Your Honor?                               |
| 09:42:48 | 20 | THE COURT:  A little bit.                                                 |
| 09:42:52 | 21 | MR. McKENZIE:  I will try to keep my voice up.                           |
| 09:42:54 | 22 | THE COURT:  That's perfect.                                              |
| 09:42:56 | 23 | **<u>DIRECT EXAMINATION (CONT.)</u>**                                    |
| 09:42:56 | 24 | BY MR. McKENZIE:                                                          |
| 09:42:56 | 25 | **Q.**  Speaking of reorienting, Special Agent James, I'd like to        |

09:43:00  1   direct your attention to the forensic analysis that you

09:43:03  2   conducted of the hard drive that we discussed yesterday.

09:43:11  3       You mentioned a type of malware that you found called

09:43:18  4   Sakula.  Remind the jury what type of malware Sakula is.

09:43:27  5   A.   Sakula is a remote access trojan that beacons to the

09:43:30  6   Internet.

09:43:32  7   Q.   Do remote access trojans, are they a type of trojan

09:43:36  8   horse?

09:43:37  9   A.   They are.

09:43:43  10  Q.   And please remind us, on what date was the Sakula malware

09:43:48  11  installed on the hard drive you analyzed?

09:43:52  12  A.   January 25th of 2014.

09:43:58  13       MR. McKENZIE:  Your Honor, I ask that we publish

09:44:00  14  Government's Exhibit 110 on page 1 -- on page 3.

09:44:06  15           THE COURT:  It's been admitted?

09:44:08  16           MR. McKENZIE:  Which has been admitted, yes.

09:44:10  17           THE COURT:  Yes, you may publish it.

09:44:12  18       And if the special agent would keep his voice up, please.

09:44:17  19           THE WITNESS:  Yes, sir.

09:44:18  20           MR. McKENZIE:  I apologize.  Page 4.  My mistake.

09:44:24  21  BY MR. McKENZIE:

09:44:25  22  Q.   Just to again get us reoriented, directing your attention

09:44:30  23  to the first message sent on January 25, 2014, will you please

09:44:35  24  read that message?

09:44:37  25  A.   "The horse is planted.  This morning."

| | | |
|---|---|---|
| 09:44:40 | 1 | **Q.**   Who sent that message. |
| 09:44:42 | 2 | **A.**   Tian Xi. |
| 09:44:46 | 3 |      MR. McKENZIE:  To refresh our recollection on who |
| 09:44:49 | 4 | Tian Xi is, may I please publish Government's Exhibit 111, |
| 09:44:54 | 5 | page 6, which is in evidence? |
| 09:45:06 | 6 |      THE COURT:  Yes. |
| 09:45:06 | 7 | BY MR. McKENZIE: |
| 09:45:06 | 8 | **Q.**   Directing your attention to the top right column, do you |
| 09:45:09 | 9 | see the name Tian Xi? |
| 09:45:12 | 10 | **A.**   I do. |
| 09:45:12 | 11 | **Q.**   Directing your attention to the first sentence of the |
| 09:45:16 | 12 | first full paragraph, does it identify Tian Xi as a |
| 09:45:24 | 13 | manufacturing engineer? |
| 09:45:25 | 14 | **A.**   It does. |
| 09:45:28 | 15 |      MR. McKENZIE:  Okay.  I would like to return one |
| 09:45:33 | 16 | more time to Government's Exhibit 110, page 4? |
| 09:45:38 | 17 |      THE COURT:  Yes. |
| 09:45:45 | 18 | BY MR. McKENZIE: |
| 09:45:45 | 19 | **Q.**   Directing your attention to the first message of January |
| 09:45:48 | 20 | 25, 2014, to whom did Tian send that message? |
| 09:45:52 | 21 | **A.**   Xu Yanjun. |
| 09:46:02 | 22 | **Q.**   Okay.  I think we are now back to where we were |
| 09:46:04 | 23 | yesterday. |
| 09:46:04 | 24 |      I'd like to return to your forensic analysis.  Yesterday |
| 09:46:10 | 25 | you discussed the Sakula malware, but you also mentioned a |

| | | |
|---|---|---|
| 09:46:14 | 1 | second type of malware that you discovered.  Will you remind |
| 09:46:17 | 2 | us what that program is called? |
| 09:46:19 | 3 | **A.**    That program is called plugX. |
| 09:46:22 | 4 | **Q.**    How many types of variants of plugX did you find on |
| 09:46:28 | 5 | the -- on the hard drive? |
| 09:46:28 | 6 | **A.**    There were two different versions of plugX on the hard |
| 09:46:33 | 7 | drive. |
| 09:46:33 | 8 | **Q.**    Will you explain to the jury what it means to have |
| 09:46:37 | 9 | multiple versions of plugX? |
| 09:46:43 | 10 | **A.**    What it means to have multiple versions of plugX is |
| 09:46:46 | 11 | there are actually two sets of files related to the plugX |
| 09:46:50 | 12 | malware that were independent of each other. |
| 09:46:54 | 13 | **Q.**    Did you analyze both sets of files? |
| 09:46:56 | 14 | **A.**    I did. |
| 09:46:57 | 15 | **Q.**    Did both of them work? |
| 09:46:58 | 16 | **A.**    No, they did not both work. |
| 09:47:01 | 17 | **Q.**    Tell the jury what you mean by that. |
| 09:47:03 | 18 | **A.**    So the plugX malware is composed of several different |
| 09:47:10 | 19 | files that it needs to have in order to operate correctly. |
| 09:47:14 | 20 | One of the variants of plugX, one of the files appeared to |
| 09:47:19 | 21 | be corrupted, and so it did not run properly when you |
| 09:47:23 | 22 | attempted to run it.  Or when I attempted to run it. |
| 09:47:27 | 23 | **Q.**    And what about the other variant of plugX?  Did that |
| 09:47:31 | 24 | work? |
| 09:47:32 | 25 | **A.**    The other variant did work properly. |

JAMES - DIRECT (McKENZIE)                                    8

09:47:34   1    Q.    What type of malware is plugX?

09:47:37   2    A.    PlugX is a remote access trojan.

09:47:41   3    Q.    And what happened when you ran the variant of plugX that

09:47:44   4    worked?

09:47:45   5    A.    The variant that successfully ran would issue a beacon

09:47:50   6    to a domain on the Internet.

09:47:52   7    Q.    Were you able to determine what that domain was?

09:47:55   8    A.    I was.

09:47:55   9    Q.    And what was that domain?

09:47:58   10   A.    The domain for the variant of plugX that worked was

09:48:04   11   ns24.dnsdojo.com.

09:48:12   12   Q.    Do you sometimes refer to that as dnsdojo.com?

09:48:17   13   A.    I do.

09:48:19   14   Q.    What does it mean in plain English that the program

09:48:24   15   beaconed to this dnsdojo.com?

09:48:27   16   A.    The beacon to dnsdojo.com was a way for the malware to

09:48:33   17   check in with the computer intruders that intended to

09:48:37   18   control it.

09:48:38   19   Q.    Based on your analysis of the hard drive, did the plugX

09:48:44   20   program actually beacon out to dnsdojo.com?

09:48:49   21   A.    From my analysis of the hard drive, I could not

09:48:51   22   determine that.

09:48:51   23   Q.    Were you able to determine that it was designed to do so?

09:48:55   24   A.    Yes.

09:48:56   25   Q.    Are you familiar with the term "Crowd Strike"?

JAMES - DIRECT (McKENZIE)                                        9

| | | |
|---|---|---|
| 09:49:02 | 1 | **A.** I am. |
| 09:49:03 | 2 | **Q.** What is Crowd Strike? |
| 09:49:05 | 3 | **A.** Crowd Strike is a US information security and incident |
| 09:49:09 | 4 | response company. |
| 09:49:10 | 5 | **Q.** Does Crowd Strike publish publicly available blog posts |
| 09:49:17 | 6 | about hacking activities? |
| 09:49:18 | 7 | **A.** They do. |
| 09:49:18 | 8 | **Q.** Directing your attention to on or about February 25, |
| 09:49:24 | 9 | 2014, did there come a time that you became aware of a blog |
| 09:49:28 | 10 | post on Crowd Strike? |
| 09:49:34 | 11 | MS. CORS: Your Honor, objection. |
| 09:49:35 | 12 | THE COURT: Basis? |
| 09:49:37 | 13 | MS. CORS: Hearsay. |
| 09:49:40 | 14 | MR. McKENZIE: I haven't gotten into the substance |
| 09:49:42 | 15 | of anything yet. |
| 09:49:42 | 16 | THE COURT: We are not there yet. Overruled. |
| 09:49:45 | 17 | BY MR. McKENZIE: |
| 09:49:45 | 18 | **Q.** Did you become aware of a blog post on Crowd Strike? |
| 09:49:48 | 19 | **A.** I was aware that there was a blog post. |
| 09:49:52 | 20 | **Q.** Without getting into the details, what was the general |
| 09:49:55 | 21 | topic of the post? |
| 09:49:56 | 22 | **A.** The general topic of the post was computer intrusion |
| 09:50:00 | 23 | activity targeting French aerospace. |
| 09:50:04 | 24 | **Q.** Was that post published on the Internet? |
| 09:50:07 | 25 | **A.** It was. |

