## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | **:** | Case No. 1:18-cr-00043 |
| | **:** | |
| Plaintiff, | **:** | Judge Timothy S. Black |
| | **:** | |
| v. | **:** | |
| | **:** | **SENTENCING MEMORANDUM OF** |
| YANJUN XU, | **:** | **YANJUN XU** |
| | **:** | |
| Defendant. | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |

## INTRODUCTION

The first time Yanjun Xu stepped foot on American soil was when he was extradited from Belgium to stand trial. He was then and remains now a dedicated citizen of China who stands before this Court for sentencing because he was serving his country. This fact alone makes this case unique and warrants considerations that are not normally part of the sentencing calculus.

The government asks the Court to impose a sentence on Mr. Xu that far exceeds sentences received by other individuals convicted of crimes involving the theft or attempted theft of trade secrets. The government does so based primarily upon a clear and transparent desire to use Mr. Xu's sentence to send a message to China, to make him a shining example of what happens when the Chinese government tries to unlawfully acquire American technology. But the law is clear. The Court's only duty at sentencing is to fashion a sentence that is sufficient, but no greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a). In so doing, the Court must sentence Mr. Xu the person, the individual, and take into account all factors relevant

to sentencing, including the unique circumstances of this crime and the harsh and isolating

conditions under which Mr. Xu has been detained for over four years.

Both the government and the defense agree that this case falls far outside the heartland

and does not easily lend itself to evaluation under the U.S. Sentencing Guidelines. But the parties

disagree as to the impact these differences should have on the ultimate sentence imposed by this

Court. As set forth more fully below, Mr. Xu respectfully submits that the aspects of this case

that make it unique also support a term of imprisonment of time served. Such a sentence, at this

point more than 55 months, is sufficient but not greater than necessary to accomplish the goals of

sentencing.

**ARGUMENT**

I.  <u>Legal Standard.</u>

In fashioning a sentence for Mr. Xu, this Court is directed to impose a sentence that is

"sufficient but not greater than necessary" to satisfy the factors set forth in 18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a); *United States v. Grossman*, 513 F.3d 592, 594 (6th Cir. 2008). These

factors include:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the
>> law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most effective
>> manner;
>
> (3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established [by the U.S.S.G.];

(5) any pertinent policy statement [from the U.S. Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

While the Court must first calculate a sentencing range under the United States Sentencing Guidelines ("guidelines"), it is no longer bound to sentence a defendant within that range. *United States v. Booker*, 543 U.S. 220, 245 (2005). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). In fact, the guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence," including policy considerations. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (internal citations omitted). Ultimately, the sentence must be reasonable, not greater than necessary, and based on the proper consideration of all relevant sentencing factors.

II.     Mr. Xu's Background and Personal Characteristics.

It is impossible to understand Mr. Xu and the crimes for which he was convicted without first understanding the culture into which he was born and in which he lived. China is a country steeped in tradition that values loyalty to one's family, community, and country above all else. From an early age, children are taught to act in a manner that brings honor to the family, serves the community and furthers the interests of the Chinese state. Throughout his life, Mr. Xu has acted in accordance with these core values.

Mr. Xu was born into a family of modest means and limited education. As the first born and only son, Mr. Xu was under intense pressure to succeed, take care of his family and thereby bring honor and glory to his family and ancestors. PSR (Doc. 197) ¶¶ 86-88.  Mr. Xu never resented these pressures. Rather, he sought to use the burdens placed on him and the difficult experiences he endured to develop personal strength. *Id.* ¶ 90.

As a young boy, Mr. Xu understood that in order to succeed and bring honor to his family, he had to work hard academically and earn top grades in school. *Id*. ¶ 88. Under the Chinese educational system, students are tested at various stages of their matriculation. At each stage, the top few percent are given access to the best schools and universities; the remaining students are diverted to less prestigious schools or trades. This weeding out process begins early in a student's elementary years and places extraordinary pressure on students like Mr. Xu whose families lack wealth or political connections and are thus required to place in the top few percent at each testing stage to ultimately have access to well-paying jobs to provide for their families. Often this required Mr. Xu to study late into the night and on weekends – leaving little if any time for relaxation.

