# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 30, 2024

Ms. Justine Harris
Ms. Katie Elizabeth Renzler
Sher Tremonte
90 Broad Street
23rd Floor
New York, NY 10004

Mr. Kevin Koller
Office of the U.S. Attorney
Southern District of Ohio
221 E. Fourth Street
Suite 400
Cincinnati, OH 45202

Re:  Case No. 22-4020*, USA v. Yanjun Xu*
     Originating Case No. : 1:18-cr-00043-1

Dear Counsel,

The court today issued an amended opinion and judgment.

Enclosed is a copy of the court's amended opinion together with the amended judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0208p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

> No. 22-4020

*v.*

YANJUN XU,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:18-cr-00043-1—Timothy S. Black, District Judge.

Argued: February 1, 2024

Decided and Filed: August 30, 2024

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Justine A. Harris, SHER TREMONTE LLP, New York, New York, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Justine A. Harris, Katie Renzler, SHER TREMONTE LLP, New York, New York, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

———————————

## AMENDED OPINION

———————————

DAVIS, Circuit Judge. Yanjun Xu, a Chinese citizen and member of China's Ministry of State Security (an intelligence organization), was convicted of conspiracy to commit economic espionage and conspiracy to steal trade secrets from multiple aviation companies over a five-year period. Xu was also convicted of attempted economic espionage by theft or fraud and attempted

theft of composite fan-blade technology from GE Aviation.  Xu was sentenced to a combined 240 months' imprisonment.  On appeal, Xu seeks to have the judgment vacated and the case remanded to the district court for a new trial.  He argues that the district court erred in failing to dismiss Counts 1 and 2 in the indictment as duplicitous, and that the district court abused its discretion in admitting expert testimony in violation of Federal Rule of Evidence 704(b).  In the alternative, Xu seeks to have his sentence vacated, arguing that it was both procedurally and substantively unreasonable.  We affirm the district court's judgment.

## I.

### A.

Xu joined the Chinese Ministry of State Security ("MSS") in 2003.  The MSS is responsible for China's foreign intelligence operations and is known for engaging in espionage and targeting trade secrets and other classified information in foreign countries.  Xu rose through the ranks to become MSS's Deputy Division Director of the Sixth Bureau of Jiangsu Province, which is responsible for science and technology intelligence, and is integral in China's industrial and cyber-espionage activities.  As Director, Xu was responsible for procuring foreign military and commercial aviation technology.

*Espionage Targeting Various Companies*.  Between 2013 and 2018, Xu and other MSS operatives invited numerous aviation experts from foreign companies, including those with ties to the United States, to give presentations in China, with the goal of stealing aviation-related proprietary information.  Xu paid the invitees' travel costs and provided additional payments after they completed their presentations to local engineers.  Xu coordinated the visits with domestic aviation experts associated with state-owned aviation companies or with the Nanjing University of Aeronautics and Astronautics ("NUAA").  The local experts would meet with Xu prior to the visit to learn about the desired technology, meet with the foreign experts during the trip, and analyze the acquired information afterwards to determine its value and any potential follow-up requests.  Xu was not alone in this endeavor.  He also collaborated with other MSS operatives, including Zha Rong and Chai Meng, who assisted him in recruiting visiting experts.

Xu operated under an alias during the exchanges with foreign experts, often going by "Qu Hui," a director of the Jiangsu Provincial Association for Science and Technology ("JAST"). As part of his operation, Xu generally targeted individuals with connections to China. Among those targeted were Arthur Gau, an engineer at Honeywell Aerospace (a United States-based company); Frederic Hascoet, a project manager at Safran Aircraft Engines (a French aviation company); Bin Liang, an engineer at Stork Fokker (a United Kingdom-based company); Dr. Linda Li, an aerospace engineer who worked for various aviation companies; and Sun Li, a Boeing (United States-based) project manager.

*Espionage Targeting GE Aviation*. In March 2017, David Zheng, a GE Aviation engineer who specialized in GE's composite fan-blade technology, was contacted via LinkedIn and invited to give a presentation at the NUAA. The invitation came from Chen Feng, who claimed to be head of the International Cooperation and Exchange Office at NUAA. Zheng agreed to present in May 2017 in conjunction with a trip to China to visit family. Chen Feng conveyed that NUAA would cover costs associated with travel and suggested that he would like Zheng to present on composite materials in aircraft engines. Zheng agreed to the presentation but noted that he was required to sign a technical agreement that would restrict him from discussing work he had performed and from sharing any GE proprietary information. Zheng did not, however, disclose the invitation to GE.

In advance of the trip, Zheng made an unauthorized download of five proprietary GE Aviation training materials that were export-controlled[1] and saved them to his personal computer. Once in China, Chen scheduled a meeting where he introduced Xu under the alias, "Qu Hui." After the presentation, Chen gave Zheng $3,500 for travel expenses and for the presentation itself, which Zheng understood was actually from Xu. A few days later, Zheng returned to the United States and Xu extended a standing invitation for him to return for additional presentations.