JAMES - DIRECT (McKENZIE)                                     10

| | | |
|---|---|---|
| 09:50:07 | 1 | **Q.** I'd like to direct your attention back to Government's |
| 09:50:12 | 2 | Exhibit 110, page 4. And I'd like to begin with the messages |
| 09:50:28 | 3 | on February 25, 2014. Will you please read just the first |
| 09:50:34 | 4 | message? |
| 09:50:35 | 5 | **A.** "Call me back as soon as possible." |
| 09:50:40 | 6 | **Q.** Who sent that message? |
| 09:50:41 | 7 | **A.** Xu Yanjun. |
| 09:50:45 | 8 | **Q.** To whom did he send it? |
| 09:50:47 | 9 | **A.** Chai Meng. |
| 09:50:50 | 10 | **Q.** On what date was this message sent? |
| 09:50:52 | 11 | **A.** February 25th of 2014. |
| 09:50:56 | 12 | **Q.** On what date did Crowd Strike publish the blog post about |
| 09:51:01 | 13 | hacking activities targeting French aerospace? |
| 09:51:05 | 14 | **A.** February 25th of 2014. |
| 09:51:08 | 15 | **Q.** I'd like to read the remaining messages on the page. I |
| 09:51:13 | 16 | will read the messages sent by Chai Meng. |
| 09:51:20 | 17 | So please read the next message. |
| 09:51:23 | 18 | **A.** "What does Chen mean?" |
| 09:51:24 | 19 | **Q.** "Chen is still reporting, and I'm waiting for him to come |
| 09:51:27 | 20 | out." |
| 09:51:28 | 21 | **A.** "Ah. How will Chen Li react to this matter? The mail |
| 09:51:34 | 22 | has been forwarded to your email address." |
| 09:51:39 | 23 | MR. McKENZIE: Could we please go to page 5? |
| 09:51:42 | 24 | THE COURT: Yes. |
| 09:51:46 | 25 | BY MR. McKENZIE: |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JAMES - DIRECT (McKENZIE)                                    11

| | | |
|---|---|---|
| 09:51:46 | 1 | **Q.** Let us continue with the next two messages. |
| 09:51:52 | 2 | "Okay." |
| 09:51:53 | 3 | **A.** "The part with the red marking in the attachment, is |
| 09:51:56 | 4 | that being flagged by Suzhou's investigation?" |
| 09:52:05 | 5 | **Q.** Who sent that last message? |
| 09:52:08 | 6 | **A.** Xu Yanjun. |
| 09:52:10 | 7 | **Q.** To whom did he send it? |
| 09:52:12 | 8 | **A.** Chai Meng. |
| 09:52:13 | 9 | **Q.** Where is Safran Suzhou located? |
| 09:52:20 | 10 | **A.** In Suzhou. |
| 09:52:22 | 11 | **Q.** And who is the parent company of Safran Suzhou? |
| 09:52:27 | 12 | **A.** Safran Group. |
| 09:52:31 | 13 | **Q.** What company owns the computer that you analyzed? |
| 09:52:35 | 14 | **A.** Safran. |
| 09:52:37 | 15 | **Q.** In what company -- in what country is Safran located? |
| 09:52:40 | 16 | **A.** They are located in France. |
| 09:52:44 | 17 | **Q.** Will you please read the next message. |
| 09:52:48 | 18 | **A.** "Your QQ." |
| 09:52:50 | 19 | **Q.** Do you know what "QQ" stands for or what "QQ" is? |
| 09:52:54 | 20 | **A.** I do. |
| 09:52:55 | 21 | **Q.** What is QQ? |
| 09:52:56 | 22 | **A.** QQ is -- the most common thing it's used for is a |
| 09:53:02 | 23 | mobile messaging app. |
| 09:53:05 | 24 | **Q.** Is it popular in China? |
| 09:53:07 | 25 | **A.** It is. |

| 09:53:08 | 1 | Q. We will go through these messages. I will read Song |
| 09:53:16 | 2 | Sicheng. He responded with a series of numbers. |
| 09:53:21 | 3 | Please read the next message. |
| 09:53:23 | 4 | A. "Received. Sent already." |
| 09:53:27 | 5 | Q. "Okay. I am receiving it." |
| 09:53:31 | 6 | Directing your attention to the next set of messages, |
| 09:53:35 | 7 | will you please read the -- just the next message? |
| 09:53:39 | 8 | A. "What does Chen mean by heaping the responsibility upon |
| 09:53:43 | 9 | me and furthermore having the guest to find Gu?" |
| 09:53:50 | 10 | Q. Who sent that message? |
| 09:53:51 | 11 | A. Xu Yanjun. |
| 09:53:53 | 12 | Q. To whom did he send it? |
| 09:53:56 | 13 | A. Chai Meng. |
| 09:53:56 | 14 | Q. All right. We will read the next exchange. I will read |
| 09:53:59 | 15 | the parts of Chai Meng. Please read the next message. |
| 09:54:02 | 16 | A. "Isn't it like putting a noose on his own neck?" |
| 09:54:06 | 17 | Q. "I don't know. I told him the French device was seized. |
| 09:54:09 | 18 | He immediately stated that he had foresight. As to matter of |
| 09:54:16 | 19 | finding Gu, he never told me about it." |
| 09:54:20 | 20 | Let's pause there for a moment. |
| 09:54:27 | 21 | What country did the hard drive you analyzed come from? |
| 09:54:30 | 22 | A. It came from France. |
| 09:54:36 | 23 | Q. I'd like to take a pause from Government's Exhibit 110 |
| 09:54:39 | 24 | and turn to Government's Exhibit 111, page 1. |
| 09:54:49 | 25 | Directing your attention to the top of the screen next to |

JAMES - DIRECT (McKENZIE)                                           13

| | | |
|---|---|---|
| 09:54:53 | 1 | "Name," will you please read the name? |
| 09:54:56 | 2 | **A.**    Gu Gen. |
| 09:55:00 | 3 | **Q.**    Scrolling down to the middle of the page where it says |
| 09:55:04 | 4 | "Position," will you please read the position? |
| 09:55:06 | 5 | **A.**    "Senior IT infrastructure manager and information |
| 09:55:11 | 6 | security officer." |
| 09:55:12 | 7 | **Q.**    Scrolling to the bottom of the screen underneath the red |
| 09:55:17 | 8 | seal, will you please read the company? |
| 09:55:18 | 9 | **A.**    "Safran Beijing Enterprise Management Company, Ltd., |
| 09:55:24 | 10 | Suzhou Branch. |
| 09:55:26 | 11 | **Q.**    Thank you. |
| 09:55:26 | 12 |           MR. McKENZIE:  I'd like to return to Government's |
| 09:55:28 | 13 | Exhibit 110, which is in evidence.  I believe we were on page |
| 09:55:33 | 14 | 5. |
| 09:55:34 | 15 |           THE COURT:  Very well. |
| 09:55:40 | 16 | BY MR. McKENZIE: |
| 09:55:40 | 17 | **Q.**    Directing your attention to the message sent at 3:10 p.m. |
| 09:55:47 | 18 | We'll continue reading with you reading the part of Xu Yanjun |
| 09:55:52 | 19 | and I'll read Chai Meng. |
| 09:55:54 | 20 | **A.**    "I wanted to call him a son of a bitch.  He stated the |
| 09:55:57 | 21 | entire thing led to an exposing is because what the guest |
| 09:56:01 | 22 | has planted in the French device." |
| 09:56:04 | 23 | **Q.**    In the term or in the context of a cyber intrusion case, |
| 09:56:08 | 24 | what does "planted" mean? |
| 09:56:10 | 25 | **A.**    To install. |

| | | |
|---|---|---|
| 09:56:12 | 1 | **Q.** All right.  The next message was sent at 3:12 p.m. |
| 09:56:16 | 2 | "It's my guess to prove his brilliance." |
| 09:56:20 | 3 | **A.** "It feels bitterly disappointing to have leaders like |
| 09:56:24 | 4 | that." |
| 09:56:25 | 5 | "Can you suggest not letting the guest go to find Gu? |
| 09:56:34 | 6 | First, the guest is not exposed; two, Gu doesn't have the |
| 09:56:37 | 7 | power to decide.  Thirdly, Gu would report the situation to |
| 09:56:40 | 8 | me at any time." |
| 09:56:43 | 9 | **Q.** We will continue on to the first message from February |
| 09:56:49 | 10 | 26, 2014.  Will you please read the first message? |
| 09:56:54 | 11 | **A.** "France is letting Little Gu to check out this record, |
| 09:57:00 | 12 | ns24.dnsdojo.com.  Does it have anything to do with you |
| 09:57:07 | 13 | all?" |
| 09:57:08 | 14 | **Q.** Who sent that message? |
| 09:57:09 | 15 | **A.** Xu Yanjun. |
| 09:57:10 | 16 | **Q.** To whom did he send it? |
| 09:57:12 | 17 | **A.** Chai Meng. |
| 09:57:13 | 18 | **Q.** In what country is Safran located? |
| 09:57:16 | 19 | **A.** They are located in France. |
| 09:57:18 | 20 | **Q.** Who did Gu Gen work for? |
| 09:57:21 | 21 | **A.** Safran Suzhou. |
| 09:57:23 | 22 | **Q.** To what domain did the plugX malware you found on the |
| 09:57:27 | 23 | hard drive beacon? |
| 09:57:28 | 24 | **A.** Ns24.dnsdojo.com. |
| 09:57:38 | 25 | **Q.** At 3:08 Chai Meng responded, "Let me ask." |

JAMES - DIRECT (McKENZIE)                                    15

09:57:43   1        Directing your attention to the next message sent on

09:57:48   2   February 27, 2014, will you please read that message?

09:57:53   3   A.   "France is asking Little Gu to inspect this record,

09:58:02   4   ns24.dnsdojo.com.  Is it related to you?"

09:58:05   5   Q.   To what domain did the plugX malware beacon?

09:58:14   6   A.   Ns24.dns.dojod.com.

09:58:26   7   Q.   Directing your attention back to Government's Exhibit

09:58:30   8   111, page 1.

09:58:32   9        MR. McKENZIE:  And if I may publish to the jury,

09:58:35  10   Your Honor.

09:58:35  11        THE COURT:  Yes.  It's been admitted, right?

09:58:37  12        MR. McKENZIE:  Yes, Your Honor.

09:58:39  13   BY MR. McKENZIE:

09:58:41  14   Q.   Scrolling down to "Position."  Will you read Gu Gen's

09:58:46  15   position?

09:58:46  16   A.   The senior IT infrastructure manager and information

09:58:50  17   security officer.

09:58:52  18   Q.   Based on your years of experience in information

09:58:55  19   technology and security and work in cyber intrusion

09:58:59  20   investigations, what is the role of senior IT and security

09:59:04  21   officers in investigating cyber intrusions for a company?