Through hard work and perseverance, Mr. Xu excelled academically and became the first member of his family to attend university. In 2001, he graduated with a degree in engineering from Hohai University. After completing his undergraduate degree, Mr. Xu was lucky enough to obtain a job supporting China's research and development efforts. *Id*. ¶ 102. This position enabled Mr. Xu, a man of modest means, to earn solid wages and obtain access to other important benefits, including suitable housing and good schools. Even though he had secured a respected job, Mr. Xu continued his education, pursuing a graduate degree in electrical

4

engineering and automation from the Institute of Electrical Engineering, Hohai University. *Id.* ¶ 100.

Mr. Xu is a loving and caring husband and father. He has been married to his "college sweetheart" for over 15 years and is the proud father of a now teenage boy. Mr. Xu's wife in her letter to the Court describes Mr. Xu as "a very responsible family man" who "always takes care of family matters, big and small." She notes her husband enjoyed cooking healthy meals for the family and loved being a father to their son. She indicates he particularly enjoyed sharing his love of soccer with their son and spending time together. Mr. Xu's commitment to family extended to caring for his aging parents who lived nearby. It has been absolutely devastating for those closest to Mr. Xu not to have laid eyes on him for more than four and a half years.

Family letters also highlight Mr. Xu's caring and compassion for the broader community in which he lived. Mr. Xu has always strived to live up to the teachings and values of his family by routinely offering his time, assistance, and even financial support to those in need. Mr. Xu's father describes Mr. Xu affectionately as "[s]uch a kind filial and charitable child." He highlights one example of Mr. Xu's generosity that occurred when Mr. Xu was just eight years old. It was a gloomy and cold day. Mr. Xu's father went to pick him up from school and could not find him anywhere. After an exhaustive search, Mr. Xu's father finally located his son and learned that Mr. Xu had left school because he encountered a sick boy who was chilled and had no coat. Mr. Xu gave the boy his own coat and helped the boy home.

Letters from Mr. Xu's family demonstrate that this act of generosity was typical of Mr. Xu. Throughout his life in China, Mr. Xu served charities, gave clothes to needy children, gave pocket money to help flood-stricken families, helped pay for another schoolmate's emergency

medical bills, and routinely assisted elderly residents in the building where he lived, including by carrying their groceries up several flights of stairs to their apartments.

Mr. Xu's wife notes her husband sought to instill in their son the same charitable mindset. She recounts an example when they were at a theme park and found a wallet. Mr. Xu and his son searched for the owner. When they could not find him, they contacted the owner's bank which assisted the family in notifying the customer and returning the wallet to him. For Mr. Xu, the point of these efforts was to instill values in his child to care about others more than himself, to consider the needs of the community over his own.

These family letters highlight the critical and beneficial role Mr. Xu played in caring for his family and the neighboring community and describe the significant adverse effect his absence has had on their well-being.

III. <u>The Advisory Guidelines Range Does Not Adequately Measure Culpability in this Case.</u>

The advisory guideline range in this case is calculated using the general fraud guideline (U.S.S.G. § 2B1.1). For Mr. Xu, assuming the Court denies Mr. Xu's challenges to specific offense enhancements, this results in a total offense level of 37, with an advisory imprisonment range of 210-262 months. *See* PSR at ¶¶ 56-68; Court Order Resolving Loss Dispute (Doc. 208). Although the parties arrive at the conclusion from different vantage points, they do agree on one thing: the Court should all but disregard the guidelines in this case. *See* Govt. Post-Hearing Mem. at 1 ("Although the law requires a calculation of the sentencing guidelines, the Court should rely primarily on the other 3553(a) factors in fashioning a sentence, and place relatively little weight on the sentencing guideline range or purported loss amount in determining the sentence."). From Mr. Xu's perspective, the advisory range vastly overstates the nature of the

offense and the presumptive need for deterrence and does not support any of the other non-retributive purposes of sentencing under § 3553(a).