The FBI began investigating Zheng's May/June 2017 trip to China. In November 2017, the FBI interviewed Zheng, who agreed to cooperate with the investigation and subsequently

---

[1]"Export-controlled" refers to "material and proprietary information spec[s] [that] should not be allowed export to foreign countries without a license." (R. 190, PageID 4188).

entered into a non-prosecution agreement.  At the FBI's direction, Zheng contacted Chen Feng and Xu to express an interest in participating in an additional exchange.  Zheng told Xu that he would not be able to travel to China that spring because GE required him to travel to Europe instead.  As a result, Xu agreed to change the venue, and in anticipation of the meeting, he asked Zheng to bring his work computer to Europe—noting that the files he previously provided contained "pretty good stuff."  (R. 192, PageID 4523–24).  Xu also asked Zheng to download the files onto a separate portable storage drive prior to traveling.  According to the government, this was done as a backup in the event that Xu was unable to access the files from the computer in Europe.  Xu traveled to Europe, posing as an employee for the Nanjing Luote and Technology Information Center while using code names in the phone-message chats with MSS operatives.  When Zheng insisted on meeting in Belgium, Xu proposed meeting at a coffee shop to prevent Zheng's detection by other GE employees.

In April 2018, Belgium police arrested Xu and an MSS colleague, Xu Heng, at the request of the FBI.  Xu was later extradited to the United States based on the instant indictment.  At the time of Xu's arrest, law enforcement seized numerous blank memory cards for storing data, a memory-card reader, and envelopes containing $7,000 from his person.  Xu also possessed a laptop with an encrypted hard drive and a separate empty hard drive.  And agents retrieved four cell phones from Xu and Heng.  After extracting information from the phones, agents discovered documents and messages related to Xu's work as an intelligence officer and his attempts to acquire trade secrets from foreign companies.  However, agents were unable to obtain information from the fourth phone because it was remotely wiped shortly following Xu's arrest.  Agents also recovered hundreds of photos, including some of Zheng and his family, and one with a handwritten note that included detailed questions and a diagram related to GE's composite fan-blade technology.

**B.**

In April 2018, a federal grand jury in the United States District Court for the Southern District of Ohio returned a four-count indictment against Xu for the following:  conspiracy to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5) (Count 1); conspiracy to commit trade secret theft in violation of 18 U.S.C. § 1832(a)(5) (Count 2); attempted economic

No. 22-4020                              *United States v. Xu*                              Page 5

espionage by theft or fraud in violation of 18 U.S.C. § 1831(a)(1), (a)(4), and 2 (Count 3); and attempted theft of trade secrets by taking or deception in violation of 18 U.S.C. § 1832(a)(1), (a)(4), and 2 (Count 4). While Counts 1 and 2 charged Xu with overarching conspiracies that lasted from 2013 to 2018, Counts 3 and 4 specifically related to Xu's attempts to acquire GE's composite fan-blade technology in 2017 and 2018.

At trial, the jury heard from numerous government witnesses, including James Olson, a retired spy and former chief of counterintelligence with the Central Intelligence Agency ("CIA"). Olson testified about the relationship between the Chinese government, China's state-owned enterprises, and the MSS. Olson also testified about China's espionage strategy, including the MSS's use of expert-exchange programs to recruit foreign experts, and about general tradecraft[2] within the intelligence community. In particular, Olson discussed tradecraft techniques, including the "recruitment cycle"[3] used by both CIA and MSS operatives and how Xu's actions toward Zheng were consistent with covert intelligence-gathering tactics.

On direct examination, the government questioned Olson about a communication between Xu and Zheng in which Xu asked him to bring GE trade-secret information with him to Europe. In particular, the government queried how Xu's request might correlate with the intelligence recruitment cycle. Xu objected to this question. He asserted that Olson's testimony was excludable under Federal Rule of Evidence 704(b) because Olson was testifying about what Xu and his co-conspirators were "doing." (R. 192, PageID 4650–51). The court overruled the objection, finding that Olson was not testifying to ultimate facts but opining based on his experience. Xu did not object to the remainder of the testimony or make a continuing objection on Rule 704(b) grounds. Three days after Olson's testimony concluded, Xu filed a motion to strike parts of the testimony under Rule 704(b). The court denied the motion but indicated that it would instruct the jury to disregard any expert opinion that appeared to state Xu's intent. The jury ultimately convicted Xu on all four counts.

---

[2]"Tradecraft" is defined as "the techniques and procedures of espionage." *Tradecraft*, *Merriam-Webster's Unabridged Dictionary* (2022).

[3]Olson explained the recruitment cycle as follows: "The recruitment cycle is what we spies do. It's something that's universal. All intelligence services go through the same process to recruit spies, and it is the bread and butter of our human intelligence business. And it is a step-by-step process." (R. 192, PageID 4617).