09:59:11  22   A.   Generally, your information security office would be

09:59:14  23   the office that conducts computer or -- well, intrusion,

09:59:33  24   computer intrusion investigations into the company.

09:59:26  25   Q.   I'd like to direct your attention back to Government's

JAMES - DIRECT (McKENZIE)                                    16

| | | |
|---|---|---|
| 09:59:29 | 1 | Exhibit 110, page 5, which is in evidence. |
| 09:59:35 | 2 | I'd like to move on now to the message sent on -- the |
| 09:59:41 | 3 | messages sent on March 11, 2014.  Will you please read the |
| 09:59:48 | 4 | first message? |
| 09:59:49 | 5 | A.   "When did Gu ask you?  When did France ask you?" |
| 09:59:55 | 6 | Q.   Who sent that message? |
| 09:59:56 | 7 | A.   Xu Yanjun. |
| 09:59:57 | 8 | Q.   To whom did he send it? |
| 09:59:59 | 9 | A.   Tian Xi. |
| 10:00:01 | 10 | Q.   I will read the messages sent by Tian Xi. |
| 10:00:05 | 11 | "Gu received an email from the French side, asked me |
| 10:00:11 | 12 | yesterday." |
| 10:00:11 | 13 | A.   "Have you seen the email?" |
| 10:00:12 | 14 | Q.   "No." |
| 10:00:17 | 15 | What country is Safran located in or headquartered in? |
| 10:00:20 | 16 | A.   They are headquartered in France. |
| 10:00:22 | 17 | Q.   Could we please see the next page. |
| 10:00:33 | 18 | For March 17th, will you please read the messages sent by |
| 10:00:37 | 19 | Xu Yanjun, and I will read the messages sent by Tian Xi? |
| 10:00:43 | 20 | A.   "Anything new?  I sought out Little Gu last week and |
| 10:00:49 | 21 | current France has not finding suspicious documents in the |
| 10:00:51 | 22 | record." |
| 10:00:58 | 23 | Q.   "Nothing." |
| 10:00:59 | 24 | A.   "Should there be something new be prompt notifying me |
| 10:01:01 | 25 | and I will communicate with Little Gu." |

| | | |
|---|---|---|
| 10:01:03 | 1 | **Q.** "Understand." |
| 10:01:04 | 2 | Directing your attention now to April 17, 2014, messages, |
| 10:01:10 | 3 | let's read the first three messages, you reading those sent by |
| 10:01:15 | 4 | the defendant, I'll read those sent by Tian Xi. |
| 10:01:18 | 5 | **A.** "Of the matter, any new situation?" |
| 10:01:21 | 6 | **Q.** "No." |
| 10:01:23 | 7 | **A.** "Good." |
| 10:01:28 | 8 | **Q.** Directing your attention to the next message that was |
| 10:01:31 | 9 | sent, will you please read the message? |
| 10:01:33 | 10 | **A.** "Any updates on that incident?" |
| 10:01:37 | 11 | **Q.** Who sent the message? |
| 10:01:38 | 12 | **A.** Xu Yanjun. |
| 10:01:40 | 13 | **Q.** To whom did he send it? |
| 10:01:41 | 14 | **A.** Gu Gen. |
| 10:01:43 | 15 | **Q.** Who does Gu Gen work for? |
| 10:01:46 | 16 | **A.** Safran Suzhou. |
| 10:01:47 | 17 | **Q.** I will read Gu's response. |
| 10:01:52 | 18 | "Still checking.  They found that someone had connected |
| 10:01:54 | 19 | to our server via a tool called psexec.  The period is from |
| 10:02:00 | 20 | July last year to February this year." |
| 10:02:02 | 21 | Will you please read the next message? |
| 10:02:04 | 22 | **A.** "No conclusion?" |
| 10:02:08 | 23 | **Q.** Directing your attention to the next message, the second |
| 10:02:11 | 24 | message sent at 9:46 a.m., will you please read that message? |
| 10:02:17 | 25 | **A.** The latest status from Suzhou:  They found an intrusion |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JAMES - DIRECT (McKENZIE)                                    18

10:02:22  1    to our server through a psexec tool.  The time frame is from

10:02:28  2    July last year to February this year."

10:02:31  3    Q.    Who sent that message?

10:02:33  4    A.    Xu Yanjun.

10:02:35  5    Q.    To whom did he send it?

10:02:37  6    A.    Chai Meng.

10:02:38  7    Q.    And what is the location of Safran's subsidiary in China?

10:02:41  8    A.    Suzhou.

10:02:42  9    Q.    Directing your attention to the next message sent at 9:55

10:02:53  10   a.m., did Gu Gen send a message to the defendant which said,

10:02:59  11   "So far, no.  They will examine by remotely connecting to this

10:03:02  12   server"?

10:03:06  13   A.    He did.

10:03:06  14   Q.    How did the defendant respond?

10:03:08  15   A.    "Do they think China is hacking them?"

10:03:12  16   Q.    And will you please read Gu's response?

10:03:15  17   A.    "Don't think so."

10:03:18  18   Q.    Directing your attention now to the messages sent on

10:03:22  19   August 18, 2014.  Who sent the first message that we see on

10:03:28  20   that date?

10:03:29  21   A.    Xu Yanjun.

10:03:31  22   Q.    To whom did he send it?

10:03:32  23   A.    Tian Xi.

10:03:34  24   Q.    Please read the defendant's messages.  I'll read Tian's

10:03:37  25   response.

JAMES - DIRECT (McKENZIE)                                    19

| | | |
|---|---|---|
| 10:03:38 | 1 | **A.** "About that matter, any new situation?" |
| 10:03:41 | 2 | **Q.** "No new news. Should be an unsolved mystery." |
| 10:03:50 | 3 | **A.** "Ho, ho." |
| 10:03:51 | 4 | MR. McKENZIE: For a final time, I would like to |
| 10:03:53 | 5 | return to Government's Exhibit 111, page 1, which is in |
| 10:04:01 | 6 | evidence, Your Honor. |
| 10:04:01 | 7 | BY MR. McKENZIE: |
| 10:04:04 | 8 | **Q.** Will you please read the title of the document which is |
| 10:04:09 | 9 | displayed at the top of the screen? |
| 10:04:11 | 10 | **A.** "Employment Dismissal Record Form for Employers of |
| 10:04:19 | 11 | Suzhou Industrial Park." |
| 10:04:20 | 12 | **Q.** Please read the name that's listed at the top of the |
| 10:04:23 | 13 | screen. |
| 10:04:23 | 14 | **A.** Gu Gen. |
| 10:04:26 | 15 | **Q.** Scrolling down and directing your attention to the middle |
| 10:04:28 | 16 | of the screen, what was Gu's position? |
| 10:04:32 | 17 | **A.** Senior IT infrastructure manager and information |
| 10:04:37 | 18 | security officer. |
| 10:04:40 | 19 | **Q.** When it says "Type of" -- directing your attention to the |
| 10:04:44 | 20 | box below it, next to "Type of Contract Dissolution |
| 10:04:49 | 21 | (Termination)," which box has been selected? |
| 10:04:52 | 22 | **A.** The box for "Employer Initiated Dissolution" is |
| 10:04:58 | 23 | highlighted. |
| 10:04:59 | 24 | **Q.** Scrolling down, who is listed as the employer? |
| 10:05:05 | 25 | **A.** Safran Beijing Enterprise Management Company, Ltd., |

JAMES - DIRECT (McKENZIE)                                    20

| | | |
|---|---|---|
| 10:05:10 | 1 | Suzhou Branch. |
| 10:05:12 | 2 | **Q.**   And directing your attention to that same box, what is |
| 10:05:15 | 3 | listed as the date? |
| 10:05:16 | 4 | **A.**   November 28 of 2018. |
| 10:05:18 | 5 | **Q.**   I'd like to direct your attention now to page 6 of the |
| 10:05:21 | 6 | same exhibit. |
| 10:05:30 | 7 | Directing your attention to the top left.  Who is the |
| 10:05:34 | 8 | sender of this letter? |
| 10:05:34 | 9 | **A.**   Safran Aircraft Engines, Suzhou Co., Ltd. |
| 10:05:41 | 10 | **Q.**   Who is the recipient of the letter? |
| 10:05:43 | 11 | **A.**   Tian Xi. |
| 10:05:45 | 12 | **Q.**   In the -- in that same column, what is the date of the |
| 10:05:50 | 13 | letter? |
| 10:05:53 | 14 | **A.**   It appears to be November 13th of 2018. |
| 10:05:57 | 15 | **Q.**   As displayed on the screen currently to your bottom left, |
| 10:06:02 | 16 | what is the title of this letter? |
| 10:06:05 | 17 | **A.**   "Re:  Termination Letter." |
| 10:06:08 | 18 | MR. McKENZIE:  If we can scroll down to where we can |
| 10:06:12 | 19 | begin with "Dear Sir." |
| 10:06:12 | 20 | BY MR. McKENZIE: |
| 10:06:14 | 21 | **Q.**   Will you please read the English section of this letter? |
| 10:06:19 | 22 | **A.**   "Dear Sir, |
| 10:06:21 | 23 | "Following our meeting on October 31, 2018, the company |
| 10:06:26 | 24 | has decided to dismiss you from your position of |
| 10:06:31 | 25 | manufacturing engineer.  This decision is justified by the |

| | | |
|---|---|---|
| 10:06:36 | 1 | following reasons: |
| 10:06:38 | 2 | "You have materially breached the employer's rules and |
| 10:06:41 | 3 | regulation.  Therefore, the company hereby terminates your |
| 10:06:45 | 4 | employment contract in accordance with its Article 7 and PRC |
| 10:06:51 | 5 | applicable laws, including Article 39 of the Labor Contract |
| 10:06:55 | 6 | Law of the PRC.  Your employment contract entered with the |
| 10:06:59 | 7 | company on December 10, 2007, will terminate with immediate |
| 10:07:07 | 8 | effect.  Therefore, you will leave the company on November |
| 10:07:10 | 9 | 13, 2018. |
| 10:07:11 | 10 | "In consideration of the above, the company will not |
| 10:07:14 | 11 | pay you any compensation. |
| 10:07:16 | 12 | "Before leaving the company, please surrender any and |
| 10:07:21 | 13 | all relevant work, documents, equipment, and property, |
| 10:07:26 | 14 | together with all keys, relating to the company and/or any |
| 10:07:30 | 15 | of its clients to Patrick Calero. |
| 10:07:39 | 16 | "As from the date of the termination of your |
| 10:07:40 | 17 | employment, you will remain bound by the confidentiality |
| 10:07:43 | 18 | undertaking stipulated in your employment contract which |
| 10:07:47 | 19 | stipulates that you shall keep strictly secret and |
| 10:07:54 | 20 | confidential, and not disclose to any third party any and |
| 10:07:58 | 21 | all technical, economic, financial, or marketing information |
| 10:08:03 | 22 | acquired from the company and/or obtained because of your |
| 10:08:07 | 23 | activities in the company. |
| 10:08:09 | 24 | "The company reserves all rights to bring suits, |
| 10:08:13 | 25 | claims, or any other actions against you. |

10:08:17   1          "Yours sincerely."