The sentencing guidelines are one factor under 18 U.S.C. § 3553(a) that the Court must consider in determining a reasonable sentence. Yet it is no secret that the fraud guideline at U.S.S.G. § 2B1.1 has been under assault for some time. The guideline places an unwarranted emphasis on loss that has no empirical basis and frequently overstates the severity of the offense. *See United States v. Musgrave*, 647 F. App'x 529, 538–39 (6th Cir. 2016) ("But there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances. The data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.") (internal citations and quotation marks omitted); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."). The inherent problems with the §2B1.1 guideline range, and in particular with the loss enhancement, is thoroughly explained in a recent article in the Ohio State Journal of Criminal Law, which surveys the general reluctance of district courts nationwide to follow the loss guidelines for precisely these reasons. *See* Barry Boss, Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 OHIO STATE JOURNAL OF CRIM. LAW 605 (2021).

In this case, the Court has found a specific offense characteristic enhancement of 22 points based on an intended loss amount of $50 million.[1] After incorporating additional enhancements, a 22 point assessment raises Mr. Xu's advisory guideline range from level 15 (18 to 24 months) to level 37 (210-262 months). In other words, Mr. Xu's sentence range increases by more than *15 years* based entirely on an "intended" loss amount which, even under the Court's analysis, is at best a rough approximation. There is nothing empirical, reasonable, or just about such a dramatic increase, which is why the loss guideline in this case simply does not achieve a fair result. Thus, for entirely different reasons than those proffered by the government, we join the government in urging the Court to afford the guidelines in this case little to no weight.

IV.     Mr. Xu's Sentence Must be Individualized.

In addition to the unworkability of the guidelines in this case, there are certain facts upon which the parties should agree, even after a hard-fought trial. The parties agree that neither GE Aviation (nor any other entity mentioned at trial) suffered actual losses. The parties should also agree that, even if Mr. Xu had obtained the material offered by the FBI, the Chinese aviation industry would still have remained years away from building jet engines with polymeric carbon composite fan modules. This is in no small part due to the fact that the information David Zheng could have provided related only to one discrete part of the entire, complex, highly-engineered jet engine.

---

[1] Mr. Xu maintains his objection to the finding of intended loss for the reasons set forth in his post-hearing memorandum of law. *See* Doc. 205, 207.

The parties should also agree that, in performing his job duties, Mr. Xu was working to further his country's interests. He was not a rogue operator, or criminal mastermind or, in fact, in any way operating outside the scope of his employment. He did not allegedly seek proprietary information in order to monetize it for his own greedy purposes, or to start his own company, or to sell it on the black market. He was working on behalf of China, trying to obtain information that would be helpful to the aerospace industry in the People's Republic of China. These shared facts make this case extremely unusual.

The government is asking the Court to impose a decades-long sentence. There is only one explanation for that request, given the lack of actual harm and the highly speculative nature of any potential future harm. That explanation is that the government intends to use the Court to "send a message" to China through the sentencing of Mr. Xu. A message, a warning, that if China continues to try to acquire American trade secrets, those tasked with finding such secrets will be punished with the utmost harshness and brutality. As its prior pleadings make clear, the government at sentencing will seek to make Mr. Xu a proxy for China and its policies, and will argue that all of the grievances the United States has against China should be channeled into the punishment of Mr. Xu.

The government's position is troubling on a number of fronts. For one, it flies in the face of the requirement under 18 U.S.C. § 3553(a) that sentencing be individualized. *See Gall v. United States*, 552 U.S. 38, 50 (2007) (the sentencing judge "must make an individualized assessment based on the facts presented"); *United States v. Lee*, 974 F.3d 670, 684 (6th Cir. 2020) ("A district court's case-by-case decisionmaking thus helps achieve a defendant-specific sentencing goal: the need to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" (dissent citing 18 U.S.C. § 3553(a)(1)); *United States v.*

*Cavera*, 550 F.3d 180,189 (2d Cir. 2008) ("the district court reaches an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing."). Almost by definition, sentencing someone to "send a message" to an entire country takes the individual defendant out of the equation – the defendant could literally be anyone. In fact, as this Court made clear at the sentencing of Paul David Musgrave, "[t]here is no justice in imposing a sentence merely to make an example out of a defendant." *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (quoting with approval from this Court's re-sentencing transcript).[2]

It is true that general deterrence is one of the sentencing factors the Court must consider. *See* 18 U.S.C. § 3553(a)(2)(B). However, it is only one among several factors, and an over-emphasis on general deterrence, especially in this case, is problematic. First, a sentence is substantively unreasonable if the "court place[s] too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018); *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) ("A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, *or gives an unreasonable amount of weight to any pertinent factor*.") (emphasis added). As the 9th Circuit stated in *United States v. Barker*:

> [D]eterrence as a sentencing rationale is subject to limitation. Tailoring
> punishment to the individual criminal may reduce the efficacy of deterrence, but
> that reduction is an inevitable cost of a system that eschews mechanistic

_____

[2] This Court initially sentenced Mr. Musgrave to one day imprisonment, which constituted a significant variance from his guideline range of 57-71 months. The government appealed, and the Sixth Circuit remanded for sentencing to allow the Court to more fully explain its sentence. Upon remand, the Court re-imposed a one-day custodial sentence, increased the terms of home confinement and supervision, and imposed a fine. *See Musgrave*, 647 F.App'x at 530-32.

punishment. General deterrence is a legitimate aim, but it has never been the *sole* aim in imposing sentence.

Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also—and always—as ends in themselves.

771 F.2d 1362,1366-1367 (9th Cir. 1985) (emphasis in original).

Second, the unusual circumstances of this case make general deterrence an even less important factor for sentencing than usual.[3] The government claims that it has been China's policy for years to try to steal American technology and know-how in order to replicate such technology domestically and become less dependent on other nations. *See e.g.* Govt. Post Evidentiary Hearing Mem. at 5-7. Doc. 206; PAGEID 5134. According to the government, China's entire economic plan – detailed in five and ten year plans released in 2015 – depends in part on the acquisition of foreign technology – including aviation technology. *Id.*

Here, those the government seeks to deter are not street gang members or even would-be white collar offenders who might be scared to put their hands in the cookie jar for fear of going to jail. The government suggests that the prosecution and harsh punishment of one alleged Chinese intelligence officer will "deter" an entire nation, an entire government structure, an entire political agenda. That is nothing more than wishful thinking. Just as Russia's annexation plot in Ukraine or plans for future aggression would not be deterred by the loss or capture of one Russian soldier, the prosecution and sentencing of one person who was serving his country will

---

[3] The National Institute of Justice, the research arm of the Department of Justice, has observed that decades of research into deterrence seem to suggest that imprisonment and, in particular, lengthy sentences, do little to deter future crime. *See* https://www.ojp.gov/pdffiles1/nij/247350.pdf.

do nothing to affect China's economic and political plans. The weight of the world's most populous nation will not be shifted by this Court's sentencing of Mr. Xu.[4]

Moreover, if the Court is urged to take into account the impact a lengthy sentence might have on China, it should also consider the inverse. What is the effect of a draconian "message" sentence on the well-being of the United States, and particularly its foreign intelligence officers? The government claims that Mr. Xu is a foreign intelligence officer, working for China's equivalent of the CIA. The CIA, and our country's other clandestine services, employ intelligence officers all over the world – many of whom are tasked with unearthing and obtaining information that might be considered secret or protected by a foreign country. Indeed, the White House has even issued a presidential directive authorizing the gathering of foreign trade secrets if doing so serves the national interest. *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/07/executive-order-on-enhancing-safeguards-for-united-states-signals-intelligence-activities/.[5] Although the directive distinguishes between trade secrets obtained to achieve an economic advantage for private businesses and those obtained to further

---

[4] Indeed, if it so chose, the United States could send far more meaningful "messages" to China. It could impose trade controls, implement political sanctions, create corporate taxes to force American companies to leave China. But such steps would not be politically viable. Most of the products we consume here are made in China. Virtually all American global companies, including GE Aviation, have a presence in China. Our two countries depend on each other, despite all the rhetoric to the contrary, and it therefore actually makes no political sense to punish China in any significant way. This reality renders hollow the government's efforts to "send a message" to China with Mr. Xu's sentencing.

[5] Sec. 2(b)(ii)(B): "It is not a legitimate objective to collect foreign private commercial information or trade secrets to afford a competitive advantage to United States companies and United States business sectors commercially. The collection of such information is authorized only to protect the national security of the United States or of its allies or partners."

national interests, China's nationalized economy allows for no such distinction. China's economic security and success are synonymous with its national security interests.