At sentencing, the parties disputed the loss amount attributable to Xu under United States Sentencing Guidelines § 2B1.1(b)(1). The probation office calculated the intended loss to be between approximately $65 million and $150 million based on GE's estimate that developing one engine costs $107 million. This calculation resulted in a 24-level adjustment to the offense and a Guidelines range of 262 to 327 months' imprisonment. Xu objected. As such, the court held an evidentiary hearing. Following the hearing, the parties provided supplemental briefing on the issue. Xu argued that the district court should not consider any "intended loss" because the term appeared only in the commentary of the Guidelines, which, he asserted, was not binding on the court. Xu also argued that if the court did consider intended loss, the proper measure should be the potential reduction in GE's competitive advantage or market share, not the $98 million cost to research and develop a jet engine. Xu argued, however, that the intended loss should be zero because "any future potential loss in 'competitive advantage' is utterly speculative." (R. 205, PageID 5118, 5122).

The government agreed with probation that the cost of research and development is the appropriate estimate of intended loss under the Guidelines. It also provided an alternate loss calculation based on the estimated loss in market share that GE would have suffered if Xu had been successful, and China had developed its own composite fan-blade engine as intended. This calculation used publicly available sales and revenue data reported in GE's 2021 Annual Report, which estimated that GE had 55% market share of the $73 billion aircraft engine market in 2019.

The district court found that Xu intended to cause GE pecuniary harm. And instead of calculating the loss amount based on GE's research and development costs, the court calculated the loss amount based on the intended future loss to GE's market share. Using GE's report, the court relied on GE's annual profits from commercial aircraft engines (in lieu of the government's suggestion to use a different measure). Additionally, the court, "in an effort to extend all fairness to [Xu] . . . constrain[ed] its computation to reflect a more logical outcome." (R. 208, PageID 5235). Specifically, the court assumed that a competing product in the relevant market would capture no more than 1% of that business and limited the loss to just a single year. This method yielded an estimated intended-loss calculation of $50,094,000, which equated to a 22-level

increase (a 2-level reduction from the PSR's calculation) and a Guidelines' range of 210 to 262 months' imprisonment.

The district court sentenced Xu to 240 months' imprisonment:  the statutory maximum of 180 months each on Counts 1 and 3, concurrent with one another, and the statutory maximum of 120 months' imprisonment each on Counts 2 and 4, also concurrent with one another but consecutive, in part, to his 180-month sentences.  Specifically, 60 months of his 120-month sentence would run consecutively to the 180-month sentence on Counts 1 and 3.  Xu appealed.

## II.

On appeal, Xu raises three claims:  (1) the district court erred in denying his motion to dismiss and allowing the government to prosecute duplicitous charges; (2) the district court erred in admitting expert testimony from Olson in violation of Federal Rule of Evidence 704(b); and (3) the district court improperly calculated Xu's Guidelines range and imposed an unreasonable sentence.  As such, Xu requests that we vacate his conviction and remand to the district court for a new trial, or in the alternative, vacate his sentence finding it both procedurally and substantively unreasonable.

## A.

We review de novo a district court's ruling on a motion to dismiss an indictment.  *United States v. Iossifov*, 45 F.4th 899, 911 (6th Cir. 2022).  Here, we consider whether the district court should have dismissed Counts 1 and 2 as duplicitous.

*Duplicitous Counts*.  "Whether an indictment is duplicitous is a question of law that this Court reviews de novo."  *United States v. Williams*, 998 F.3d 716, 734 (6th Cir. 2021) (italics omitted) (quoting *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007)).  It is well-recognized that "[s]eparate offenses must be charged in separate counts of an indictment."  *Id.*; *see also* Fed. R. Crim. P. 8(a).  An indictment is deemed "duplicitous" if it "charges separate offenses within a single count.  The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both."  *United States v. Anderson*, 605 F.3d 404, 414 (6th

Cir. 2010) (quoting *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997)). Such indictments "do not allow 'the jury [to] convict on one offense and acquit on another,' which is why they implicate the Sixth Amendment guarantee of jury unanimity." *Williams*, 998 F.3d at 734 (quoting *Washington*, 127 F.3d at 513).

Xu argues that the indictment is duplicitous because the conspiracy counts each charged more than one crime rather than a single overarching conspiracy. As such, Xu contends that the jury may have convicted him without reaching a unanimous verdict in violation of his Sixth Amendment rights. He insists that the separate transactions involving "contemplated expert exchanges in 2013 and 2014, and the alleged effort to obtain trade secrets from GE Aviation through Zheng in 2017 and 2018," were too disconnected to comprise an overall agreement to carry out the conspiracy objectives. (ECF 29, Appellant's Br. 35). Xu claims that the separate incidences evince, at best, multiple schemes. In *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002), we addressed a similar argument. There, the government charged the defendant with three drug offenses: conspiracy to distribute marijuana, conspiracy to distribute cocaine, and conspiracy to distribute crack cocaine. *Id.* at 397–98. The defendant challenged the indictment as duplicitous arguing that the government sought to join "three separate offenses" in violation of the Sixth Amendment's guarantee of unanimity. *Id.* at 397. We found that although the indictment contained three drug charges, it did not violate the defendant's constitutional rights because "an agreement to commit several crimes is not duplicitous, as conspiracy is itself the crime. *A single conspiracy may have as its objective the distribution of two different drugs without rendering it duplicitous.*" *Id.* at 398 (internal citations omitted) (emphasis in original) (quoting *United States v. Dale*, 178 F.3d 429, 431–32 (6th Cir. 1999)).