10:08:19   2   **Q.**   And then what is -- who is listed as the company sending

10:08:23   3   the letter?

10:08:23   4   **A.**   Safran Aircraft Engines, Suzhou Co., Ltd.

10:08:32   5          THE COURT:  Counsel, I'd like to take a break at an

10:08:34   6   appropriate point.

10:08:35   7          MR. McKENZIE:  Perfect timing, Your Honor.  The

10:08:37   8   government has no further questions.

10:08:40   9          THE COURT:  Very well.  We are going to recess for

10:08:44  10   20 minutes, until 10:30.

10:08:47  11       Members of the jury, as you know, please do not discuss

10:08:50  12   the case among yourselves or with anyone else.  No independent

10:08:54  13   research.  Continue to keep an open mind.

10:09:00  14       We'll rise as you leave.

10:09:02  15          THE COURTROOM DEPUTY:  All rise for the jury.

10:09:03  16       (Jury out at 10:09 a.m.)

10:09:43  17          THE COURT:  Jury's left the room and the door is

10:09:45  18   closed.  We're going to break until 10:30, at least as to the

10:09:48  19   jury.  That's my intention.

10:09:51  20       We can chat in 15 minutes or the issues that are arising

10:09:59  21   may not require attention yet.  When is the witness to be

10:10:03  22   called that Mr. --

10:10:08  23          THE INTERPRETER:  Your Honor, the interpreter is

10:10:09  24   having a hard time hearing you.  I'm sorry.

10:10:13  25          THE COURT:  That's okay.

| | | |
|---|---|---|
| 10:10:19 | 1 | Do I need to address the defense's concerns about Arthur |
| 10:10:24 | 2 | Gau now from the government's perspective? |
| 10:10:28 | 3 | MR. MANGAN: He is the next witness. It's a matter |
| 10:10:30 | 4 | of whether you wanted to wait until the next break or not. |
| 10:10:35 | 5 | We're fine either way. |
| 10:10:36 | 6 | THE COURT: Why don't we be seated and hear the |
| 10:10:38 | 7 | issue. We're outside the presence of the jury. We're talking |
| 10:10:43 | 8 | about the next witness. |
| 10:10:46 | 9 | Mr. Miedel, forget my lapse. I know exactly who you are. |
| 10:10:52 | 10 | MR. MIEDEL: You can just keep calling me the New |
| 10:10:56 | 11 | York lawyer. That's okay. |
| 10:10:57 | 12 | THE COURT: If you can take the mask off and tell me |
| 10:11:00 | 13 | what I can call you. |
| 10:11:02 | 14 | MR. MIEDEL: The New York lawyer. |
| 10:11:03 | 15 | THE COURT: I didn't want to do that. |
| 10:11:06 | 16 | MR. MIEDEL: Your Honor, I wanted to raise this |
| 10:11:07 | 17 | issue because, as I said, Arthur Gau is the next witness. And |
| 10:11:10 | 18 | according to the government's exhibit book, they, I think, |
| 10:11:16 | 19 | will attempt to introduce Exhibit 81a and 81b through Arthur |
| 10:11:22 | 20 | Gau. |
| 10:11:26 | 21 | Exhibit 81 is a Chinese letter, in Chinese, and 81b is |
| 10:11:33 | 22 | the English translation of it. And it essentially is a typed |
| 10:11:37 | 23 | letter that Arthur Gau will testify was given to him in 2003, |
| 10:11:44 | 24 | purportedly by an individual named Zha, Z-H-A, Rong, R-A-N-G |
| 10:11:51 | 25 | [sic], who I think the government will argue was somehow |

JAMES - DIRECT (McKENZIE)                                24

| | |
|---|---|
| 10:11:53 | 1 |
| 10:11:58 | 2 |
| 10:12:04 | 3 |
| 10:12:12 | 4 |
| 10:12:15 | 5 |
| 10:12:21 | 6 |
| 10:12:25 | 7 |
| 10:12:29 | 8 |
| 10:12:36 | 9 |
| 10:12:41 | 10 |
| 10:12:44 | 11 |
| 10:12:49 | 12 |
| 10:12:53 | 13 |
| 10:12:58 | 14 |
| 10:13:00 | 15 |
| 10:13:04 | 16 |
| 10:13:09 | 17 |
| 10:13:14 | 18 |
| 10:13:21 | 19 |
| 10:13:25 | 20 |
| 10:13:30 | 21 |
| 10:13:39 | 22 |
| 10:13:42 | 23 |
| 10:13:46 | 24 |
| 10:13:50 | 25 |

1    associated with MSS, or at least later was.

2         And that letter contains a number of questions about what

3    seemed to be engineering questions or problems.  We object to

4    the introduction of that exhibit for a couple of reasons.  The

5    first is that it is hearsay.  It is an out-of-court statement

6    obviously made, proposed for the truth of the matter because

7    the government wants to show that the document is asking

8    Arthur Gau specific engineering questions or presents

9    engineering issues that they want him to respond to.

10        There is no applicable hearsay exception because this

11   letter was created and given to Arthur Gau ten years before

12   the beginning of the conspiracy in this case.  It was given in

13   2003.  The conspiracy begins, according to the indictment, in

14   2013.

15        And if it's not being introduced for the truth, then it

16   has no relevance, because if it is not for purposes of the

17   charged conspiracy, the letter itself does not ask for any

18   specific trade -- it doesn't ask for the -- Mr. Gau to reveal

19   trade secrets.  As noted, it was written 10 years before the

20   conspiracy.  At that point in 2003, Mr. Xu was not involved in

21   that.  There is no evidence that he was even working with Zha

22   Rong at that time.  There is no evidence that Zha Rong was

23   working for MSS at the time.  Arthur Gau will testify,

24   presumably, that he believe that Zha Rong was working for

25   NUAA.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JAMES - DIRECT (McKENZIE)                        25

10:13:52  1      In terms of relevance, it is absolutely more prejudicial

10:13:59  2  than probative, again because -- the probative value is

10:14:04  3  minimal again because it occurred ten years before the charged

10:14:08  4  conspiracy.

10:14:09  5      The document is signed by Zha Rong -- it's typed, so it's

10:14:16  6  not signed but it's typed with his name, but we don't actually

10:14:20  7  have any way of knowing who wrote it.  It was not given to

10:14:23  8  Arthur Gau by Zha Rong; it was given to him by somebody else.

10:14:28  9  The document doesn't actually ask him to reveal any trade

10:14:32  10  secrets.

10:14:32  11      And I think that what the problem is, the prejudice is

10:14:35  12  that the jury could mistakenly conclude that this was a

10:14:41  13  decades-long pattern in an effort to get Mr. Gau to cough up

10:14:50  14  trade secrets when, in fact, there is -- this document doesn't

10:14:52  15  advance that theory at all.  And the jury could mistakenly

10:14:55  16  consider it to be meaningful when it's not.  Thank you.

10:15:01  17          THE COURT:  When did this issue -- when did you

10:15:05  18  become aware of it?

10:15:07  19          MR. MIEDEL:  Well, I was aware of it for a while

10:15:10  20  but, again, Mr. Gau wasn't scheduled to be testifying until

10:15:15  21  today.  So I notified the government of it this morning.  I

10:15:18  22  think they are prepared to argue it.

10:15:19  23          THE COURT:  The Court prefers to get a heads-up.

10:15:25  24          MR. MIEDEL:  I understand.

10:15:26  25          THE COURT:  The government wish to be heard?