It hardly seems wise to start prosecuting, and worse, imprisoning for decades, alleged foreign intelligence officers for doing their jobs.[6] Had Mr. Xu been accused of trying to steal national security secrets rather than economic ones, in all likelihood a political solution would quickly have been found and he would never have been arrested, let alone sentenced. Countries, especially superpowers, do not prosecute each other's alleged intelligence officers – it's not good politics.[7] Mr. Xu was prosecuted and tried, but now to use his sentence as America's retribution for China's efforts to steal proprietary information is short sighted and serves neither this country's national nor even its entrepreneurs' greatest interests.

Rather than aggravate Mr. Xu's sentence, his work in support of China's aviation industry should, in fact, be a mitigating factor. It is true that, since World War II, courts have

---

[6] Although such considerations are, generally speaking, within the province of the executive branch, a sentencing court may consider any and all relevant factors, including policy disagreements, in fashioning an appropriate sentence. *See Kimbrough*, 552 U.S. at 101 ("courts may vary [from Guidelines ranges] based solely on policy considerations,"); *United States v. Herrera-Zuniga*, 571 F.3d 568, 585 (6th Cir. 2009) (same).

[7] For example, in 2019, the U.S. expelled two diplomats from the Chinese Embassy, saying that at least one of them worked for Chinese intelligence, after they tried to infiltrate a military base in Virginia. No charges were filed. *See* https://www.nytimes.com/2019/12/15/world/asia/us-china-spies.html. Even when criminal charges were filed against foreign intelligence officers, those cases were quickly resolved politically. *See e.g.* https://www.nytimes.com/2010/07/09/world/europe/09russia.html (In 2010, ten Russian sleeper agents were arrested and charged with espionage in New York. Pursuant to a deal with the government, they quickly pled guilty, were sentenced to time served, and removed from the country in exchange for four individuals held in Russian prisons); https://www.nytimes.com/1986/09/30/world/the-daniloff-affair-4-tense-weeks.html; (In 1986, the U.S. and the USSR each arrested an alleged spy from the other country in the same week. Two weeks later, each was formally charged with espionage, and a week after that both of them were released and swapped.).

been generally skeptical of the so-called "Nuremberg Defense, " and Mr. Xu did not invoke a

"following orders" defense at trial. However, it is worth considering that he had no choice in the

matter. His job, according to the government, was to acquire technological information from

sources in the West. Just like any alleged foreign intelligence officer – including American ones

– it was his alleged duty to seek information wherever he could get it. His choice, according to

the prosecution, was to either follow the directives of his employers, his party, and his country,

or resign his position and endure the personal, cultural, and financial ostracization and shame of

taking such a step.

The fact that Mr. Xu did not engage in the conduct of which he was convicted out of

greed, in order to line his pockets, or for his own personal benefit – is mitigating.[8] Government

employees can be faulted for committing potential criminal acts within the scope of their

employment, but that criticism can go only so far under most circumstances. Seeking

information, with the risk that it could include secret information, is the bread and butter of every

foreign agent's job. If we expected all foreign intelligence officers (including American ones) to

balk at seeking information from other nations, including secrets that those nations presumably

took pains to protect, the entire foreign intelligence apparatus would fall apart.

In sum, we urge the Court to resist the government's demands to treat Mr. Xu as an

example, as a message to an entire nation. Like every other criminal defendant, Mr. Xu is

entitled to be treated as an individual, not a statistic. "The punishment should fit the offender and

not merely the crime." *Williams v. New York,* 337 U.S. 241, 247 (1949). We further urge the

---

[8] *See e.g. United States v. Musgrave,* 11CR183 (TSB), 4/13/15 ECF. Doc. No. 228, PAGEID 4382 ("But the circumstances of the offense at issue in this case differ greatly from the typical case in which an individual, motivated by greed, looks to line his own pockets with someone else's hard-earned money. I do not believe Mr. Musgrave was motivated by greed to line his own pockets.").

Court to consider that Mr. Xu's alleged actions were undertaken to benefit China, not him personally, and therefore to conclude that the circumstances of the offense should be a mitigating factor in the ultimate sentence.