Similar to *Campbell*, Counts 1 and 2 of Xu's indictment each allege a single conspiracy based on an overarching agreement between Xu and his co-conspirators. Count 1 alleges that from about 2013 continuing through at least April 2018, Xu and his co-conspirators agreed to steal aviation-related trade secrets to benefit the Chinese government and others. Count 2 alleges that, during the same time period, Xu and his co-conspirators knowingly agreed to steal aviation-related trade secrets; that they intended to convert the trade secrets for the economic benefit of someone other than the owners of the trade secrets; and that they intended to or knew

their offense would injure the owners of the trade secrets. The government alleged a common set of overt acts to support Counts 1 and 2. While it is true that the alleged overt acts spanned several years and were directed toward three different entities (Honeywell, Safran, and Boeing), the indictment ties the allegations together through its assertion that the acts were undertaken in furtherance of a common, overarching agreement among the conspirators—to steal aviation-related trade secrets. A conspiracy that alleges "one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy" is not duplicitous as "the agreement among all the parties constitutes a single conspiracy." *United States v. Kelley*, 461 F.3d 817, 830 (6th Cir. 2006) (citation omitted); *see also Braverman v. United States*, 317 U.S. 49, 53 (1942) ("The gist of the crime of conspiracy . . . is the *agreement or confederation* of the conspirators to commit one or more unlawful acts." (emphasis added)).

Xu resists this reasoning, arguing that some jurors may have credited the conduct relating to the Safran hacking while others may have credited the GE espionage conduct. But the district court accurately instructed the jury that to convict Xu, they had to unanimously find that: (1) he and his co-conspirators entered into an agreement between 2013 and 2018 to commit economic espionage for Count 1 and trade secret theft for Count 2; (2) he knowingly and voluntarily joined the conspiracy; and (3) at least one of the members of the conspiracy committed an overt act to advance or help each conspiracy. The jury was not required to reach unanimous agreement as to any specific overt acts Xu took in furtherance of the charged conspiracy. *See United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983) ("The government, in a criminal conspiracy case, is often presented with a host of co-conspirators and a multiplicity of overt acts . . . . [But] [i]n a conspiracy case it is the agreement which forms the nucleus of the offense."). Moreover, "[w]hether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury." *United Sates v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990). Because "[j]urors are presumed to follow instructions[,]" *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011), we must presume that the jury in this matter reached a unanimous decision on the conspiracy charges as instructed by the district court.

Xu makes the corollary argument that "[t]he proof at trial compounded the duplicity problem." (ECF 29, Appellant's Br. 35). But this argument is equally unavailing inasmuch as

we have held that "proof at trial is irrelevant to the question of whether an indictment is duplicitous." *United States v. Singer*, 782 F.3d 270, 276 (6th Cir. 2015), *abrogated on other grounds by Musacchio v. United States*, 577 U.S. 237 (2016); *United States v. Cholak*, No. 18-2209, 2019 WL 7567199, at *1 (6th Cir. July 30, 2019) (same). We center our inquiry instead on "whether the indictment can be read to charge only one violation in each count." *Singer*, 782 F.3d at 276 (citation omitted); *see also United States v. McQuarrie*, 817 F. App'x 63, 80 (6th Cir. 2020) ("[I]f the indictment may be read to charge but one crime in each count, the court will do so.") (citation omitted). And as discussed, Counts 1 and 2 meet this standard. Thus, Xu's argument that the multifarious overt acts supporting these counts somehow resulted in duplicitous charges fails as a matter of law.

Relatedly, Xu maintains that he suffered substantial prejudice, warranting a new trial, due to the district court's admission of a variety of evidence pertaining to disparate bad acts, including "Xu's use of an alias, computer hacking, and interest in information security systems," as well as the testimony of Arthur Gau (Honeywell employee), Frederic Hascoet (Safran employee), and Li Jiang (Boeing employee). (ECF 29, Appellant's Br. 37). Yet, Xu's principal complaint concerning the admission of these materials seems to be that they were permitted to be introduced only because the district court erroneously allowed the government to move forward on duplicitous charges. We have, however, rejected Xu's claim of duplicity. So, his characterization of the evidence as other bad acts, rather than acts taken in furtherance of the conspiracies rings hollow.

Finally, Xu argues, in the alternative, that we should remand so the district court can explain its rationale for denying Xu's motions to dismiss and in limine. Specifically, he complains that the district court did not state why it denied the motions in limine during the trial. Yet, the court explained that the evidence in question was intrinsic to the crimes charged and that the evidence would separately be admissible because it "speak[s] to the motivation, intent, modus operandi and the like." (R. 174, PageID 2997). In addition to admitting the testimony, the court also excluded some of the government's evidence that it found irrelevant to the charged conspiracy against Xu. We find no abuse of discretion in that regard. As for the motion to dismiss, the district court did not issue a separate order—other than the notation order—

explaining why it was denying the motion. But it need not have done more because, as explained above, a plain reading of the indictment shows that the counts were not duplicitous, and as such, there was no violation of Xu's Sixth Amendment rights.