JAMES - DIRECT (McKENZIE)                              26

10:15:28  1        MR. MANGAN:  Yes, Your Honor.  What I would say in
10:15:34  2   response is, first of all, this does pertain to an individual
10:15:39  3   named Zha Rong, and there's already been evidence submitted in
10:15:42  4   the case relating to Mr. Zha Rong and his relationship to the
10:15:46  5   defendant.  As we've asserted, he is the direct supervisor of
10:15:51  6   the defendant within the MSS.
10:15:59  7        What we are going to go through with Arthur Gau is a
10:16:02  8   number of trips that he took over to China and that he met
10:16:04  9   with Zha Rong on a number of those trips and then eventually
10:16:08  10  was introduced to the defendant.
10:16:10  11       And so our assertion, Your Honor, is that the
10:16:13  12  relationship started with Zha Rong.  It was more or less
10:16:16  13  passed over to the defendant, to kind of continue with the
10:16:21  14  relationship in later visits, and that will be the heart of
10:16:24  15  the testimony, will be these later visits.  However, to
10:16:27  16  explain sort of where it all started, his first visits were,
10:16:32  17  you know, back in that time period, when he went back to China
10:16:37  18  in, you know, the year 2000 and so on.
10:16:39  19       When he got back to the U.S. after one of these visits
10:16:42  20  where he met with an NUAA professor and he met with Zha Rong,
10:16:49  21  at that time the son of the professor showed up at Mr. Gau's
10:16:52  22  house in the U.S. and handed him this letter.  So in the
10:16:57  23  letter it is written and signed by Zha Rong asking him to see
10:17:04  24  if he's willing to do a project that would prepare a lot of
10:17:06  25  technical information.

| | | |
|---|---|---|
| 10:17:08 | 1 | So from our standpoint, Your Honor, there is two things. |
| 10:17:11 | 2 | One, to the extent it is simply a question or it is asking him |
| 10:17:16 | 3 | to do work and setting forth what they are asking for, that is |
| 10:17:19 | 4 | not hearsay.  It's simply a question or it's a request or a |
| 10:17:24 | 5 | demand.  Those are not assertions of fact. |
| 10:17:29 | 6 | In addition, Your Honor, to the extent any of the letter |
| 10:17:31 | 7 | would be interpreted as an assertion of fact, we would assert |
| 10:17:35 | 8 | that statements by Mr. Zha Rong are statements of a |
| 10:17:43 | 9 | co-conspirator and therefore also would be admissible. |
| 10:17:46 | 10 | As to the time frame, Your Honor, this is really -- we |
| 10:17:48 | 11 | understand we are limited by the years in the indictment |
| 10:17:51 | 12 | regarding the defendant's conduct.  And that is from 2013, you |
| 10:17:56 | 13 | know, to the time of his arrest.  This is kind of introductory |
| 10:18:01 | 14 | evidence to help the witness explain where the relationship |
| 10:18:06 | 15 | started and, you know, then ultimately explain where it went |
| 10:18:11 | 16 | in the years of 2016 through 2017. |
| 10:18:16 | 17 | THE COURT:  So how is the letter necessary?  Why |
| 10:18:18 | 18 | can't Gau just explain the origins of their relationship? |
| 10:18:22 | 19 | MR. MANGAN:  He can, Your Honor.  What we wanted to |
| 10:18:26 | 20 | also bring out was that at one point Zha Rong did make an ask |
| 10:18:32 | 21 | for him to do technical work that he had declined.  And then |
| 10:18:38 | 22 | there is a break in time, and then the relationship is |
| 10:18:40 | 23 | restarted.  So we did see some significance in that. |
| 10:18:48 | 24 | MR. MIEDEL:  Your Honor, may I respond? |
| 10:18:49 | 25 | THE COURT:  Yes, you get the reply. |

10:18:52  1         MR. MIEDEL:  A couple things.  First of all, while

10:18:54  2   the government has some evidence that Zha Rong worked with

10:18:57  3   Mr. Xu or was his supervisor in, I don't know, 2015, 2016,

10:19:02  4   that's 13 years after this letter.  There is zero evidence

10:19:05  5   that Zha Rong worked with Mr. Xu in 2003.

10:19:09  6         Secondly, to the extent that the government is simply

10:19:13  7   suggesting that this letter asked for, quote, technical work,

10:19:18  8   that's irrelevant.  The issue at this trial is whether Mr. Xu

10:19:23  9   conspired or attempted to gain trade secrets, not technical

10:19:27  10  work.  But it is -- and so there is a ten-year gap between any

10:19:35  11  correspondence between Mr. Gau in 2003 and Mr. Zha Rong in

10:19:40  12  2003 and the next time that they talk.  So the suggestion that

10:19:43  13  there is some sort of pattern or a beginning of a relationship

10:19:47  14  is simply belied by -- will be belied by the testimony of

10:19:51  15  Mr. Gau.  There was no contact between them for a decade.  And

10:19:55  16  so it is simply way outside the scope of the conspiracy.  It

10:20:00  17  cannot -- you cannot be a co-conspirator outside the scope of

10:20:05  18  the conspiracy.  And so it's just, I think, improper to admit

10:20:11  19  this document.

10:20:11  20         And I think -- I agree with Your Honor that Mr. Gau can

10:20:15  21  certainly talk about his visits to China in 1997 and 2000 and

10:20:19  22  2002 and who he met there if he wants, but the introduction of

10:20:24  23  this document is prejudicial.

10:20:32  24         THE COURT:  The Court sustains the defendant's

10:20:35  25  objection.  What Zha Rong may have been doing in 2003 is not

| | | |
|---|---|---|
| 10:20:41 | 1 | relevant, the background as to how Mr. Gau came to be involved |
| 10:20:47 | 2 | with the defendant, and he can explain that, he can explain, I |
| 10:20:53 | 3 | suppose, that he knew Zha Rong in 2003 and later met the |
| 10:20:58 | 4 | defendant. |
| 10:20:58 | 5 | If the defendant on cross questions Gau's explanation of |
| 10:21:02 | 6 | how he initially came to meet Zha Rong and, later, defendant, |
| 10:21:08 | 7 | then, by all means, the letter would start to become relevant. |
| 10:21:13 | 8 | But as an initial matter, Gau can explain it as an initial |
| 10:21:17 | 9 | matter without the letter, and the objection is sustained. |
| 10:21:21 | 10 | We're going to go into our recess unless there is |
| 10:21:24 | 11 | something else I need to address outside the presence of the |
| 10:21:27 | 12 | jury at this moment. Is there from the government? |
| 10:21:30 | 13 | MR. MANGAN: No, Your Honor. |
| 10:21:31 | 14 | THE COURT: The defense? |
| 10:21:33 | 15 | MR. MIEDEL: No, Your Honor. Thank you. |
| 10:21:34 | 16 | THE COURT: We're in recess. |
| 10:21:37 | 17 | THE COURTROOM DEPUTY: All rise. This court's now |
| 10:21:38 | 18 | in recess. |
| 10:21:39 | 19 | (Recess from 10:21 until 10:41 a.m.) |
| 10:41:53 | 20 | THE COURT: Back in the courtroom late. The jury's |
| 10:41:57 | 21 | not yet here. |
| 10:42:01 | 22 | We've had some drama. When my daughters used to live at |
| 10:42:07 | 23 | home with my wife and me, we had drama every day. I am well |
| 10:42:11 | 24 | trained in drama. It arises out of primarily the fact that |
| 10:42:17 | 25 | the second interpreter who had joined us today has indicated |

JAMES - DIRECT (McKENZIE)                                    30

10:42:21   1   that she typically translates hospital proceedings and does

10:42:27   2   not feel that she is adequately trained to assist us in a

10:42:33   3   courtroom that's intimidating with a bunch of lawyers.  And I

10:42:39   4   appreciate her speaking the truth, and I have released her.

10:42:43   5        That means we're going to have to go in chunks as we've

10:42:47   6   been doing previously.  We're going to work as hard as we can

10:42:51   7   to get a second one because the current interpreter is

10:42:59   8   whipped.  But she has agreed with me that she will take a deep

10:43:05   9   breath out of recognition that we're going to take short

10:43:08  10   breaks.

10:43:10  11        So we can call for the jury now.

10:44:32  12            THE COURTROOM DEPUTY:  All rise for the jury now.

10:44:34  13        (Jury in at 10:44 a.m.)

10:45:06  14            THE COURT:  You may all be seated.  The 15 jurors

10:45:09  15   have rejoined us.

10:45:11  16        And I kept you waiting again.  And I apologize for that.

10:45:18  17   I hate that.  My mother would be all over me if I were keeping

10:45:24  18   a bunch of important people waiting.  But there are times when

10:45:28  19   you leave that I have to address stuff that I need to deal

10:45:31  20   with outside your presence.  The long break here had nothing

10:45:36  21   to do with any of the lawyers or the parties.  I had to deal

10:45:39  22   with something.  It's on me.  I hope you will forgive me.

10:45:45  23        So we will continue with testimony.  Redirect, is that

10:45:52  24   right?

10:45:52  25            MR. McKENZIE:  Cross-examination at this time, Your

| | | |
|---|---|---|
| 10:45:54 | 1 | Honor. |
| 10:45:54 | 2 | THE COURT: Cross-examination. |
| 10:45:56 | 3 | MS. CORS: Thank you, Your Honor. |
| 10:45:57 | 4 | THE COURT: You may approach. |
| 10:46:00 | 5 | The witness remains under oath. The attorney for the |
| 10:46:03 | 6 | defense has an opportunity to ask questions. |
| 10:46:07 | 7 | MS. CORS: Thank you, Your Honor. And if I go too |
| 10:46:12 | 8 | fast, I assume someone will let me know to slow down so that |
| 10:46:17 | 9 | the interpreter can keep up. |
| 10:46:17 | 10 | THE COURT: You better believe it. |
| 10:46:18 | 11 | **CROSS-EXAMINATION** |
| 10:46:18 | 12 | BY MS. CORS: |
| 10:46:20 | 13 | **Q.** Good morning, Special Agent. How are you today? |
| 10:46:22 | 14 | **A.** I'm good. How are you? |
| 10:46:24 | 15 | **Q.** Good. |
| 10:46:32 | 16 | Over the past couple days you have been asked to read |
| 10:46:35 | 17 | from a number of text messages involving Mr. Xu, correct? |
| 10:46:39 | 18 | **A.** I have. |
| 10:46:40 | 19 | **Q.** And were these documents that you obtained through any |
| 10:46:45 | 20 | forensic analysis you conducted? |
| 10:46:47 | 21 | **A.** The text messages were not. |
| 10:46:49 | 22 | **Q.** Okay. Where did you get those text messages from? |
| 10:46:52 | 23 | **A.** I received them from the search warrant data from the |
| 10:46:57 | 24 | Cincinnati -- Cincinnati case. |
| 10:47:01 | 25 | **Q.** And you testified regarding your background in cyber |

10:47:07  1    counterintelligence, correct?  And computer security, and

10:47:14  2    explained to the jury much of the education you have had

10:47:19  3    relating to computers.

10:47:20  4         Do you have any training as an engineer?

10:47:22  5    **A.**   I do not have any training as an engineer.

10:47:24  6    **Q.**   And any training in the aviation field?

10:47:27  7    **A.**   I do not.

10:47:28  8    **Q.**   Okay.  Thank you.

10:47:34  9         Now, you have testified about events in Suzhou relating

10:47:44  10   to what I believe you described as the insertion of a USB

10:47:49  11   drive into a computer in January of 2014, correct?  January

10:47:55  12   25, 2014?