## V.       Avoiding Sentencing Disparity.

One of the fundamental goals of sentencing is to avoid disparities amongst similarly situated defendants. *See* 18 U.S.C 3553(a)(6). As the parties agree, however, Mr. Xu's case falls far outside the norm and presents truly unique sentencing issues. This makes finding analogous cases for §3553(a)(6) consideration difficult. Nonetheless, it may be useful for the Court to see the kinds of sentences other defendants have received who were convicted of economic espionage or similar crimes involving intellectual property to benefit China. The following chart presents only a sampling of recent cases in this area:

| Case | Offense | Sentence |
|---|---|---|
| Yu Xue<br>21-2227/2228 (3d Cir. 2022) | • Conspiracy to steal trade secrets from GlaxoSmithKline. 1832(a)(5). | 8 months imprisonment (co-defendant sentenced to time served). |
| Li Chen<br>2:19-cr-163 (S.D. Ohio 2021) | • Conspiracy to steal trade secrets while working at Nationwide Children's Hospital<br>• Conspiracy to commit mail fraud. | 30 months imprisonment. |
| Haitao Xiang<br>4:19-CR-00980-HEA-1 (E.D. MO. 2021) | • Conspiracy to commit economic espionage relating to Monsanto's development of online farming software platform. 1831(a)(5). | 29 months imprisonment. |
| Hongjin Tan<br>19-CR-9-GKF (N.D. Okla. 2020) | • Trade secret theft, unauthorized transmission of a trade secret, unauthorized possession of a trade secret. 1832(a)(1), (a)(3), (a)(3). | 24 months imprisonment. |

| | | |
|---|---|---|
| Shan Shi<br>17-cr-110 (D.D.C. 2019) | • Conspiracy to steal trade secrets relating to syntactic foam technology from a U.S. Company. 1832(a)(5). | 16 months imprisonment. |
| Yihao Pu<br>No. 11 CR 699 | • Unlawful transmission of a trade secret. 1832(a)(2).<br>• Unlawful possession of a trade secret. 1832(a)(3). | 36 months imprisonment. (Remanded). |
| Jun Xie<br>14-cr-205 (E.D. Wis. 2014) | • Theft of trade secrets involving engineering, testing, and source code data belonging to GE Healthcare which he sent to family in China and planned to join a Chinese competitor. 1832(a)(2). | 24 months probation. |
| Shanshan Du / Yu Qin<br>10CR20454 (E.D. Mich. 2013) | • (Du) Conspiracy to possess trade secrets without authorization, unauthorized possession of trade secrets, and aiding and abetting. 1832(a)(5), 1832(a)(3) and 2.<br>• (Qin) Conspiracy to possess trade secrets without authorization, unauthorized possession of trade secrets, wire fraud, and obstruction. 1832(a)(5), 1832(a)(3), 1343, 1512(c)(1). | (Du) 12 months and one day imprisonment / (Qin) 36 months imprisonment. |

As this chart demonstrates, the sentence sought by the government here falls far outside the mainstream of sentences imposed in economic espionage and trade secret theft cases involving China. In considering the other sentencing factors in 18 U.S.C. § 3553(a), the Court should also take into account the far more reasonable sentences that courts across the country have generally imposed in somewhat analogous cases.

VI.    This Court Should Take Into Account the Harsh Conditions of Detention Under Which
       Mr. Xu Has Been Housed.

       In determining a reasonable sentence under § 3553(a), this Court should also consider the

extreme and harsh conditions of Mr. Xu's confinement since his arrival in the United States in

2018. *See e.g.*, *United States v. Sutton*, 2007 WL 3170128 (D.N.J. Oct. 25, 2007) (granting

variance below sentencing guideline range due to harsh conditions of confinement). First, as the

Court knows, during the first two years of the pandemic, all federal inmates were forced to

endure physical conditions unlike any experienced by federal inmates in modern times. This led

to a slew of compassionate release and sentencing reduction motions all across the country,

many of which were granted. These same concerns were also considered by judges at sentencing,

who routinely granted lower sentences based on severe conditions of pretrial confinement. As

one federal judge in New York explained at a recent sentencing:

> Prison is supposed to be punishment, but it is not supposed to be trauma of that
> nature or close. My colleagues and I commonly informally credit prisoners who
> have served time awaiting extradition in dreadful prisons overseas with more time
> served than measured by the calendar. The same logic applies here and then some.
> Your time in the MCC was way harder than anyone intended when you were
> detained following your arrest.