## B.

*Rule 704(b) Expert Testimony.* "We review a district court's decision whether to admit expert testimony under an abuse of discretion standard." *United States v. Bauer*, 82 F.4th 522, 534 (6th Cir. 2023). However, in cases where a defendant fails to object at trial, as is partially the case here,[4] we review the admission of expert testimony under the plain-error standard. *See United States v. Hall*, 20 F.4th 1085, 1100 (6th Cir. 2022). To satisfy plain error, a defendant must show "(1) error, (2) that was plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Collins*, 799 F.3d 554, 575 (6th Cir. 2015) (citation omitted). Xu maintains that the government's espionage expert, Olson, violated Federal Rule of Evidence 704(b) by improperly opining as to Xu's intent to obtain trade secrets. Xu argues the district court erred in admitting the testimony and in denying Xu's belated motion to strike. We disagree.

Rule 704(b) provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). We therefore ask, "whether the expert actually referred to the intent of [Xu], or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that [Xu] . . . also possessed the requisite intent." *United States v. Jaffal*, 79 F.4th 582, 603 (6th Cir. 2023) (quoting *United States v. Dunnican*, 961 F.3d 859, 876 (6th Cir. 2020)). Importantly, we have held that "[l]aw enforcement officers may testify concerning

---

[4]During Olson's testimony, Xu objected on Rule 704(b) grounds only once. At no point after that did Xu object to any additional testimony or ask for a continuing objection. Regarding the single objection, we review for abuse of discretion while the remainder of the testimony is reviewed under the plain error standard, even though he filed a motion to strike three days after Olson left the stand. Whether we apply abuse of discretion or plain error, the district court's findings were proper.

the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.'" *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) (quoting *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990)).

Xu points to multiple passages from Olson's testimony where he contends that Olson opined on his mental state. For example, regarding an email from Xu to Zheng, which included a reference to "foreign countries' structural materials," (R. 192, PageID 4643), Olson testified that the reference "meant that the objective was to obtain this technology from foreign countries." (*Id.*) To place the response in context, however, the government immediately asked a follow-up question: "How consistent is this kind of list with the type of requirements that you were discussing earlier that a[n] [intelligence] officer might typically be pursuing?" (*Id.*) Olson responded that Xu's email was "*consistent with* what [he] believe[d] an intelligence service would have in the form of requirements" passed on to them from technical experts. (*Id.* at 4644–45 (emphasis added)). We have found this line of testimony to be permissible. *See Jaffal*, 79 F.4th at 603 (explaining that "[l]aw-enforcement officers are 'routinely allowed to testify that circumstances are *consistent with* [the] distribution of drugs rather than personal use.'" (alteration in original) (emphasis added) (quoting *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)).

Next, Xu alludes to Olson's testimony where he mentioned the words "think[ing]" and "wanted" in reference to Xu's pursuit of trade secrets. Xu then points to a portion of Olson's testimony where he was asked on direct examination what his understanding was after reading a sentence in an e-mail from Xu, and Olson responded, "[m]y understanding was this is intelligence officer's pressing, who is pushing for additional cooperation, wants to see how the target will respond to that request." (R. 192, PageID 4642–43). Xu also highlights a portion of the testimony where the government, in relation to Xu's asking Zheng to bring his GE-issued laptop to Europe, asked, "based on your experience and the recruitment cycle we discussed previously, what is your assessment of this?" (*Id.* at 4652). Olson responded:

> I assess this as moving into the producing stage . . . And I see here a[n] [intelligence] officer, in my opinion, from China who is increasingly aggressive, pushing for the additional stuff, to bring the computer. I think that he's very

> encouraged by how this is going.  He has a -- an agent, potential agent who he
> thinks is going to be very compliant.

(*Id*.)  Next, Xu focuses on another portion of testimony where, in response to the government asking Olson "[f]rom your standpoint, in terms of an intelligence operation, why would someone want to wipe a phone afterwards[;]" Olson responded, '[y]ou would want to wipe a phone because it has incriminating information on it." (*Id.* at 4663).  Finally, Xu concludes his argument by asserting "the most egregious violation," (ECF 29, Appellant's Br. 43), occurred when Olson stated, "the conversations and the actions of [Xu] are those of an intelligence officer conducting espionage.  I had no question about that at all." (R. 192, PageID 4667).

　　After examining the dialogue as a whole, the context of Olson's testimony makes it clear that he did not opine on whether Xu possessed the requisite intent to steal trade secrets.  Rather, Olson, as a former intelligence officer, explained how Xu's actions toward Zheng were "consistent with," "typical of," and "indicative of" a covert intelligence-gathering operation based on common tradecraft principles and techniques.  (R. 192, PageID 4638, 4639–40, 4654, 4663).  When experts testify, district courts do not require them to preface every answer to avoid a Rule 704(b) violation.  Instead, it is the role of the court to ascertain whether an expert's testimony crosses the line of reaching an ultimate issue.  *See* Fed. R. Evid. 704(a).  Under any applicable standard, the district court did not err in admitting Olson's testimony, and Xu has not produced any evidence to the contrary.