10:47:57  13   **A.**   Yes.

10:47:58  14   **Q.**   Okay.  What I'd like to do is walk through the timeline

10:48:03  15   of events that you've testified to.  So as I understand it, on

10:48:11  16   January 25, 2014, a USB was inserted into the computer of

10:48:20  17   Mr. Hascoet, correct?

10:48:22  18   **A.**   That is correct.

10:48:22  19   **Q.**   And that occurred in, you believe and have testified, his

10:48:27  20   office in Suzhou; is that correct?

10:48:29  21   **A.**   I don't know where it was inserted physically.

10:48:32  22   **Q.**   Okay.  So you don't know where it was inserted.  But at

10:48:38  23   some point on that date, based on your forensic analysis, this

10:48:43  24   USB drive was inserted into his computer.  Is that fair?

10:48:46  25   **A.**   That is correct.

| | | |
|---|---|---|
| 10:48:47 | 1 | **Q.**   And you testified that on that same day, from that USB |
| 10:48:55 | 2 | drive, a certain virus malware was placed on the computer of |
| 10:49:02 | 3 | Mr. Hascoet, correct? |
| 10:49:02 | 4 | **A.**   That is correct. |
| 10:49:03 | 5 | **Q.**   And then I believe you testified that shortly thereafter |
| 10:49:08 | 6 | you read some text messages, I believe it was maybe the day |
| 10:49:11 | 7 | after, where there were communications about someone looking |
| 10:49:16 | 8 | at that computer, correct? |
| 10:49:17 | 9 | **A.**   That is correct. |
| 10:49:18 | 10 | **Q.**   And can you explain to the jury again what that meant to |
| 10:49:23 | 11 | you? |
| 10:49:23 | 12 | **A.**   What that means to me is somebody verified that the |
| 10:49:27 | 13 | computer had beaconed in, and they would have had the |
| 10:49:30 | 14 | ability to look at files on the computer if they wanted to. |
| 10:49:34 | 15 | **Q.**   So in or around the 25th, 26th, based on your review of |
| 10:49:41 | 16 | that computer and what happened with that malware and the |
| 10:49:45 | 17 | beaconing, it's your understanding that at that point in time |
| 10:49:49 | 18 | someone who had access to this server, wherever it was, would |
| 10:49:52 | 19 | have had the ability to access the computer of Mr. Hascoet, |
| 10:49:58 | 20 | correct? |
| 10:49:58 | 21 | **A.**   That is correct. |
| 10:49:59 | 22 | **Q.**   And that would include looking at items on the computer; |
| 10:50:03 | 23 | is that correct? |
| 10:50:03 | 24 | **A.**   That is correct. |
| 10:50:05 | 25 | **Q.**   Okay.  And I believe you mentioned that would also |

| | | |
|---|---|---|
| 10:50:08 | 1 | provide access to upload or download documents; is that |
| 10:50:12 | 2 | correct? |
| 10:50:12 | 3 | **A.**   Upload or download files. |
| 10:50:17 | 4 | **Q.**   Files, okay. |
| 10:50:18 | 5 | **A.**   Yes. |
| 10:50:19 | 6 | **Q.**   And I believe, based on your testimony, that that laptop |
| 10:50:22 | 7 | became connected to that server, I think, around the 27th of |
| 10:50:25 | 8 | January of '14.  Does that sound correct to you? |
| 10:50:29 | 9 | **A.**   There was evidence on the hard drive that it -- the |
| 10:50:33 | 10 | Sakula malware connected outbound as of that date. |
| 10:50:37 | 11 | **Q.**   And that was to that domain you were talking about |
| 10:50:39 | 12 | earlier; is that correct? |
| 10:50:42 | 13 | **A.**   Yes, that's correct. |
| 10:50:43 | 14 | **Q.**   And what was that domain again? |
| 10:50:44 | 15 | **A.**   There was two domains.  One was oa.ameteksen.com, and |
| 10:50:54 | 16 | the other one was secure.safran-group.com. |
| 10:51:01 | 17 | **Q.**   And then on or around January 30th, was that when, based |
| 10:51:05 | 18 | on your forensic analysis, some additional malware virus, the |
| 10:51:11 | 19 | key logger, was installed on that computer? |
| 10:51:13 | 20 | **A.**   I believe that is correct. |
| 10:51:14 | 21 | **Q.**   Okay.  And at the time -- strike that.  Then near the end |
| 10:51:26 | 22 | of January, around January 31, 2014, I believe in your report |
| 10:51:33 | 23 | there is an indication that the computer starts communicating |
| 10:51:35 | 24 | with secure.safran-group.com; is that correct? |
| 10:51:41 | 25 | **A.**   The computer would have continued to communicate to |

| | | |
|---|---|---|
| 10:51:45 | 1 | that domain, yes. |
| 10:51:46 | 2 | **Q.**   Okay.  So it continues to communicate, continues to |
| 10:51:48 | 3 | provide access.  Whoever has access to that domain has access |
| 10:51:52 | 4 | to Mr. Hascoet's computer, correct? |
| 10:51:53 | 5 | **A.**   That would be correct. |
| 10:51:54 | 6 | **Q.**   Okay.  And then when did that computer, from your |
| 10:52:00 | 7 | recollection, stop communicating with that domain? |
| 10:52:09 | 8 | **A.**   Based on the evidence available on the hard drive, I |
| 10:52:12 | 9 | believe it was on or about February 20 -- February 14th, if |
| 10:52:17 | 10 | I remember correctly. |
| 10:52:18 | 11 | **Q.**   Okay.  So the computer stops communicating around |
| 10:52:21 | 12 | February 14th with this domain.  And then at the same time, |
| 10:52:26 | 13 | does the key logger stop recording or was that a little later? |
| 10:52:31 | 14 | **A.**   I would have to go back and look at the key logger data |
| 10:52:37 | 15 | to see when the key logger stopped. |
| 10:52:39 | 16 | **Q.**   About around the same time, is it your recollection? |
| 10:52:42 | 17 | **A.**   It would probably be around the same time. |
| 10:52:45 | 18 | **Q.**   Okay.  I think I've seen February 17, 2014? |
| 10:52:48 | 19 | **A.**   Okay. |
| 10:52:48 | 20 | **Q.**   Does that sound -- |
| 10:52:49 | 21 | **A.**   Yeah, that sounds correct. |
| 10:52:50 | 22 | **Q.**   Okay.  So from January 25th, we know that, based on your |
| 10:52:56 | 23 | forensic analysis, malware is put on this computer, we know |
| 10:53:00 | 24 | that the computer starts communicating with a domain, and we |
| 10:53:04 | 25 | know that that communication stops on or around February 14th, |

| 10:53:10 | 1 | correct? |
| 10:53:10 | 2 | **A.** That's -- |
| 10:53:13 | 3 | **Q.** So three to four weeks, correct? |
| 10:53:15 | 4 | **A.** Yep. |
| 10:53:16 | 5 | **Q.** And based on your analysis, at any point during that time |
| 10:53:19 | 6 | was an effort made to target any documents on that computer? |
| 10:53:22 | 7 | **A.** Based on the evidence on the hard drive? It's hard to |
| 10:53:32 | 8 | determine that. |
| 10:53:34 | 9 | **Q.** Okay. And based on your forensic analysis, was there any |
| 10:53:39 | 10 | effort to obtain or download a trade secret from that |
| 10:53:43 | 11 | computer? |
| 10:53:44 | 12 | **A.** That could not be determined from my analysis. I did |
| 10:53:48 | 13 | not find evidence of that. |
| 10:53:49 | 14 | **Q.** Okay. But you did find analysis, did you not, that after |
| 10:53:55 | 15 | these -- this virus/malware was installed on the computer, was |
| 10:54:03 | 16 | anything accessed after January 30th? |
| 10:54:09 | 17 | **A.** I could not determine that from my analysis. I could |
| 10:54:13 | 18 | not determine that anything was accessed. |
| 10:54:15 | 19 | **Q.** Okay. So you don't know anything either way? |
| 10:54:18 | 20 | **A.** No, don't know either way. |
| 10:54:20 | 21 | **Q.** Now, this computer was also forensically analyzed by the |
| 10:54:29 | 22 | French Intelligence Service as well; is that correct? |
| 10:54:32 | 23 | **A.** That is correct. |
| 10:54:32 | 24 | **Q.** And a report dated September 17, 2014, does that sound |
| 10:54:38 | 25 | familiar? That was prepared by the French? |

| Time | Line | |
|---|---|---|
| 10:54:43 | 1 | **A.**   That's probably correct. |
| 10:54:43 | 2 | **Q.**   And do you recall as one of the findings of that report |
| 10:54:47 | 3 | that any data recovery, if any took place, did not appear to |
| 10:54:52 | 4 | be targeted in any matter? |
| 10:54:55 | 5 | MR. McKENZIE:  Objection, Your Honor. |
| 10:54:56 | 6 | THE COURT:  Your objection? |
| 10:54:58 | 7 | MR. McKENZIE:  Objection, Your Honor. |
| 10:54:59 | 8 | THE COURT: Basis? |
| 10:55:01 | 9 | MR. McKENZIE:  Hearsay. |
| 10:55:03 | 10 | MS. CORS:  Your Honor, I am asking for a finding.  I |
| 10:55:05 | 11 | am not asking for him to repeat what was in the report. |
| 10:55:11 | 12 | THE COURT:  Objection's overruled. |
| 10:55:16 | 13 | You can answer the question, if you remember it. |
| 10:55:20 | 14 | THE WITNESS:  Could you repeat the question, please? |
| 10:55:22 | 15 | BY MS. CORS: |
| 10:55:22 | 16 | **Q.**   Sure.  So as -- was it your understanding that one of the |
| 10:55:26 | 17 | findings of this report was that any data recovery did not |
| 10:55:29 | 18 | appear to be targeted in any manner? |
| 10:55:36 | 19 | **A.**   I don't recall that statement, and I'm a little bit |
| 10:55:42 | 20 | confused on the term "data recovery" being used there.  Is |
| 10:55:46 | 21 | that downloading of files, I guess is what my question is? |
| 10:55:53 | 22 | **Q.**   Did you have any understanding as to whether the French |
| 10:55:58 | 23 | forensic analysis concluded that any files were exported? |
| 10:56:03 | 24 | **A.**   I don't believe they could conclude that any files were |
| 10:56:07 | 25 | exported. |