*United States v. De Jesus*, 20 Cr. 19 (S.D.N.Y.) (May 12, 2022) Doc. 29 at 36.

       Second, and perhaps even more importantly, the conditions of confinement *specifically*

imposed on Mr. Xu have been far more onerous than those experienced by other nonviolent,

white collar defendants and directly impact the extent to which any additional term of

imprisonment is necessary to achieve the sentencing goals set forth in § 3553(a), including the

need to provide just punishment and deterrence. *See id.* Mr. Xu was a first-time, nonviolent

offender who was indicted for an economic crime. He poses no threat to himself or others and,

since his arrival in the United States, has been a model detainee. Yet despite these facts, Mr. Xu

for the past four years has been subject to conditions of detention far more brutal and extreme

17

than those experienced by other white collar defendants and, indeed, harsher than those imposed even on the vast majority of violent offenders housed in the federal system. The adverse effect these severe conditions have had on Mr. Xu's well-being and family relationships cannot be overstated.

Mr. Xu was extradited to the United States in October 2018 and transferred to FCI Milan. Mr. Xu remained at FCI Milan until August 2021 when he was transferred to the Butler County jail to await trial and sentencing. Throughout most of Mr. Xu's detention, both pretrial and post-conviction, Mr. Xu has been locked in special segregated housing units, usually reserved for those violating disciplinary rules, where his rights, including his freedom of mobility, have been severely restricted.

For nearly four years, and for no legitimate reason, Mr. Xu has been locked down in a small, 70 square foot cell for an average of 23 hours a day. He was detained in isolation and barred from any contact with other inmates. Even now, after some of his restrictions were loosened, his ability to interact with other inmates remains limited to a single bunkmate.

At FCI Milan, Mr. Xu was granted a mere five hours per week of recreation time, which he had to spend in a small fenced-in courtyard, prohibited from running or accessing any exercise equipment. Upon arrival at Butler County jail, Mr. Xu was not allowed to be outside at all. For nearly fourteen months, the only time Mr. Xu spent in the fresh air was during transports to and from the courthouse.

Mr. Xu arrived at FCI Milan thousands of miles from home and extremely isolated. He knew very little English, and yet throughout his detention in Milan, Mr. Xu had to fight to obtain even the most basic of reading materials in his native language, Mandarin. Only after many months of effort and with the assistance of the Court was Mr. Xu able to receive a small number

of books and other reading materials to occupy him during his 23 hours per day of lockdown. Restrictions on commissary privileges also deprived Mr. Xu from purchasing basic items available to most other detainees and inmates, including warmer clothing, athletic shoes, extra food and personal hygiene items.

The restrictions placed on Mr. Xu at FCI Milan also severely hindered his ability to communicate effectively with his family, including his wife and son. Mail between Mr. Xu and his family was subject to a translation protocol that often delayed the arrival of family letters by many months. These family letters, which included very personal and private communications between a husband and wife, were then included in criminal discovery for others to see. In at least one instance, even Mr. Xu's notes of a call with his attorneys were sent out for translation and made their way into the criminal discovery.

Throughout his detention, Mr. Xu had no access to email and limited access to phone privileges. Calls to China were charged at an exorbitant rate ($1.00 or more per minute), further restricting his ability to stay close to his family. Mr. Xu's inability to have consistent and timely communication with his loved ones has taken a significant toll on his mental and physical well-being.

These kinds of severe restrictions are traditionally limited to dangerous terrorists and extreme violent offenders, not alleged government employees charged with attempting to steal economic secrets. The conditions under which Mr. Xu has been detained for these past four years are far more restrictive and severe than those experienced by other white collar defendants. Mr. Xu therefore respectfully requests the Court to join the many other courts around the country and consider Mr. Xu's conditions of confinement in fashioning a reasonable sentence.