　　*Jury Instructions & Sufficiency of Evidence*.  Even if we were to conclude that the district court erred in admitting Olson's testimony, the court's jury instructions were sufficient to cure the error.  "Courts generally presume that properly-instructed juries are 'capable of considering evidence for one purpose but not another.'"  *Kendel v. Loc. 17-A United Food & Com. Workers*, 512 F. App'x 472, 481 (6th Cir. 2013) (quoting *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000)).  "This presumption applies unless there is an *overwhelming probability* that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be *devastating* to the defendant."  *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

Here, once the district court denied Xu's motion to strike portions of Olson's testimony based on purported Rule 704(b) violations, the court explained that it would issue jury instructions to disregard any opinion witness who appeared to testify regarding Xu's intent. The court modified the instructions, at Xu's request, to specifically mention Olson and instructed the jury as follows:

> [Y]ou are not to consider any opinion testimony regarding the defendant's state of mind or his intent. Therefore, as it relates to the testimony of James Olson, to the extent that Mr. Olson specifically testified that the defendant intended to steal trade secrets, you must disregard those limited portions of his testimony.
>
> This is because it is up to you and you alone to determine whether the defendant intended to steal trade secrets.

(R. 195, PageID 4878). Nevertheless, relying on this court's ruling in *Kendel*, Xu argues that this instruction was insufficient to cure the alleged violation because it did not address a specific statement from Olson and did not detail what portions of the testimony "could be permissibly considered." 512 F. App'x at 481.

In *Kendel*, the district court expressed concern that a lay witness's testimony was inappropriate because she reached a legal conclusion in violation of Rule 704(b), amounting to "'ultimate issue'" testimony. *Id.* at 480. To remedy the error, the court issued limiting instructions. *Id.* In affirming the district court, we distinguished a prior decision relied on by the plaintiff, *Field v. Trigg Cnty. Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004). We emphasized that the reason the *Field* court determined that the jury instructions were insufficient was because it found the instructions "'patently jumbled and confusing,' which made it impossible to determine what the court meant as to how the evidence should be treated." *Kendel*, 512 F. App'x at 481 (quoting *Field*, 386 F.3d 737). In concluding that the district court's instructions were sufficient to cure the error in *Kendel*, we noted that the trial court's jury instructions were in fact "*clear* and provided a reasonably straightforward rationale for why [the witness's] testimony had been admitted and for what reasons it could be permissibly considered." *Id.* Furthermore, we explained that "the [district] court prohibited the defendants from referencing [the witness's] testimony in closing argument and agreed to [plaintiff's] request that the instruction be set apart in its own section and near the beginning of the jury instructions." *Id.* (emphasis added).

Here, like *Kendel*, the district court provided jury instructions to limit Olson's testimony "to the extent that [he] specifically testified that the defendant intended to steal trade secrets." (R. 195, PageID 4878).  Although the *Kendel* court further discussed how the jury instructions also provided "reasons [the testimony] could be permissibly considered," that was not the dispositive factor in our determination that the instructions were sufficient.  512 F. App'x at 481. The emphasis was on whether the jury instructions were "clear" in directing the jury to properly consider the evidence at hand.  *Id.*; *see also United States v. Shaffer*, 781 F. App'x 404, 413 (6th Cir. 2019) (holding any Rule 704(b) error was harmless where the court "mitigated any potential harm by issuing clear and comprehensive jury instructions about expert testimony and permissible inferences").  The jury instructions in this case were clear and specified which portions of testimony should be limited, while assuring the jurors that it was up to them to determine whether Xu had the requisite intent to be found guilty; the jury instructions were sufficient.

Xu also briefly argues that given the lack of direct evidence regarding his intent, there was an "overwhelming probability" that a reasonable juror would not have been capable of following the limiting instructions.  But the direct and circumstantial evidence showing Xu's intent to steal trade secrets in this case was voluminous.  Xu used an alias (Qu Hui) when communicating with Zheng, warned Zheng to avoid using his GE email when sending him sensitive materials, directed Zheng to select a meeting location where he would not be seen by his coworkers, and created an alias and cover story when traveling in Europe—which would be unnecessary if Xu were after only open-source information and not proprietary trade secrets as he claimed at trial to defeat the intent element.  Xu also requested that Zheng:  (1) create a file directory, which would ultimately generate a list of every file on Zheng's computer; (2) provide step-by-step instructions on how to do so; and (3) send Zheng a list of "domestic requirements," the discussion of which would have led to GE trade secrets.  After receiving the file directory, Xu escalated his pursuit when he called Zheng, asked him to download the GE files and bring them to a meeting, and arrived at the meeting in Belgium with a blank hard drive and memory cards to transfer the stolen files.  Moreover, Xu brought envelopes of cash with him to the meeting, along with a list of handwritten questions, the discussion of which would have led to GE proprietary information.  Under the circumstances, there is ample evidence in the record

demonstrating that Xu attempted to knowingly steal GE's trade secrets. Xu fails to present evidence that there is an "overwhelming possibility" that the jury would not be able to follow such clear instructions, or any likelihood of a "devasta[ing]" impact. *See Kendel*, 512 F. App'x at 481. As such, we must presume that the jury was able to follow the instructions and that any potentially prejudicial testimony was cured. *Id.*