| | | |
|---|---|---|
| 10:56:10 | 1 | **Q.**   So it appears, from your perspective, their conclusions |
| 10:56:13 | 2 | were consistent with the conclusions of your own forensic |
| 10:56:16 | 3 | analysis? |
| 10:56:17 | 4 | **A.**   That is correct. |
| 10:56:19 | 5 | **Q.**   Now, your report analyzed a file, a self-extracting RAR |
| 10:56:29 | 6 | file, I believe, that contained images on Mr. Hascoet's |
| 10:56:32 | 7 | computer; is that correct? |
| 10:56:33 | 8 | **A.**   That is correct. |
| 10:56:35 | 9 | **Q.**   And can you explain to the jury what -- what those images |
| 10:56:38 | 10 | were? |
| 10:56:39 | 11 | **A.**   The images were pictures of the various locations that |
| 10:56:45 | 12 | we determined to be in Nanjing, Jiangsu Province. |
| 10:56:52 | 13 | **Q.**   They appeared to be vacation photos? |
| 10:56:55 | 14 | **A.**   They would be consistent with vacation photos. |
| 10:56:57 | 15 | **Q.**   And in the course of your investigation, you reviewed, as |
| 10:57:06 | 16 | I understand, communications involving Tian Xi, correct? |
| 10:57:11 | 17 | **A.**   Tian Xi, yes. |
| 10:57:13 | 18 | **Q.**   And many of those communications you read here for the |
| 10:57:16 | 19 | jury, correct? |
| 10:57:16 | 20 | **A.**   That is correct. |
| 10:57:18 | 21 |        THE COURT:  Ms. Cors, could you keep your voice up, |
| 10:57:21 | 22 | please? |
| 10:57:22 | 23 |        MS. CORS:  Yes.  Sorry, Your Honor. |
| 10:57:23 | 24 | BY MS. CORS: |
| 10:57:24 | 25 | **Q.**   And in those communications do you recall seeing any |

JAMES - CROSS (CORS)                                      39

10:57:26  1  reference to trade secrets?

10:57:28  2  **A.**   I do not.

10:57:29  3  **Q.**   Do you recall seeing any discussion about obtaining

10:57:32  4  documents from Safran?

10:57:34  5  **A.**   I do not.

10:57:35  6  **Q.**   Do you recall any reference to composite materials?

10:57:41  7  **A.**   I do not.

10:57:42  8  **Q.**   Do you recall any reference to aviation technology?

10:57:48  9  **A.**   I do not.

10:57:49  10  **Q.**   And do you recall any reference to fan blade technology?

10:57:58  11  **A.**   I do not.

10:57:59  12  **Q.**   Okay.  And then you were asked to read, and I understand

10:58:01  13  you reviewed, communications involving Mr. Gu Gen, correct?

10:58:08  14  **A.**   Correct.

10:58:09  15  **Q.**   And who is Mr. Gu Gen again?

10:58:13  16  **A.**   Gu Gen is the IT infrastructure and information

10:58:18  17  security officer for Safran Suzhou.

10:58:20  18  **Q.**   Okay.  And with respect to these communications, do these

10:58:23  19  communications reference any effort to obtain documents?

10:58:27  20  **A.**   They do not.

10:58:29  21  **Q.**   Do they reference any attempt to steal trade secrets?

10:58:34  22  **A.**   They do not.

10:58:38  23  **Q.**   Do they reference any -- do they reference composite

10:58:41  24  materials?

10:58:41  25  **A.**   No.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

10:58:41  1    **Q.**    Do they reference fan blades, including fan blades

10:58:45  2    designed by GE?

10:58:48  3    **A.**    They do not.

10:58:49  4    **Q.**    Okay.  And there were additional communications you were

10:58:51  5    asked to review and read into the record regarding alleged

10:58:55  6    colleagues of Mr. Xu, correct?

10:58:59  7    **A.**    That is correct.

10:59:00  8    **Q.**    Chai Meng?

10:59:02  9    **A.**    Chai Meng.

10:59:03  10   **Q.**    And I am going to ask you the same series of questions.

10:59:06  11   In those communications, was there any reference about

10:59:08  12   obtaining documents from Safran Suzhou or any entity of

10:59:14  13   Safran?

10:59:15  14   **A.**    There were not.

10:59:16  15   **Q.**    Were there any reference to trying to obtain trade

10:59:20  16   secrets?

10:59:20  17   **A.**    There weren't.

10:59:21  18   **Q.**    Any reference to composite materials?

10:59:25  19   **A.**    There was not.

10:59:28  20   **Q.**    Any reference to aviation fan blades?

10:59:34  21   **A.**    No.

10:59:35  22   **Q.**    Or GE Aviation?

10:59:37  23   **A.**    There was not.

10:59:38  24   **Q.**    Now, Mr. Gu Gen was head of security, correct?

10:59:44  25   **A.**    He is head of information security.

| | | |
|---|---|---|
| 10:59:46 | 1 | **Q.** And in your experience, would someone who's head of |
| 10:59:50 | 2 | information security have pretty broad access to the databases |
| 10:59:55 | 3 | and computers of the company? |
| 10:59:57 | 4 | **A.** Generally, they would. |
| 10:59:59 | 5 | **Q.** Yet, I believe you just testified there was never a |
| 11:00:01 | 6 | request of Mr. Gu Gen, to your knowledge, to -- to use that |
| 11:00:05 | 7 | access to obtain any information from the company, correct? |
| 11:00:08 | 8 | **A.** Correct. |
| 11:00:09 | 9 | **Q.** Now, on your direct testimony you talked a little bit |
| 11:00:19 | 10 | about the MSS and its local office in Nanjing, the JSSD, |
| 11:00:26 | 11 | correct? |
| 11:00:27 | 12 | MR. McKENZIE: Objection, Your Honor. |
| 11:00:28 | 13 | THE COURT: Basis? |
| 11:00:30 | 14 | MR. McKENZIE: Assumes facts not in evidence. |
| 11:00:32 | 15 | THE COURT: Sustained as to form. |
| 11:00:40 | 16 | BY MS. CORS: |
| 11:00:41 | 17 | **Q.** Mr. James, you were shown documents that the government |
| 11:00:43 | 18 | alleged related to Mr. Xu, correct? |
| 11:00:47 | 19 | **A.** Mr. Xu Yanjun. |
| 11:00:52 | 20 | **Q.** And his alleged role with MSS in its office in Nanjing, |
| 11:00:58 | 21 | the JSSD, correct? |
| 11:00:59 | 22 | **A.** I was shown that. |
| 11:01:01 | 23 | **Q.** The MSS and the JSSD have multiple functions, do they |
| 11:01:15 | 24 | not? |
| 11:01:16 | 25 | **A.** They do. |

| | | |
|---|---|---|
| 11:01:17 | 1 | **Q.**   Okay.  I believe you've testified in the past that in |
| 11:01:20 | 2 | your view they are sort of a combination of the FBI and CIA, |
| 11:01:25 | 3 | correct? |
| 11:01:26 | 4 | MR. McKENZIE:  Objection, Your Honor.  Outside the |
| 11:01:28 | 5 | scope of direct. |
| 11:01:32 | 6 | MS. CORS:  May I address this, Your Honor?  On |
| 11:01:34 | 7 | direct, the issue of Mr. Xu and his employment with the MSS |
| 11:01:39 | 8 | was brought up.  On direct the issue of an incursion into a |
| 11:01:44 | 9 | computer was brought up.  I'm simply trying to explore what |
| 11:01:48 | 10 | could be the basis for an incursion. |
| 11:01:53 | 11 | THE COURT:  The Court overrules the objection.  I am |
| 11:01:56 | 12 | going to give you some latitude. |
| 11:01:58 | 13 | MR. McKENZIE:  Your Honor, I am going to make a |
| 11:02:01 | 14 | second renewed objection under different grounds of improper |
| 11:02:04 | 15 | impeachment by referencing prior testimony without asking a |
| 11:02:07 | 16 | direct question first. |
| 11:02:10 | 17 | THE COURT:  Overruled. |
| 11:02:11 | 18 | Please proceed. |
| 11:02:14 | 19 | MS. CORS:  Thank you, Your Honor. |
| 11:02:15 | 20 | BY MS. CORS: |
| 11:02:15 | 21 | **Q.**   Now, with respect to the MSS and the -- let me start with |
| 11:02:19 | 22 | this. |
| 11:02:20 | 23 | You had -- in connection with your investigation in the |
| 11:02:25 | 24 | Southern District of California, did you provide testimony to |
| 11:02:28 | 25 | the grand jury? |

11:02:29  1    **A.**    I did.

11:02:30  2    **Q.**    Okay.  And as part of that testimony, did you opine on

11:02:35  3    the roles and functions of the MSS and its office, JSSD and

11:02:40  4    Nanjing?

11:02:41  5    **A.**    Yes.

11:02:41  6    **Q.**    And do you recall identifying some of those functions as

11:02:46  7    somewhat of a combination between the FBI and CIA?

11:02:49  8    **A.**    That would be correct.

11:02:51  9    **Q.**    And you identified one of the primary responsibilities of

11:02:57  10   MSS and JSSD as collecting of intelligence, correct?

11:03:03  11   **A.**    That is correct.

11:03:06  12   **Q.**    Intelligence, by definition information?

11:03:12  13   **A.**    That could be another term for intelligence.

11:03:14  14   **Q.**    It could also include open-source information; is that

11:03:17  15   correct?

11:03:17  16   **A.**    It could.

11:03:18  17   **Q.**    Some of the other functions, I believe you identified

11:03:22  18   nonmilitary foreign intelligence; is that correct?