VII.     The Court Should Consider the Collateral Effects of Mr. Xu's Immigration Status in Fashioning a Sentence.

The Court should also consider other ways in which Mr. Xu's imprisonment sets him apart from other defendants. For the period of time before he is deported back to China, he will continue to be incarcerated far away from his beloved wife and son, and his aging parents. He will have few visitors, if any, and will no longer even have the legal visits that broke up the solitude of his detention. As a foreign national subject to deportation, he will not be eligible to serve his sentence in a camp, which would normally be available to non-violent, white collar offenders. *See* https://www.bop.gov/policy/progstat/5100_008.pdf at 50. He will not be able to avail himself of early release into a half-way house. *See* https://www.bop.gov/policy/progstat/7310_004.pdf at 10-11. He will not be able to obtain "earned time credits," a new feature of the First Step Act that allows individuals to earn credits by completing rehabilitative programming and engaging in "productive activities" like helping to deliver programming to other prisoners.[9] Nor will he be eligible to participate in BOP's Federal Prison Industries programs that provides work opportunities to inmates during their incarceration. 28 C.F.R. § 345.35(a); *see also* FBP UNICOR Program Details *avail. at*: https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp. All of these inequities may be considered by the Court in determining a just and reasonable sentence.

Mr. Xu's lack of access to these BOP programs will result in Mr. Xu serving a longer sentence with fewer privileges than similarly-situated inmates. Mr. Xu respectfully requests that the Court consider the adverse effects of Mr. Xu's immigration status on his access to BOP

[9] Depending on a person's risk level, 15 days of credit can be earned for every 30 days of programming or productive activities. These time credits can be redeemed for early transfer into a halfway house, home confinement, or supervised release. Non-citizens with immigration detainers cannot redeem earned time credits. *See* 18 U.S.C. § 3632(d)(4).

programs, including early release programs, in determining an appropriate sentence. *See, e.g.,*

*United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009) (acknowledging courts have discretion

to consider variances based on factors such as immigration status and fewer prison

opportunities).

## CONCLUSION

The United States and the People's Republic of China are at war, economically. The

U.S.-China Trade War Has Become a Cold War - Carnegie Endowment for International Peace;

Businesses Push Biden to Develop China Trade Policy - The New York Times (nytimes.com).

Through a fortuitous sting operation, the U.S captured an alleged Chinese "soldier," an alleged

intelligence officer tasked with acquiring American trade secrets. In the U.S. government's view,

Mr. Xu personifies this economic enemy, its political agenda, and its foreign policy goals. But

because it cannot punish the country of China itself, it now wants this Court to use Mr. Xu as a

proxy for the Chinese nation, to use Mr. Xu's sentence to send a message to China that its

economic policies will not be tolerated. But in reality, no one can reasonably believe that China

or its policies will in any way be affected by this Court's sentencing of Mr. Xu. It is meaningless

to suggest it. Instead, all that results if the government prevails is that one man–a man with a

family, a career, a life–will spend much of his life in prison for serving his country. To what

end?

In truth, if "messages" and geopolitics are taken out of the equation, if this case is treated

like any other criminal case, a lengthy sentence is simply not warranted under the facts. As the

Sixth Circuit in the *Musgrave* case observed in referring to this Court's sentencing, "[b]ased on

the district court's review of statistics and other cases, of all white-collar defendants in our

circuit, nearly 30% receive no prison time." *Musgrave*, 647 F. App'x at 538. Mr. Xu is a first

time offender, whose alleged criminal conduct caused no actual losses and may never have led to

substantial harm, even if he had been successful. Yet no one requests a non-custodial sentence for Mr. Xu. In fact, he has been imprisoned since April 2018, for more than 4 ½ years. For a defendant with no prior criminal record who, even in the government's view, allegedly committed his crime not out of some larcenous intent, but at the direction and for the greater good of his country, who has suffered under extraordinarily harsh conditions of confinement and who is alone, thousands of miles from his family, from his beloved wife and son, a sentence of significantly more than time served is not reasonable, not just, and does not advance the aims of sentencing.

Accordingly, Mr. Xu respectfully urges this Court to consider the unusual mitigating facts and circumstances of this case, and to impose a sentence of time served, which here is sufficient but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Jeanne M. Cors*
Jeanne M. Cors (0070660)
Sanna-Rae Taylor (0091302)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
cors@taftlaw.com
srtaylor@taftlaw.com

Florian Miedel (*pro hac vice)*
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, NY 10004
Telephone: (212) 616-3042
Fax: (800) 507-8507
fm@fmamlaw.com

COUNSEL FOR DEFENDANT

22

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties in this case by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's system.

/s/ Jeanne M. Cors