Because Olson did not testify to Xu's intent but rather that his actions were consistent with those of a spy, we find no violation of Rule 704(b). But even if any error occurred, it was cured by the limiting instructions provided by the district court.

## C.

*Reasonableness of Xu's Sentence*. We review a district court's sentencing determination for reasonableness. *United States v. Thomas-Mathews*, 81 F.4th 530, 540–41 (6th Cir. 2023) (citation omitted). "The reasonableness inquiry has two components: procedural and substantive." *Id.* at 541 (citation omitted); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). Xu challenges both the procedural and substantive reasonableness of his sentence. We address each argument in turn.

### 1. *Procedural Reasonableness*

"Procedural error occurs when the district court 'fail[s] to calculate (or improperly calculat[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence.'" *United States v. Gates*, 48 F.4th 463, 469 (6th Cir. 2022) (alterations in original) (italics omitted) (quoting *United States v. Fowler*, 819 F.3d 298, 304 (6th Cir. 2016)); *see also Gall*, 552 U.S. at 51. Stated differently, "a sentence is procedurally reasonable where the trial court follows proper procedures and gives adequate consideration to [the § 3553(a)] factors." *United States v. Perez-Rodriguez*, 960 F.3d 748, 753 (6th Cir. 2020) (alteration in original) (internal quotation marks and citation omitted). We generally review de novo legal questions involving a district court's calculation of the Sentencing Guidelines range. *See United States v. You*, 74 F.4th 378, 396 (6th Cir. 2023). However, a district court's determination of the amount of a loss attributable to a defendant is reviewed only for clear error.

*Id.* at 398. This is because "district courts are well positioned to assess the evidence and estimate loss." *Id.*

Xu maintains that by relying on Application Note 3(A) under Section 2B1.1 of the Sentencing Guidelines, which includes "intended loss" in the definition of "determination of loss," the district court erred in applying a 22-level increase to his base offense level that resulted in a Guidelines range of 210 to 262 months' imprisonment. *See* U.S.S.G. § 2B1.1 cmt. n.3(A). Specifically, Xu argues that the Supreme Court's ruling in *Kisor v. Wilkie*, 588 U.S. 558 (2019), and this court's subsequent ruling in *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021) (relying on *Kisor*), limit the court's deference to the United States Sentencing Commission's commentary. In that vein, because the "intended loss" commentary improperly expands the plain meaning of Section 2B1.1, according to Xu, we should afford it no deference here. In his reply brief, however, Xu acknowledges that our published holding in *You*—which was issued after Xu filed his opening appellate brief—forecloses this argument. We agree. In *You*, which also involved conspiracy to commit trade secrets theft, we concluded (1) that the term "loss" as used in §2B1.1 is genuinely ambiguous and (2) that the Commission's reading of §2B1.1 to include intended loss, as set forth in Application Note 3(A), falls "within the zone of ambiguity" and "reflects the Commission's 'fair and considered judgment.'" *You*, 74 F.4th at 397 (quoting *Kisor*, 588 U.S. at 579). As such, we held that the "character and context" of the Commission's reading entitled it to deference. *Id.* Xu flatly argues that *You* was wrongly decided. But given *You's* binding effect—and Xu's acknowledgment in that regard—we do not reach the merits. *See* 6th Cir. R. 32.1.

Regarding the district court's calculation of his sentence, Xu argues that the intended loss calculation is unreasonable because it lacked any evidentiary basis for Xu's intent to deprive GE of a portion of its market share or that this deprivation supported an intended-loss calculation of $50 million. First, in addition to the overwhelming evidence demonstrating that Xu specifically targeted GE's trade-secret technology, *see* discussion *supra* Section II(B), the government also proffered evidence that GE's composite fan-blade technology provided a significant competitive advantage and sizable market share worldwide; that the Chinese government has prioritized developing its domestic aviation industry, including building a commercial airliner and advanced

aircraft engines, with the intent to make the state-owned enterprises more competitive with foreign companies; and that the Chinese government uses the MSS to attain this goal by means of industrial espionage. The government has therefore provided sufficient evidence for the district court to find that Xu, in attempting to steal GE's trade secrets and provide them to Chinese companies, intended to cause GE pecuniary harm.