11:03:24  19   **A.**    That is correct.

11:03:25  20   **Q.**    And then you also identified as a function of both the

11:03:29  21   MSS and the JSSD office performing political and domestic

11:03:35  22   security.  Do you recall that?

11:03:37  23   **A.**    I do.

11:03:37  24   **Q.**    And could you explain to the jury what your understanding

11:03:41  25   of political and domestic security is?

11:03:44  1  **A.**    That would be looking for internal spies inside of

11:03:51  2  China.

11:03:51  3  **Q.**    Could it also include monitoring and surveilling

11:03:54  4  foreigners or individuals who are in China?

11:03:56  5  **A.**    It could.

11:03:57  6  **Q.**    Could it also include monitoring and surveilling

11:04:00  7  companies that are operating within China's borders?

11:04:03  8  **A.**    It could.

11:04:06  9  **Q.**    And, in fact, would you agree that China views cyberspace

11:04:11  10  within its national borders as a proper area of control?

11:04:17  11        MR. McKENZIE:  Objection as to first being outside

11:04:20  12  the scope and, second, relevance.

11:04:22  13        THE COURT:  Second, what?

11:04:24  14        MR. McKENZIE:  Relevance as to his opinion.

11:04:29  15        THE COURT:  Overruled.

11:04:31  16    I'm going to need to break momentarily, but finish up.

11:04:36  17        MS. CORS:  Okay.  I can finish this up.

11:04:37  18  BY MS. CORS:

11:04:38  19  **Q.**    And as part of any functions with respect to political

11:04:41  20  and domestic security, there are a number of methods the

11:04:46  21  Chinese government can use to do that; isn't that correct?

11:04:49  22  **A.**    That is correct.

11:04:50  23  **Q.**    Okay.  Do some of those include searching hotel rooms?

11:04:54  24  **A.**    I'm not familiar with exactly what the MSS does or

11:04:58  25  doesn't do inside of China.

11:05:01  1    **Q.**   In terms of monitoring, surveilling, in your experiences

11:05:05  2    as a cyber expert, could bugging or intruding into someone's

11:05:10  3    computer to monitor that computer be a technique that --

11:05:14  4    **A.**   That could be.

11:05:15  5    **Q.**   -- is used?

11:05:16  6         Is that a technique that governments sometimes use to

11:05:18  7    conduct such surveillance?

11:05:20  8    **A.**   It could be.

11:05:23  9              THE COURT:  I'm going to interject here and ask if

11:05:25  10   we can break.

11:05:27  11              MS. CORS:  Certainly, Your Honor.

11:05:29  12              THE COURT:  And I think we're straying a bit, but I

11:05:32  13   gave you some latitude.

11:05:33  14        Members of the jury, we are going to break for 20

11:05:36  15   minutes.  During the break, take a break.  As you know, don't

11:05:39  16   discuss the case among yourselves or with anyone else.  No

11:05:42  17   independent research.  Continue to keep an open mind.

11:05:47  18        Out of respect for you, we'll rise as you leave for 20

11:05:50  19   minutes.

11:05:51  20              THE COURTROOM DEPUTY:  All rise for the jury.

11:05:52  21        (Jury out at 11:05 a.m.)

11:06:31  22              THE COURT:  The jury's left the room.  The door is

11:06:34  23   closed.  Is there anything that requires my attention before

11:06:37  24   we break for 20 minutes?  First, from the government?

11:06:41  25              MR. McKENZIE:  No, Your Honor.

| | | |
|---|---|---|
| 11:06:42 | 1 | THE COURT:  From the defense? |
| 11:06:43 | 2 | MS. CORS:  No, Your Honor. |
| 11:06:44 | 3 | THE COURT:  Very well. |
| 11:06:46 | 4 | Let the record reflect that Judge Cole is here observing |
| 11:06:49 | 5 | my work during recess. |
| 11:06:52 | 6 | THE COURTROOM DEPUTY:  The court is now in recess. |
| 11:06:54 | 7 | (Recess from 11:06 a.m. until 11:31 a.m.) |
| 11:31:17 | 8 | THE COURT:  May we call for the jury from the |
| 11:31:20 | 9 | government's perspective? |
| 11:31:23 | 10 | MR. McKENZIE:  Yes, Your Honor. |
| 11:31:24 | 11 | THE COURT:  And from the defense as well? |
| 11:31:26 | 12 | MS. CORS:  Yes, Your Honor. |
| 11:31:27 | 13 | THE COURT:  Let's call for the jury.  Let me get my |
| 11:31:28 | 14 | mask.  You can call for the jury. |
| 11:32:38 | 15 | THE COURTROOM DEPUTY:  All rise for the jury. |
| 11:32:39 | 16 | (Jury in at 11:32 a.m.) |
| 11:33:10 | 17 | THE COURT:  You may all be seated.  Thank you. |
| 11:33:17 | 18 | The 15 jurors have rejoined us after a break.  Thank you |
| 11:33:21 | 19 | for your patience. |
| 11:33:22 | 20 | We'll continue with the testimony of this witness. |
| 11:33:26 | 21 | MS. CORS:  Thank you, Your Honor. |
| 11:33:30 | 22 | Your Honor, I have no further questions for this witness. |
| 11:33:33 | 23 | Thank you. |
| 11:33:33 | 24 | THE COURT:  Very well. |
| 11:33:34 | 25 | Redirect, if any? |

JAMES - REDIRECT (McKENZIE)                                    47

| | |
|---|---|
| 11:33:41 | 1 |

MR. McKENZIE:  Very briefly, Your Honor.

THE COURT:  Very well.

### REDIRECT EXAMINATION

BY MR. McKENZIE:

**Q.**   Special Agent James, when you analyzed the Sakula malware, were you able to determine whether or not it beaconed out to a domain?

**A.**   Yes, I was.

**Q.**   Were you able to determine whether any particular files were transferred from the computer to anywhere else?

**A.**   I could not determine that.

**Q.**   Why not?

**A.**   Depending on how the files are transferred, our records are not maintained on the hard drive so it's really hard to determine that after the fact.  Generally, you would need to actually watch the transfer occur.

**Q.**   And so just to be clear, is it the case that you determined that no files were transferred, or is it the case that you could not determine what files, if any, were transferred?

**A.**   There was no evidence to support whether or not files were transferred either way.

**Q.**   During your years of experience in cyber intrusion cases involving remote access trojans, is part of the purpose that they're installed to take files?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

| | | |
|---|---|---|
| 11:35:27 | 1 | MS. CORS: Objection, Your Honor. |
| 11:35:28 | 2 | THE COURT: Basis? |
| 11:35:30 | 3 | MS. CORS: Leading and beyond the scope. |
| 11:35:33 | 4 | THE COURT: Overruled. |
| 11:35:34 | 5 | Don't lead the witness. Go ahead, ask. |
| 11:35:40 | 6 | BY MR. McKENZIE: |
| 11:35:41 | 7 | **Q.** As part of your experience, what are some of the reasons, |
| 11:35:48 | 8 | some of the main reasons that you've experienced for why |
| 11:35:52 | 9 | people installed remote access trojans on computers? |
| 11:35:57 | 10 | **A.** Some of the primary reasons are, one, to gain access to |
| 11:36:00 | 11 | the computer so that you can use it to do what your motive |
| 11:36:04 | 12 | is. Once you have access, you can run commands and |
| 11:36:10 | 13 | compromise other computers on the network. |
| 11:36:12 | 14 | In this case, they used computers that were compromised |
| 11:36:16 | 15 | to compromise other companies. |
| 11:36:19 | 16 | MS. CORS: Objection, Your Honor. |
| 11:36:20 | 17 | THE COURT: Beyond the scope? |
| 11:36:22 | 18 | MS. CORS: Yes, beyond the scope. |
| 11:36:24 | 19 | THE COURT: Sustained. |
| 11:36:26 | 20 | MR. McKENZIE: No further questions, Your Honor. |
| 11:36:27 | 21 | THE COURT: Very well. |
| 11:36:30 | 22 | Redirect or recross on redirect? |
| 11:36:33 | 23 | MS. CORS: Thank you, Your Honor. |
| 11:36:35 | 24 | **RECROSS-EXAMINATION** |
| 11:36:35 | 25 | BY MS. CORS: |

11:36:38  1   **Q.**   Special Agent James, you just testified that this type of

11:36:42  2   virus malware can be used to gain access to achieve motives,

11:36:46  3   correct?

11:36:46  4   **A.**   That is correct.

11:36:46  5   **Q.**   And in this instance, you are not in any position to know

11:36:49  6   what those motives were, correct?

11:36:54  7   **A.**   Can we be more specific on the question?

11:36:57  8   **Q.**   Well, there can be many different reasons why a person or

11:37:02  9   entity may seek to install this type of file on a computer,

11:37:07  10  correct?

11:37:08  11  **A.**   That is correct.

11:37:08  12  **Q.**   And one of those reasons could be to gain access to the

11:37:12  13  computer and to see what is in the computer to surveil, to

11:37:16  14  monitor, correct?

11:37:17  15  **A.**   That is correct.

11:37:23  16          MS. CORS:  No further questions.  Thank you.

11:37:24  17          MR. McKENZIE:  Nothing further, Your Honor.  Thank

11:37:26  18  you.

11:37:26  19          THE COURT:  Are you going back to San Diego?

11:37:28  20          THE WITNESS:  I hope so.

11:37:30  21          THE COURT:  Travel safe.  You may step down, sir.

11:37:33  22          THE WITNESS:  Thank you.

          23      (Proceedings reported but not transcribed.)

          24

          25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Mary A. Schweinhagen, Federal Official Realtime

 4    Court Reporter, in and for the United States District Court

 5    for the Southern District of Ohio, do hereby certify that

 6    pursuant to Section 753, Title 28, United States Code that the

 7    foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is

10    in conformance with the regulations of the Judicial Conference

11    of the United States.

12

13    s/Mary A. Schweinhagen

14    _____ 15th of December, 2021

15    MARY A. SCHWEINHAGEN, RDR, CRR
      FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```