Second, the district court's $50 million intended-loss calculation was reasonable. "Determining the value of a trade secret . . . is no easy task." *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013). But it is not necessary for district courts to determine "an exact figure for the loss that a victim suffered or the amount of harm that a defendant caused or intended to cause; a 'reasonable estimate' will do." *You*, 74 F.4th at 398 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). In *You*, not only did we endorse the use of hypothetical lost profits to estimate the intended loss from a company targeted for attempted trade-secret theft, but we specifically cited the calculation method used by the district court in the matter presently before us, and explained that the district court in *You* should have used a similar methodology in its calculation. *See id* at 398–99 (citing *United States v. Xu*, No. 1:18-cr-043, 2022 WL 16715663, at *7 (S.D. Ohio Nov. 5, 2022)). Again, the district court limited its loss calculation to a hypothetical where China would only capture 1% of GE's commercial engine market share, limited the timeframe to just a single year, and excluded lost profits from GE's "Systems & Other" business line, even though a portion of that market share would have been captured had the Chinese government been successful. We endorse such a conservative calculation method.

Xu also disputes the district court's reliance on the 2021 GE Annual Report for its intended-loss calculation—specifically GE's revenue and profit data from 2019—because it was not introduced as evidence during trial or the evidentiary hearing. However, it *was* introduced in post-hearing briefing in response to Xu's challenge of the calculation, which afforded Xu an opportunity to respond. Xu does not direct us to any caselaw that disallows the use of evidence submitted during supplemental briefing regarding sentencing calculations. And to the extent that he alleges some form of prejudice, this argument is unavailing based on his access to the documents and ability to refute them through briefing, which he did in his Reply. Because the

district court properly calculated the sentence consistent with our guidance in *You*, Xu's sentence is procedurally reasonable.

**2.** *Substantive Reasonableness*

We review for abuse of discretion whether a sentence is substantively reasonable. *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). "A claim that a sentence is substantively unreasonable is a claim that a sentence is too long," for example, if the trial court "placed too much weight on some of the § 3553(a) factors and too little on others." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). "Because [t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a), this Court applies a great deal of deference to a district court's determination that a particular sentence is appropriate." *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting *Gall*, 552 U.S. at 51). A within-Guidelines sentence is presumed to be substantively reasonable. *United States v. Miller*, 73 F.4th 427, 431 (6th Cir. 2023). "But a defendant can rebut this presumption if a district court chose a sentence arbitrarily, ignored pertinent § 3553(a) factors, or gave unreasonable weight to any single factor." *Id.* (quoting *United States v. Gardner*, 32 F.4th 504, 530 (6th Cir. 2022)) (cleaned up).

Xu maintains that his sentence is substantively unreasonable because the district court failed to consider that his sentence is higher than those imposed on similarly situated individuals. Xu does not challenge the evidence against him or the court's application and weighing of any other § 3553(a) factors in relation to the substantive reasonableness of his sentence. Rather, Xu focuses solely on the purported "unwarranted disparit[y]" of his sentence in relation to defendants in other cases who were charged with economic espionage and trade secret offenses. (ECF 29, Appellant's Br. 57); *see also* 18 U.S.C. § 3553(a)(6). In particular, Xu argues that his 120-month trade secret sentence for Counts 2 and 4 was much longer than other defendants' sentences. Yet, the defendants in the out-of-circuit cases Xu cites were not similarly situated to him. For example, the defendants were all company insiders convicted of stealing or conspiring to steal trade secrets from their employers; they were not international spies who repeatedly targeted foreign companies' trade secrets using sophisticated tradecraft processes over a five-year period. *See United States v. Shi*, No. 17-CR-110 (CRC), 2019 WL 6879409, at *4 (D.D.C.

Dec. 17, 2019); *United States v. Pu*, 814 F.3d 818, 821–22 (7th Cir. 2016); *United States v. Jin*, 733 F.3d 718, 719–20 (7th Cir. 2013).  To reflect the severity of their crimes, in both *United States v. Jin* and *United States v. Shi*, the Guidelines range was just 78 to 97 months' imprisonment.  *Jin*, 733 F.3d at 722; *Shi*, No. 17-cr-110, Sent'g Hr'g Tr., ECF No. 338, PageID 4.  In *United States v. Pu*, the parties agreed on a sentence range of just 12 to 18 months following the defendant's guilty plea, resulting in an 18-month sentence, not 48 months as stated in Xu's opening brief.  *See Pu*, 1:11-cr-00699-1, Sent'g Hr'g Tr., ECF No. 297, PageID 2501.

Conversely, Xu's 210 to 260 months' Guidelines range reflected his lack of acceptance of responsibility through a guilty plea, higher intended-loss calculation, as well as enhancements for his managerial role and the overall sophistication of his tradecraft methods.  Because the severity and nature of the crimes between Xu and the other noncomparable defendants varied, the differences in sentencing were warranted.

Xu has not provided any evidence to rebut the presumption of reasonableness of the district court's within-Guidelines sentence.  As such, his sentence is substantively reasonable.

**III.**

For the foregoing reasons, we **AFFIRM**.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-4020

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

     v.

YANJUN XU,

     Defendant - Appellant.

> **FILED**
> Aug 30, 2024
> KELLY L. STEPHENS, Clerk

Before:  BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

# AMENDED JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk